# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                   Case No. 21-CR-253

SAMUEL L. SPENCER,

    Defendant.

## ORDER DENYING REQUEST FOR *FRANKS* HEARING AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On March 22, 2022, a grand jury sitting in the Eastern District of Wisconsin returned a five-count second superseding indictment against Samuel L. Spencer and Ericka G. Buie, charging Spencer with sex trafficking by force, fraud, and coercion and charging both Spencer and Buie with conspiracy to commit sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(1), and 1594(c). (Docket # 17.) Spencer was arraigned on the charges and entered a plea of not guilty. (Docket # 20.) This case has been designated complex (Docket # 15), and a jury trial before the Honorable Pamela Pepper will be scheduled after resolution of pretrial motions.

Presently before me is Spencer's motion to suppress evidence obtained from his residence located at 2718 N. 58th Street in Milwaukee, Wisconsin pursuant to a search warrant issued by Magistrate Judge William Duffin on November 9, 2020. (Docket # 60-1.) During this search, law enforcement found a cell phone belonging to Buie and from this information, law enforcement requested a search warrant for five separate TextNow accounts associated with Spencer and Buie. The warrant was issued by Magistrate Judge Stephen C.

Dries on December 29, 2020. (Docket # 60-2.) Spencer moves to suppress evidence obtained pursuant to these two search warrants. (Docket # 58.) Spencer further moves for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to address the affiant's alleged intentional and/or reckless omissions in the warrant affidavit. (*Id.*) For the reasons explained below, I will deny the request for a *Franks* hearing and recommend that the motion to suppress be denied.

## BACKGROUND

On November 9, 2020, Racine County Sheriff Investigator Heather Spranger sought a warrant to search Spencer's home at 2718 N. 58th Street in Milwaukee for evidence of sex trafficking and gun possession. (Docket # 60-1.) Spranger was working with the FBI's Milwaukee Human Trafficking Task Force. (*Id.*) Task Force Officer ("TFO") Spranger avers that on August 1, 2016, Spencer was stopped for a traffic infraction by the Glendale Police Department. (Nov. 9, 2020 Search Warrant Aff. ¶ 8.) Spencer had an active warrant for battery from the Franklin Police Department. (*Id.*) Spencer was arrested. (*Id.*) At the time of the stop, an adult female, referred to as "Victim 1," was a passenger in Spencer's vehicle. (*Id.*) Victim 1 said that she knew Spencer as "Bin Laden" and disclosed to the Glendale PD that Spencer was forcing her to engage in commercial sex acts and taking all of the profits from the activity. (*Id.*) Victim 1 stated that Spencer would take photos of her and use them to post commercial sex advertisements for her online. (*Id.*)

TFO Spranger avers that between August 2016 and December 2016, Victim 1 left and returned to Spencer multiple times, usually coinciding with periods when she was incarcerated. (*Id.* ¶ 9.) During the periods when she was away from Spencer, Victim 1 gave multiple interviews to members of the Task Force. (*Id.*) Victim 1 stated that Spencer controlled

2

when she ate, slept, and performed commercial sex acts. (*Id.* ¶ 10.) She disclosed that Spencer had other girls working for him as well and that Spencer would transport her to Iowa and Chicago for commercial sex acts. (*Id.*) TFO Spranger avers that Victim 1 stated Spencer instructed her to charge $250-300 for an hour and $150-200 for a half hour. (*Id.* ¶ 11.) Spencer also imposed rules for her commercial sex dates and would count the condoms he gave her to ensure he was being paid for every date she did. (*Id.*) Victim 1 stated that Spencer admitted to trafficking the sixteen-year-old daughter of another woman who worked for him. (*Id.* ¶ 12.)

Victim 1 stated that Spencer also sold illegal drugs, including heroin, cocaine/crack, and crystal meth and that Spencer used cocaine and would become extremely aggressive when he consumed the drug. (*Id.* ¶ 13.) Victim 1 stated that Spencer caused her physical harm multiple times, including once breaking her nose and other bones, requiring hospital treatment. (*Id.* ¶ 14.)

TFO Spranger avers that Victim 1 stated she had become addicted to heroin because Spencer provided her the drug. (*Id.* ¶ 15.) After a few days of not doing heroin, she would experience withdrawal symptoms and would contact Spencer to provide more heroin. (*Id.*) She stated that Spencer would not give her any drugs unless she performed a commercial sex act. (*Id.*) Victim 1 stated that Spencer would post advertisements for commercial sex acts featuring her photographs, and she provided law enforcement with an email address and telephone number Spencer used in the advertisements. (*Id.* ¶ 16.)

TFO Spranger states that on February 25, 2012, the Milwaukee Police Department interviewed Victim 1 at Mount Sinai Hospital, where Victim 1 had requested to speak with law enforcement about a pimp. (*Id.* ¶ 17.) During this interview, Victim 1 reported that Spencer had taken over trafficking her from another pimp around the time of her birthday the

3

previous year, which was September 2011. (*Id.*) At the time, officers noted that Victim 1 had a large scar on her face, which Victim 1 explained came from Spencer striking her with a belt. (*Id.*)

TFO Spranger avers that on July 31, 2020, an adult female, referred to as Victim 3, called police to report an armed robbery taking place at 2718 N. 58th Street in Milwaukee, Wisconsin. (*Id.* ¶ 18.) Victim 3 told MPD officers that she was doing laundry at this address, which she stated belonged to Buie, when she was robbed at gunpoint of $328, an LG phone, 20 lottery tickets, a bag of laundry, and a large black purse. (*Id.*) Victim 3 stated that she knew one of the suspects as Buie's boyfriend, "Samuel." (*Id.* ¶ 19.) Later that day, Victim 3 identified Spencer from a photo array as "Samuel" and told law enforcement that Spencer also resided in the lower unit of Buie's residence. (*Id.*) Victim 3 stated that during the robbery, Spencer, and another male known to her as "Nephew," used force against her, including Spencer strangling Victim 3 and striking the back of her head. (*Id.* ¶ 20.) Officers observed visible red marks on her neck. (*Id.*)

On August 14, 2020, Victim 3 told task force officers that she knew Spencer by various nicknames, including "Bin Laden" and that while Spencer mostly sells drugs, he is dangerous to women because he is physically abusive. (*Id.* ¶¶ 24–25.) Victim 3 stated that she saw Spencer use physical violence against "another white female who worked performing commercial sex acts dates for him." (*Id.* ¶ 25.) Victim 3 stated that Buie posts commercial sex advertisements on a website and that many of the commercial sex dates take place at the 58th Street residence. (*Id.* ¶ 27.) Victim 3 described that Buie runs a webcam service from the residence, distributing erotic videos featuring women. (*Id.* ¶ 28.)

TFO Spranger avers that Victim 3 stated that the women who worked for Buie and Spencer performed commercial sex dates in the basement of the residence. (*Id.* ¶ 30.) Victim 3 stated that Spencer is "known to keep women hostage at the apartment" by threatening them with physical injury, taking their IDs and credit cards, and taking and monitoring their phones. (*Id.* ¶ 32.) Victim 3 stated that Spencer transported the women to known prostitution tracks, that Spencer kept all of the money that the women made from commercial sex acts, and that Spencer controlled her by manipulating her crack cocaine addiction, providing her drugs if she gave him the money she earned by performing commercial sex dates. (*Id.* ¶ 35.)

In an interview of Victim 3 by the task force on August 28, 2020, Victim 3 admitted to performing commercial sex acts at Spencer's direction and that she and multiple other women performed commercial sex work out of the 58th Street residence. (*Id.* ¶ 36.) Victim 3 stated that Spencer keeps a "machine gun" in the kitchen and uses the text application "TextNow" for "everything," including selling drugs and advertising women for commercial sex acts. (*Id.* ¶¶ 38–39.)

TFO Spranger avers that case agents located commercial sex act advertisements for another victim, Victim 2, identified by both Victim 1 and Victim 3, and that the IP addresses used to post the advertisements was associated with Buie and the billing address for the account listed the 58th Street residence. (*Id.* ¶¶ 43–44.) Additionally, law enforcement located a commercial sex advertisement for Victim 3, which was also connected with Buie and the 58th Street location. (*Id.* ¶¶ 45–47.)

On December 29, 2020, FBI Special Agent Blake Shubert applied for and was granted a search warrant for information associated with TextNow accounts associated with Spencer and Buie. (Docket # 60-2.) Agent Shubert's affidavit relies on much of the same information

5

provided by Victims 1 and 3. (Dec. 29, 2020 Search Warrant Aff. ¶¶ 15–48.) Agent Shubert avers that the November 9, 2020 search warrant of the 58th Street residence was executed on November 10, 2020, and law enforcement seized several digital devices. (*Id.* ¶ 54.) One such device was a cell phone associated with Buie in which law enforcement located text messages between Buie and Spencer discussing Spencer's TextNow accounts. (*Id.* ¶ 64.)

## ANALYSIS

Spencer moves to suppress all evidence and derivative evidence obtained from both the November 9, 2020 search warrant for the 2718 N. 58th Street residence and the December 29, 2020 search warrant for Spencer's and Buie's TextNow accounts. The crux of Spencer's argument is that for both affidavits, probable cause hinges on the statements of Victims 1 and 3. Spencer argues, however, that both Victims 1 and 3 have serious credibility concerns— including multiple past criminal convictions and previous instances of lying to police—none of which were articulated in the affidavits despite being known by law enforcement at the time of drafting. (Docket # 58 at 8–10.) Spencer also requests a *Franks* hearing.

    1.    *Request for a* Franks *Hearing*

While Spencer requests a *Franks* hearing, he argues that this is not a "typical" *Franks* motion. A defendant is entitled to a *Franks* hearing only if he makes a "'substantial preliminary showing' that: (1) the affidavit contained a materially false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (quoting *Franks*, 438 U.S. at 155–56). This standard also applies when an affidavit is challenged on the ground that facts were omitted. *See, e.g.*, *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984). In other words, to be entitled to a

*Franks* hearing based on omissions in a search warrant affidavit, the defendant must show that the omitted facts were material—"that is, if the fact[s] were included, the affidavit would not support a finding of probable cause." *Id*.

Spencer agrees that assuming Victims 1 and 3's allegations, as stated in the affidavit, are credible, then the warrant indeed establishes probable cause that Spencer committed a crime. (Docket # 58 at 3.) Spencer also agrees that the affidavit sufficiently links the criminal allegations to the residence to be searched. (*Id.*) Spencer argues, however, that under the Seventh Circuit's decision in *United States v. Glover*, 755 F.3d 811 (7th Cir. 2014), when an affidavit omits all information about a source's credibility, the usual *Franks* analysis is improper. (*Id.*) Spencer notes that in the "typical *Franks* misrepresentation" case, the court's approach in deciding whether omitted information affects probable cause is to incorporate the omitted material facts into the affidavit and see if probable cause remains. (Docket # 69 at 10.) He argues, however, that in cases where credibility information is omitted, the *Glover* court instructs that the omission is presumed material and the affidavit is deficient "as a matter of law," leaving only the question of whether the officer acted either intentionally or with reckless disregard for the truth. (*Id.* at 9, citing *Glover*, 755 F.3d at 820.)

I disagree with Spencer's interpretation of *Glover*. In *Glover*, the affiant submitted to a state court a probable cause affidavit stating that a confidential informant ("CI") spoke with the affiant regarding a felon in possession of several firearms. 755 F.3d at 814. The CI stated that he had seen the guns at the person's house the day before and many times over the last six weeks. *Id.* at 814–15. The CI stated that the person needed the guns for his drug trade and because he was part of a "stick up crew" for a gang who robbed people carrying large amounts of money or drugs. *Id.* at 815. In the affidavit, the affiant corroborated the fact that the

7

individual was defendant Glover, that Glover had two prior felony convictions, and confirmed the residence where the CI stated Glover lived and where he had seen the firearms. *Id.*

The affiant's affidavit did not, however, include any available information on the CI's credibility. *Id.* The *Glover* court noted that the CI had been an informant for the Chicago police for six years, had been affiliated with a gang, had fourteen criminal convictions, had used aliases when questioned by police officers on two occasions, and had received payment for providing information to the police in the past. *Id.* The *Glover* court stated that in cases where a search warrant affidavit is based on an informant's report, probable cause determinations are informed by a "totality of the circumstances" analysis where reliability, veracity, and basis of knowledge are all highly relevant considerations. *Id.* at 816 (citing *Illinois v. Gates*, 462 U.S. 213 (1983)). The *Glover* court found that the "complete omission of information regarding [the CI's] credibility is insurmountable, and it undermines the deference we would otherwise give the decision of the magistrate to issue the search warrant." *Id.* Although the court noted that in general, no one factor necessarily dooms a search warrant, in cases that "test the sufficiency of affidavits for warrants obtained based on informants," information about the informant's credibility or potential bias "is crucial." *Id.*

The *Glover* court noted that while it has said that the omission of an informant's criminal background and financial motive is not necessarily essential to the probable cause determination, that was in the context of a detailed affidavit that had been extensively corroborated. *Id.* at 818 (citing *United States v. Taylor*, 471 F.3d 832 (7th Cir. 2006)). However, in cases such as Glover's where the affidavit "presents a close question as to probable cause under the primary factor analysis," then "any available credibility information is likely to be

material to the magistrate's decision." *Id.* The court found that while the issuing judge may have found the CI credible despite his criminal history, financial motives, and past deception to police, without putting this information before the judge, the judge lacked "even a minimum of information on credibility that might have triggered further inquiry." *Id.*

I do not read *Glover* as creating a bright-line rule that in cases where a search warrant affidavit omits all information about a source's credibility, that the omissions are presumed material and the affidavit is deficient as a matter of law, as Spencer contends. (Docket # 69 at 9.) As an initial matter, *Glover* addressed the credibility of "informants," not the credibility of sources as a whole. *See* 755 F.3d at 816. This distinction is important because the Seventh Circuit places significance on the status of the individual providing the information to law enforcement in determining reliability. For example, "a citizen informant is inherently more reliable than the usual police informants who are often mired in some criminal activity themselves." *United States v. Towns*, 913 F.2d 434, 441 (7th Cir. 1990). However, a confidential informant "stand[s] on a very different footing than an unidentified tipster like 'the John Doe,' with whom the policed have had no prior involvement." *Draine v. Bauman*, 708 F. Supp. 2d 693, 700 (N.D. Ill. 2010) (internal citations omitted).

The *Glover* court noted that when assessing an affidavit that relies almost entirely on an *informant*'s statements, information regarding the informant's credibility or potential bias becomes crucial. 755 F.3d at 816. The court found that in Glover's case, the CI's tip provided little detail and was only minimally corroborated. *Id.* at 817. The *Glover* court found that these facts, when combined with the CI's "checkered past" and gang affiliation, raised concerns that perhaps the CI was reporting Glover merely because of gang rivalries. *Id.* The court concluded that in this case, the "omission of that adverse information impaired the neutral

9

role of the magistrate deciding whether to issue the warrant." *Id.* Thus, because the "omitted credibility information was clearly material for the reasons laid out above[,] . . . [o]nly the inquiry into the officer's state of mind remains." *Id.* at 820. But nothing in the *Glover* court's language indicates that in all cases where credibility information is completely omitted will the search warrant affidavit automatically fail. In fact, the court specifically noted that "[w]here information about credibility is not available, other factors such as extensive corroboration may overcome the doubt inherent in relying on an informant without a track record." *Id.* at 818. In other words, the omission of credibility information is not automatically fatal.

The Seventh Circuit's cases subsequent to *Glover* reiterate this finding that although information about an informant's credibility is crucial, its omission "is not necessarily fatal." *United States v. Bradford*, 905 F.3d 497, 504 (7th Cir. 2018); *see also United States v. Woodfork*, 999 F.3d 511 (7th Cir. 2021); *United States v. Sanford*, 35 F.4th 595 (7th Cir. 2022). For example, in *Bradford*, law enforcement began investigating Bradford after he participated in a suspicious firearm purchase with his girlfriend and their friend, Smith. 905 F.3d at 500. All three were eventually arrested on firearms charges. *Id.* Around this same time, law enforcement obtained additional information from confidential informants that Bradford was selling crack cocaine. *Id.* at 501. Smith, who began cooperating with ATF after his arrest, was one of those informants. *Id.* Agents used Smith to conduct two controlled buys, and Smith told agents about drugs and firearms he observed in Bradford's house. *Id.*

ATF applied for a search warrant for Bradford's house. *Id.* The affidavit contained the facts Smith had told law enforcement. *Id.* While the affidavit mentioned Smith's role in the illegal firearms purchase, it failed to mention that at the time of the warrant application, Smith

10

had three prior felonies, was on probation, and was paid by ATF for his services. *Id.* at 502. In upholding the warrant, the *Bradford* court found:

> Agent Ulery's warrant application left out adverse information bearing on Smith's credibility: his three felony convictions, one of which he failed to disclose to law enforcement; his probation status; and the payments he received for his services as an informant. And Smith did not appear before the magistrate for questioning. Still, we're satisfied that the June 9 warrant was facially valid. Smith's information was fresh, firsthand, quite detailed, and corroborated, all of which supports the magistrate's finding of probable cause.

*Id.* at 504. The *Bradford* court distinguished its case from *Glover* on the basis that the omission of credibility information in *Glover* was fatal only because of the weak showing on the primary factors relevant to probable cause. *Id.* at 504–05.

As such, I see no basis for straying from the "typical" *Franks* analysis when omissions are alleged. Thus, to warrant a *Franks* hearing, the defendant must show that the omitted facts were material—"that is, if the fact[s] were included, the affidavit would not support a finding of probable cause." *Williams*, 737 F.2d at 604. In making this determination, I consider the affidavit, "incorporating omitted material facts," and analyze whether probable cause still exists. *See United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006).

   2.   *The Search Warrant Affidavit – Probable Cause*

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. An affidavit for a search warrant establishes probable cause when it alleges facts sufficient to induce a reasonably prudent person to believe that a search of a particular place will uncover evidence of a crime. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The Supreme Court has explained: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given

11

all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Though the affiant need not state each and every detail of the suspected crime, mere conclusory statements are insufficient. *See United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996).

The affidavit must contain sufficient evidence to enable the magistrate judge to exercise independent judgment rather than simply ratifying the conclusions of others. *Gates*, 462 U.S. at 239. A court's duty in reviewing a judicial officer's previous probable cause finding, however, is simply to ensure that the judicial officer had a substantial basis for concluding that probable cause existed. *Id.* at 238–39. A court should give a magistrate judge's determination of probable cause considerable weight and resolve doubtful cases in favor of upholding the warrant. *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000).

Again, Spencer does not contest that the search warrant affidavit for the 58th Street residence, as it currently stands, supports a finding of probable cause. (Docket # 58 at 3.) Thus, the issue before me is whether the addition of certain facts about Victim 1's and Victim 3's history would destroy the affidavit's probable cause. Spencer argues that the following credibility information was omitted: As to Victim 1, she has 11 criminal convictions, including: theft, drug possession, identity theft, obstructing, using an oleoresin device to cause bodily harm, bail jumping, and failing to report to jail; she has had dozens of police contacts; in nearly every police contact she lied about something, typically her identity; and she made accusations against Spencer after she herself was arrested for engaging in criminal activity. (*Id.* at 3–4.) As to Victim 3, she has 19 criminal convictions, which includes 7 felonies for such

12

Case 2:21-cr-00253-PP   Filed 02/16/23   Page 12 of 16   Document 72

offenses as drug trafficking, obstruction, bail jumping, battery, prostitution, and driving after revocation; and she also lied to police about her identity. (*Id.* at 4.)

While Spencer acknowledges that courts have generally, in the context of a probable cause analysis, distinguished crime victims from confidential informants, he argues that Victims 1 and 3 are not "the sort of victims to whom courts have given automatic deference, because they too are implicated in illegal activity." (*Id.* at 11.) In the case of crime victims, the Seventh Circuit has found that a "statement from 'the putative victim . . . who it seems reasonable to believe' is ordinarily sufficient to establish probable cause." *Johnson v. Saville*, 575 F.3d 656, 660 (7th Cir. 2009) (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994)). Spencer contends, however, that the omitted information shows that Victims 1 and 3 are "liars" and thus it is not reasonable to believe their statements. (Docket # 69 at 12.)

I disagree. As the *Glover* court noted, the strength of the probable cause finding depends on the totality of the circumstances presented to the magistrate judge for review. Here, although the affidavits did not contain the information that Spencer points to, they do not suffer the weaknesses of the affidavit in the *Glover* case. First, the affidavits contained detailed and consistent statements from two separate victims, Victims 1 and 3. Both stated that Spencer sells drugs; is physically abusive towards women; abused Victim 2, who is the mother of his child; has women perform commercial sex dates at the 58th Street residence; advertises the commercial sex services online; and keeps all of the money the women make from the commercial sex acts, among other details. While Spencer contends that Victims 1 and 3 know each other and are likely coordinating their accusations (Docket # 69 at 13), there is no evidence of this beyond his speculation.

13

Additionally, beyond the consistency between Victim 1's and Victim 3' statements, unlike in *Glover*, the affidavits contained corroboration by law enforcement. As to the warrant to search the residence, case agents located commercial sex act advertisements from the website "Skipthegames.com" for Victim 2, who was identified by both Victims 1 and 3. (Nov. 9, 2020 Search Warrant Aff. ¶ 43.) The IP address used to post the advertisements was maintained by AT&T and according to its records, the IP address' subscriber at the relevant date and time was Buie and the billing and service address listed was the 58th Street residence. (*Id.* ¶ 44.) Law enforcement also located a commercial sex advertisement on "Skipthegames.com" for Victim 3, as well as photographs of ten other females, with the same telephone number associated with Buie's IP address and AT&T account. (*Id.* ¶ 45.) Law enforcement also confirmed an email address associated with the advertisement similar to the name of Buie's web cam business and Facebook username. (*Id.* ¶ 46.) Law enforcement observed Spencer on several occasions at the 58th Street residence and entering the lower unit, consistent with Victim 3's statement that Spencer resides in the lower unit of the residence. (*Id.* ¶¶ 19, 49–51.)

As to the TextNow warrant, law enforcement learned from Victim 3 that Spencer used the application "TextNow" for "everything," including selling drugs and advertising women for commercial sex acts. (Dec. 29, 2020 Search Warrant Aff. ¶ 46.) After executing the November 9 search warrant of the 58th Street residence, law enforcement seized several digital devices, including a Samsung Galaxy cell phone that included multiple usernames previously identified by Victim 3 as used by Buie. (*Id.* ¶ 55.) Buie's cell phone contacts included a Facebook messenger contact with a picture of Spencer associated with it, as well as an alias previously identified by Victim 3 as used by Spencer. (*Id.* ¶ 56.) Law enforcement

further corroborated Spencer's Facebook account previously identified by Victim 3 (*id.* ¶ 57) and message exchanges between Buie and Spencer regarding commercial sex dates (*id.* ¶¶ 58–59, 61–63).

Law enforcement subpoenaed TextNow and confirmed that two accounts existed registered by the name "benready Sir" under the username "sssir4544" and another account registered by the name "Bengettingit Ready" under the username "sssir4545" with the email address sssir454@gmail.com. (*Id.* ¶ 65.) These names of "sssir4544" and "sssir4545" were found in message exchanges between Buie and Spencer discussing password changes. (*Id.*) Further, after Spencer was arrested by the FBI in November 2020 on an outstanding federal arrest warrant, recorded jail calls between Spencer and Buie showed Spencer instructing Buie to go to TextNow and get a number with an area code other than 262 and 414. (*Id.* ¶ 74.)

For these reasons, even if the omitted information was included in the search warrant affidavit, it would still sufficiently allege probable cause to search the 58th Street residence and the TextNow accounts. Thus, Spencer's request for a *Franks* hearing is denied, and I recommend that Spencer's motion to suppress evidence obtained pursuant to both warrants be denied.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress (Docket # 58) be **DENIED**.

**FURTHER, IT IS ORDERED** that the defendant's motion for a *Franks* hearing (Docket # 58) is **DENIED**.

**FINALLY, IT IS ORDERED** that the parties' motions to seal (Docket # 59, Docket # 66) are **GRANTED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 16th day of February, 2023.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge