UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                    Case No. 21-cr-253-pp

    v.

SAMUEL L. SPENCER,

        Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR ACQUITTAL ON COUNT FIVE AND MOTION FOR A NEW TRIAL (DKT. NO. 229)**

On January 19, 2024, following a two-week trial, the jury found the defendant guilty on each of the five counts charged in the second superseding indictment (four counts of substantive sex trafficking in violation of 18 U.S.C. §§1591(a)(1) and (b)(1) and one count of conspiracy to commit sex trafficking in violation of 18 U.S.C. §1594(c)). Dkt. Nos. 158 (amended second superseding indictment); 189 (jury verdict). After receiving several extensions of time by which to do so, dkt. nos. 204, 225, 227, the defendant filed a motion for acquittal on Count Five (the conspiracy count) under Federal Rule of Criminal Procedure 29 and for a new trial under Federal Rule of Criminal Procedure 33, dkt. no. 229. As part of his Rule 33 motion for a new trial, the defendant asks the court to issue a Fed. R. Crim. P. 17(c) subpoena and to hold an evidentiary hearing. The court will deny both motions and will deny the defendant's request for post-trial discovery and a related evidentiary hearing.

1

## I.  Background

On December 14, 2021, the grand jury returned an indictment charging the defendant with three counts of sex trafficking by force, fraud and coercion in violation of 18 U.S.C. §§1591(a)(1) and (b)(1). Dkt. No. 1. On January 11, 2022, the grand jury returned a superseding indictment adding a fourth count of sex trafficking by force, fraud and coercion. Dkt. No. 3. Each of the four substantive sex-trafficking counts corresponded to a different alleged adult female victim. Id. On March 22, 2022, the grand jury returned a second superseding indictment that added one count of conspiracy to commit sex trafficking in violation of 18 U.S.C. §1594(c). Dkt. No. 17. The second superseding indictment eventually was amended to reflect a modified date range relating to the substantive sex-trafficking offense alleged in Count Two. Dkt. Nos. 156 (order granting the government's motion to narrow Count Two of the second superseding indictment); 158 (amended second superseding indictment).

Trial began on January 8, 2024. On the second day of trial, the government began its case-in-chief, which lasted four full trial days and included testimony from thirteen witnesses. Dkt. Nos. 212-215. Of the thirteen government witnesses who testified at trial, four were the alleged sex-trafficking victims, two were expert witnesses, one was a sister of one of the alleged victims, two were non-law enforcement bystanders who testified to witnessing on isolated occasions the defendant's violence toward an alleged victim, one was the defendant's alleged coconspirator and three were either former or

2

current law enforcement officers. Id. The government concluded its case-in-chief at the end of the day on the fifth day of trial, and the defense began its case-in-chief on the morning of the sixth day. Dkt. Nos. 216, 217.

The defense presented its entire case-in-chief on the trial's sixth day. Dkt. No. 217. Witnesses included an expert, the defense team's investigator, an individual who knew the defendant and one of the defendant's alleged victims. Id. Between testimony, the court held the jury instruction conference. Id. at 123-159. After the defendant's final witness, the court instructed the jury. The government and the defense presented their respective closing arguments on the following morning, after which the jury began its deliberations. Dkt. No. 218. The jury did not reach a verdict on that seventh day, and deliberations continued into the next morning. At approximately 11:00 a.m. on the eighth day of trial, the jury returned its verdict. Dkt. No. 219.

## II.     Analysis

### A.     Defendant's Motion for Acquittal on Count Five

The defendant moves under Federal Rule of Criminal Procedure 29 for acquittal on Count Five of the second superseding indictment (conspiracy to commit sex trafficking). The defendant argues that he should be acquitted on Count Five because (1) his purported coconspirator cannot be considered a coconspirator in the sex-trafficking conspiracy because she agreed to plead guilty to misprision of the same conspiracy, and (2) the government failed to prove that the coconspirator possessed the state of mind necessary to engage in a conspiracy. Neither argument has merit.

3

1. *Standard of Review*

A court considering a Fed. R. Crim. P. 29 motion asks "whether, after viewing the evidence in light most favorable to the government, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." United States v. Torres-Chavez, 744 F.3d 988, 993 (7th Cir. 2014) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The movant "bears a heavy, indeed, nearly insurmountable, burden." United States v. Warren, 593 F.3d 540, 546 (7th Cir. 2010). The court must defer to the credibility determinations of the jury and may overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Torres-Chavez, 744 F.3d at 993 (citing United States v. Blassingame, 197 F.3d 271, 284 (7th Cir. 1999)).

2. *The Coconspirator's Plea Agreement*

a. The Parties' Arguments

Count Five of the second superseding indictment alleged that the defendant conspired with Ericka Buie and others to engage in sex trafficking by force, fraud or coercion. Dkt. No. 17-1. The defendant asserts that Buie—"the only potential coconspirator the government identified at trial[]"—"accepted a plea deal that resulted in her pleading to a different charge—misprision of a felony." Dkt. No. 229 at 1-2 (citing Dkt. Nos. 159, 202). He asserts that the plea deal Buie accepted provides that her misprision-of-a-felony charge "was based on the fact that the conspiracy charged in Count Five existed, Buie had knowledge of it and that she, (1) failed to notify an authority as soon as

4

possible, and (2) that she took some step to conceal the crime." Id. at 2 (citing the paragraph of the plea agreement that listed the elements of misprision of a felony, Dkt. No. 159 at ¶9).

The defendant argues that in pleading guilty, Buie essentially admitted that "she failed to report the sex trafficking conspiracy the government claims that she and [the defendant] participated in together." Dkt. No. 229 at 2. He argues that Supreme Court precedent holds that "Buie cannot be liable for not reporting a crime that she committed"—in other words, that she "cannot be guilty of both conspiring with [the defendant] to engage in sex trafficking and misprision of that same offense." Id. (citing Hoffman v. United States, 341 U.S. 479 (1951); United States v. Kuh, 541 F.2d 672 (7th Cir. 1976)). The defendant contends that because Buie pled guilty to the misprision charge, she cannot have been a coconspirator to the conspiracy to commit sex trafficking charge and "without any other identified coconspirators, there was no basis to find a conspiracy existed." Id.

The defendant recounts that during the jury instruction conference, "the defense requested that the Court instruct the jury that Buie could not be considered a possible co-conspirator" given that she had accepted a plea deal to misprision of the conspiracy and that the court rejected that argument because "Buie had only signed a plea agreement and hadn't yet pled guilty to anything, and . . . was charged as a co-conspirator." Id. at 2-3 (citing Dkt. No. 217 at 1652). The defendant contends that because Buie since has "pled guilty to misprision of the conspiracy charged in count five," and the court has

5

accepted her plea, "she cannot be considered a co-conspirator in that conspiracy." Id. at 3.[1]

The government argues that Buie's plea agreement does not provide a basis on which to acquit the defendant of Count Five's sex-trafficking conspiracy charge. It asserts that although "[t]he evidence at trial proved that Ms. Buie knowingly and willingly conspired to assist the defendant in trafficking multiple women by force, fraud, or coercion for commercial sex," "Ms. Buie's lesser responsibility for the criminal conduct, however, combined with her acceptance of responsibility, cooperation, and the nature of her relationship with the defendant, led the government to engage in plea negotiations with Ms. Buie." Dkt. No. 239 at 3-4. The government says that these negotiations resulted in the government offering Buie a plea to the lesser charge of misprision of felony, with the underlying felony being sex trafficking. Id. at 4.

The government argues that "the defendant is wrong about the nature of Ms. Buie's misprision plea: [she] did not plead guilty to misprision of *conspiracy* to engage in sex trafficking. Rather, she pled to misprision of the *substantive* offense of sex trafficking." Dkt. No. 239 at 4 (emphasis in original). The government contends that "[t]his fact makes the defendant's argument inapposite" given that she did not "plead guilty to failing to report the crime she

_____

[1] Buie signed the plea agreement on January 6, 2024. Dkt. No. 159 at 13. The defendant's trial began January 8, 2024. Buie testified on January 16, 2024. Dkt. No. 186. The court conducted Buie's change-of-plea hearing on February 26, 2024, dkt. no. 207, and sentenced her to serve three years of probation on May 30, 2024, dkt. nos. 278 (minutes), 279 (judgment).

6

was accused of having committed," but, rather, "to failing to report a crime that the defendant committed: the substantive offense of sex trafficking by force, fraud, or coercion." Id.

The government asserts that not only does the defendant's misunderstanding of Buie's plea deal "undermine[] the entirety of the defendant's first argument seeking an acquittal on Count Five[,]" but the defendant also gets the law wrong. Dkt. No. 239 at 4 & n.1. First, the government contends that "any claim of a constitutional inconsistency between a plea to misprision and the commission of an offense under Section 1594(c) belongs to Ms. Buie alone." Id. at 4. It argues that "the question of whether *Ms. Buie* can be convicted for failure to report an offense she may be said to have participated in does not affect the *defendant's* legal rights." Id. at 4-5 (emphasis in original). Second, the government argues that "the fact that Ms. Buie pled to a lesser charge does not mean she could not have been found guilty of conspiracy." Id. The government contends that its decision to make the offer, and Buie's to accept it, "speak to her culpability relative to the defendant's, her circumstances, and her acceptance of responsibility"—not to the government's ability to "prove her guilty of the conspiracy." Id. It argues that "[b]ecause there was evidence that the defendant and Ms. Buie conspired to engage in sex trafficking, the defendant's motion for acquittal on this ground must be denied." Id.

b.      Discussion

The second superseding indictment charged Buie with conspiring with the defendant and others to commit sex trafficking. Dkt. No. 17 at 5. But Buie did *not* plead guilty to misprision of conspiracy to commit sex trafficking; she pled guilty to an information charging her with misprision of *sex trafficking* (an offense with which she had not been charged in the second superseding indictment). United States v. Buie, Case No. 21-cr-253 (E.D. Wis.), Dkt. No. 159 at 2, ¶5. The information to which she pled charged the following:

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1.  On or about November 10, 2020, in the State and Eastern District of Wisconsin, **ERICKA G. BUIE**, had knowledge of the actual commission of a felony cognizable by a court of the United States, namely sex trafficking by force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591(a)(1), (b)(1).

2.  The defendant did conceal the same by lying to law enforcement about the nature of the sex trafficking conduct, in violation of Title 18, United States Code, Section 4, and she did not as soon as possible make known the same to some judge or other person in civil or military authority under the United States.

All in violation of Title 18, United States Code, Section 4.

Id. at Dkt. No. 202. The factual basis of the plea agreement stated, among other things, that Buie "did not notify an authority that [the defendant] was committing the crime of sex trafficking." Id. at Dkt. No. 159, p. 3, ¶6. It stated that Buie "took affirmative steps to conceal [the defendant's] crimes by, among other things, denying to law enforcement that prostitution and/or drug sales or use were occurring at her residence," and that when law enforcement

8

confronted her with the fact that her phone number had appeared in commercial sex ads, she denied the number was hers. Id.

Because Buie did not plead guilty to misprision of conspiracy to commit sex trafficking, the defendant's argument is without merit.[2]

Even if Buie had pled guilty to misprision of *conspiracy* to commit sex trafficking, the law the defendant cites in support of his argument does not stand for the propositions he asserts: that "Buie cannot be guilty of both conspiring with [the defendant] to engage in sex trafficking and of misprision of that same offense." Dkt. No. 229 at 2. The defendant cited Hoffman, 341 U.S. 479 (1951) (no pinpoint cite) for the proposition that, "under long standing [sic] Supreme Court precedent, Buie cannot be liable for not reporting a crime that she committed." Id. The Hoffman Court held that the Fifth Amendment protects a defendant not only from having to give "answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." Hoffman, 341 U.S. at 486 (citing Blau v. United States, 340 U.S. 159 (1950)). It clarified that that Fifth Amendment protection "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Id. (citing Mason v. United States, 244 U.S. 362, 365 (1917)).

---

[2] The defendant argues that "collateral estoppel should bar the government from taking a different position than they took in Buie's plea agreement, which was signed before trial." Dkt. No. 229 at 2. As the court explains in the body of this order, the government has not taken a different position than the one it took in the plea agreement.

When presented with the government's offer to allow her to plead guilty to misprision of sex trafficking, Buie could have argued that, under Hoffman, being charged with misprision of sex trafficking compromised *her* Fifth Amendment rights by exposing her to punishment for failing to provide law enforcement with information that could have subjected her to prosecution for engaging in sex trafficking. But Buie's Fifth Amendment right against self-incrimination has nothing to do with whether the government presented evidence beyond a reasonable doubt that the defendant conspired with Buie to commit sex trafficking.[3]

The defendant also cited United States v. Kuh, 541 F.2d 672 (7th Cir. 1976) (no pinpoint cite) for the proposition that "Buie cannot be guilty of both conspiring with [the defendant] to engage in sex trafficking and of misprision of that same offense." Dkt. No. 229 at 2. Again, Buie did not plead guilty to misprision of conspiring with the defendant to engage in sex trafficking. And, like Hoffman, Kuh is a Fifth Amendment self-incrimination case, in which two defendants learned of the robbery of an armored truck containing funds belonging to a bank, then possessed and concealed part of the stolen money. Kuh, 541 F.2d at 673-74. The Seventh Circuit found that by knowingly receiving, possessing and concealing money taken from a bank, the two defendants "could reasonably apprehend that they had violated" the bank

---

[3] The government frames this issue in terms of standing, arguing that only Buie had standing to raise the issue of "whether a person guilty of conspiracy can be convicted of misprision." Dkt. No. 239 at 3. The court agrees that only Buie has standing to raise her own Fifth Amendment right.

robbery statute, 18 U.S.C. §2113. Id. at 675. It concluded that the government could not "use the misprision statute" against the two defendants—"persons who knowingly possessed, received, and concealed the proceeds of a bank robbery"—without raising "a serious Fifth Amendment question." Id. at 676. The Seventh Circuit rejected the argument that "although a person who fails to disclose a felony in which he might be implicated is protected from punishment by the Fifth Amendment, his failure to make known the felony, when coupled with an act of concealment, makes him susceptible to prosecution, conviction and punishment under" the misprision statute. Id. 677.

Again, Buie might have been able to make an argument under Kuh that being charged with misprision of sex trafficking compromised her Fifth Amendment right by exposing her to punishment for failing to inform law enforcement of facts that could have subjected her to prosecution for sex trafficking. But that possibility is not relevant to whether the government proved beyond a reasonable doubt that the defendant and Buie conspired to engage in sex trafficking.

The defendant asserts that he isn't trying to vicariously assert Buie's Fifth Amendment rights; he says he is arguing that "the government cannot pursue two separate and fundamentally inconsistent theories of guilt against him and Buie." Dkt. No. 258 at 2. He maintains that the "government's decision to pursue a conviction of misprision against Buie is fundamentally at odds with pursuing a conspiracy conviction naming her as [the defendant's] only co-conspirator: for Buie to be guilty of misprision, she cannot have

11

participated in the underlying offense," and "[b]ecause Buie is the only co-conspirator the government identified, [the defendant's] conviction for conspiracy cannot stand." Id. at 3. This "clarification" undercuts the defendant's argument. The government's theory—which it charged in Count Five—was that the defendant and Buie agreed with each other and with others known and unknown to the grand jury to commit sex trafficking. It did not change that theory when, in exchange for Buie's cooperation, it allowed her to plead guilty to the charge of failing to disclose to law enforcement, and lying to law enforcement about, that sex trafficking. And technically, it is not true that Buie cannot be "guilty" of misprision of sex trafficking if she participated in sex trafficking. It is more correct to say that if she was guilty of participating in sex trafficking, she would have a valid argument that the charge of misprision of that sex trafficking offense equated to a charge that she refused to give up her Fifth Amendment rights.

Because the defendant's argument is based on a misreading of Buie's plea agreement and misapplication of the law,[4] the court will deny his motion

---

[4] In his reply brief the defendant emphasizes that in laying out the elements of the misprision offense, paragraph nine of the plea agreement states that the offense concerned "Count Five of the superseding indictment in [the defendant's case]." Dkt. No. 257 at 3 (citing Dkt. No. 159 at ¶9). Count Five is the conspiracy count. Dkt. No. 17 at 5. While the defendant is correct that paragraph nine of the plea agreement references the conspiracy-to-commit-sex-trafficking charge, the plea agreement states that Buie was pleading guilty to misprision of "*sex trafficking by force, fraud, or coercion, in violation of Title 18, United States Code, Section 1591(b)(1)*." Dkt. No. 159 at ¶5. Paragraph nine's reference to Count Five of the superseding indictment does not change the fact that Buie pled guilty to misprision of sex trafficking, *not* misprision of conspiracy to commit sex trafficking.

12

for acquittal on Count Five relating on the ground that Buie cannot be guilty of both conspiring with him to engage in sex trafficking and of misprision of that same offense.

        3.      *The Coconspirator's State of Mind*

        a.      The Parties' Arguments

The defendant argues that the court must acquit him of Count Five because Buie lacked the necessary *mens rea* to engage in a conspiracy to commit sex trafficking. He recounts that at trial, the government argued that Buie had conspired with the defendant "to cause others to engage in commercial sex acts *in reckless disregard of the fact* that force, threats of force, fraud or coercion would be used to cause them to engage in a commercial sex act." Dkt. No. 229 at 3. The defendant asserts that the government's theory "was that [the defendant] was violent towards Buie, so she recklessly disregarded the fact the [he] was also likely violent towards the women engaging in prostitution." Id.

At the jury instruction conference, the defendant argued "that the instructions on Count Five, the conspiracy charge, should not include the reckless disregard language[] . . . because conspiracy is a specific intent crime, and you can't agree to do something that includes a recklessness component." Dkt. No. 229 at 3. Defense counsel "cited the LaFave treatise on substantive criminal law" to support this position at the jury instructions conference, but the court "dismissed the defense argument, stating: 'unless you can come up with a case, LaFave is not a binding authority, and I'm not aware of any case

13

that indicates or supports the argument that you all are making.'" Id. at 3-4 (citing Dkt. No. 217 at 1654). The defendant now offers legal support for the argument.

The defendant first cites United States v. Ganji, 880 F.3d 760, 776 (5th Cir. 2018) for the proposition that "[o]ne cannot negligently enter into a conspiracy." Id. at 4. He next observes that the United States Supreme Court cited to LaFave when stating that "[i]n a conspiracy, two different types of intent are generally required—the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy." Dkt. No. 229 at 4 (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 444 n.20 (1978) (citation omitted)). And the defendant discusses at length Judge Marsha Berzon's concurring opinion in United States v. Jauregui, 918 F.3d 1050, 1060 (9th Cir. 2019). Dkt. No. 4-5.

The defendant observes that in Jauregui, the defendant—who had pled guilty to conspiring to import methamphetamine—"believed that he was agreeing to import marijuana but agreed that it was reasonably foreseeable that the substance was methamphetamine." Id. at 5 (citing Jauregui, 918 F.3d at 1053-54). The defendant says that at sentencing, the Jauregui court imposed a sentence above the statutory maximum for conspiring to import marijuana; the issue presented was whether the sentence was permissible. Id. (citing Jauregui, 918 F.3d at 1056). The defendant states that the answer to that question "turned on whether the conspiracy charge could be sustained if it

14

was reasonably foreseeable that the drug was methamphetamine." Id. (citing Jauregui, 918 F.3d at 1056).

While the majority opinion in Jauregui concluded that the answer was no—that the conspiracy to import methamphetamines could not be sustained merely because it was "reasonably foreseeable" that the substance was meth— the defendant focuses on Judge Berzon's concurring opinion. The defendant explains that Judge Berzon reasoned that the fact that the defendant "admitted that 'it was *reasonably foreseeable* that the controlled substance may be methamphetamine' would not, under traditional conspiracy law, establish that he knowingly joined a conspiracy whose object was importing methamphetamine." Dkt. No. 229 at 5 (quoting Jauregui, 918 F.3d at 1063 (emphasis in original)). He recounts that Judge Berzon's concurrence continued: "Although Jauregui's lack of awareness regarding his coconspirators' involvement of methamphetamine may have been negligent, '[o]ne cannot negligently enter into a conspiracy.'" Id. (quoting Jauregui, 918 F.3d at 1063). Recounting that Judge Berzon relied on a hypothetical to illustrate the point—the same hypothetical the defendant in this case raised during the jury instruction conference before this court—the defendant explains that Judge Berzon reasoned that "coconspirators who plan to bomb a building can reasonably foresee that people will die as a result of a building's destruction but not intend for that result." Id. (quoting Jauregui, 918 F.3d at 1063). He says that Judge Berzon observed that although the "reasonable foreseeability" might make them "liable for reckless murder, negligent

15

homicide, or felony murder[,] . . . that reasonable foreseeability alone does not give rise to liability for *conspiracy* to commit a homicide." Id. (quoting Jauregui, 918 F.3d at 1063).

The defendant cites several state supreme court cases "that have reached the same conclusion with respect to state conspiracy crimes." Dkt. No. 229 at 6 (citing Palmer v. People, 964 P.2d 524 (Colo. 1998) (conspiracy to commit reckless manslaughter not a legally cognizable crime); State v. Beccia, 505 A.2d 683, 685 (Conn. 1986); State v. Baca, 124 N.M. 333 (1997); State v. Donohue, 150 N.H. 180 (2003); State v. Borner, 836 N.W.2d 383 (N.D. 2013); People v. Swain, 12 Cal. 4th 593 (1996)). And he cites "an array of federal civil cases holding that one cannot conspire to achieve an unintentional result." Id. (citing Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437, 1440 (M.D. Fla. 1998); Sonnenreich v. Philip Morris Inc., 929 F. Supp. 416, 419 (S.D. Fla. 1996); Wright v. Brooke Grp. Ltd., 114 F. Supp. 2d 797, 836 (N.D. Iowa 2000)).

The defendant argues that because the "government's case for conspiracy rested on the recklessness prong," and because he and Buie "could not have conspired to achieve a result under a recklessness standard," the court must acquit him of Count Five. Dkt. No. 229 at 7.

The government responds that the defendant essentially is arguing "that conspiracy to commit sex trafficking is a legal impossibility because 'you can't agree to do something that includes a recklessness component.'" Dkt. No. 239 at 5 (citing Dkt. No. 232 at 3). It responds that because Congress included the "reckless disregard" language in 18 U.S.C. §1594(c) "to criminalize conspiring

16

to violate Section 1591(a)," id. (citing 18 U.S.C. §1594(c)), "to grant the relief the defendant seeks here, this Court would have to take the extraordinary step of invalidating an entire provision of 18 U.S.C. §1594," id. The government asserts that the defendant asks the court to take this "extraordinary step" while failing to cite "a single case . . . deal[ing] with any of the sex trafficking laws." Id. at 5-6.

The government says that the defendant disregards the fact "that courts have repeatedly held, without expressing the defendant's concern, that the government may prove the offense of conspiracy to engage in sex trafficking by showing that the defendant acted in reckless disregard of an attendant fact." Id. at 6 (citing United States v. Anthony, 942 F.3d 955, 962 n.1 (10th Cir. 2019); United States v. Wilson, No. 10-60102, 2010 WL 2991561, at *5 (S.D. Fla. July 27, 2010)). It argues that this is because "[t]he *mens rea* element required for conspiring to violate Section 1591 is knowledge, not recklessness." Id. The government explains that "[p]roving a violation of Section 1591(a) first requires the government to prove that a defendant '*knowingly* recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited by any means the person identified in the indictment.'" Id. (citing Seventh Circuit Pattern Instructions, p. 748 (emphasis added)). It says that "to prove a conspiracy in violation of Section 1594(c), the government must prove that the defendant *knowingly* became a member of the conspiracy with intent to advance the conspiracy . . . , meaning that the defendant *knew* that the victim would be recruited, enticed, harbored, etc." Id. (citing Dkt. No.

17

187 at 26; <u>Wilson</u>, 2010 WL 2991561, at *5). The government argues that "[i]n this statutory scheme, the concept of 'reckless disregard' comes up only with respect to the ancillary question of how the sex trafficking statute was violated, . . . that is, whether the defendant knew or recklessly disregarded that force, threats of force, fraud, or coercion would be used." <u>Id.</u> at 6-7. It maintains that "'reckless disregard' is not the primary *mens rea* for the crime of sex trafficking," which is made "all the more obvious when one considers that Section 1591 requires no *mens rea* at all for the manner in which the statute is violated when a minor is involved; a defendant can be convicted solely based on a reasonable opportunity to observe the minor." <u>Id.</u> at 7. The government contends that because "[r]eckless disregard is not . . . the primary *mens rea* of the underlying crime," the defendant is wrong "to assert that the *mens rea* for the underlying crime is inconsistent with that required for conspiracy." <u>Id.</u> The government ends by asserting that "the defendant has not cited a single case that invalidates Section 1594(c) and . . . the logic of his argument does not apply to the statute at hand," and urges the court to "decline to take the extraordinary step of acquitting [the defendant] of Count Five by implicitly invalidating a portion of the statute." Dkt. No. 239 at 8.

In reply, the defendant spends the bulk of his time disagreeing with the government that the case it cites—<u>United States v. Chagra</u>, 807 F.2d 398 (5th Cir. 1986)—is persuasive. Dkt. No. 258 at 5-7.

b.    Discussion

Many of the state and federal court cases the defendant cites support the proposition that one cannot conspire to achieve an unintended result, or conspire to do something with "reckless disregard." But not one of those cases involves subsection (a) of the federal substantive sex-trafficking statute, or subsection (c) of the federal conspiracy-to-commit-sex-trafficking statute. Section 1591(a)—the substantive sex-trafficking statute—states:

> (a) Whoever **knowingly**—
>
> > (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, **recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person**; or
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> **knowing**, **or**, except where the act constituting the violation of paragraph (1) is advertising, **in reckless disregard of the fact**, **that means of force, threats of force, fraud, coercion** described in subsection (e)(2), or any combination of such means **will be used to cause the person to engage in a commercial sex act**, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, **shall be punished** . . . .

18 U.S.C. §1591(a) (2018) (emphasis added). Title 18 U.S.C. §1594(c)—the conspiracy-to-commit-sex-trafficking statute—states that "[w]hoever conspires with another to violate section 1591 shall be fined under this title, imprisoned for any term of years or for life, or both."

The defendant insists that Buie could not have conspired with him in violation of §1594(c) to participate in sex trafficking if she merely "recklessly

19

disregarded"—but did not *know*—that "force, threats of force, fraud, [or] coercion" would be used to cause the victims to engage in commercial sex acts. Accepting this argument would invalidate §1591(a)'s "recklessly disregarded" prong as it relates to §1594(c), without any legal authority to support doing so.

There are two ways that the government can prove a violation of §1591(a): (1) by proving that the defendant *knowingly*, in or affecting interstate commerce, recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized or solicited a person by any means (18 U.S.C. §1591(a)(1)), *or* (2) by proving that the defendant *knowingly* benefitted from participating in a venture that engaged in knowingly recruiting, enticing, harboring, transporting, obtaining, advertising, maintaining, patronizing or soliciting a person in interstate commerce by any means (18 U.S.C. §1591(a)(2)). As the Seventh Circuit has put it, the government "must prove that the defendant, with the requisite state of mind, either (1) engaged in one of the listed acts of sex trafficking or (2) benefitted from participating in a venture that engaged in one of those acts." <u>G.G. v. Salesforce.com, Inc.</u>, 76 F.4th 544, 552 (7th Cir. 2023)).

Whichever way the government alleges that the defendant violated §1591(a), the government must prove that the defendant committed the act "knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act . . . ."

20

18 U.S.C. §1591(a). The Seventh Circuit has read this language to mean that "[t]wo states of mind support sex-trafficking: knowledge or reckless disregard." United States v. Groce, 891 F.3d 260, 268 (7th Cir. 2018) (citing 18 U.S.C. §1591(a)).

Finally, 18 U.S.C. §1594 governs attempts and conspiracies to commit sex trafficking. Subsection (c) states that "[w]hoever conspires with another to violate section 1591 shall be fined under this title, imprisoned for any term of years or for life, or both." 28 U.S.C. §1594(c).

The defendant asserts that the government's theory at trial was that "[the defendant] was violent towards Buie, so she recklessly disregarded the fact that [the defendant] was also likely violent towards the women engaging in prostitution." Dkt. No. 229 at 3. He asserts that he and Buie "could not have conspired to achieve a result under a reckless standard." Id. at 7. Effectively, the defendant argues that when the government charges someone with conspiring to commit sex trafficking in violation of §1594(c), it must prove that each of the coconspirators *knew* that force, fraud or coercion would be used to get the victims to engage in commercial sex acts; it is not enough for the government to show that one conspirator acted in *reckless disregard* of that fact.

The defendant's insistence that one cannot *conspire* in violation of §1594(c) to commit sex trafficking in reckless disregard of the fact that means of force, threats of force, fraud, coercion or any combination thereof will be used to cause the person to engage in a commercial sex act—when one *can*

21

commit the *substantive* crime of sex trafficking in violation of 18 U.S.C. §1591(a) by performing one of the acts in §§1591(a)(1) or (2) in reckless disregard of that fact—is puzzling. Section 1591 is not the only federal criminal statute with a "knowing or in reckless disregard" sub-component. Sections 1324(a)(1)(A)(ii) and (iii) of Title 8 of the United States Code make it a criminal offense for someone to bring or attempt to bring an "alien" into the United States, or to harbor or conceal an "alien," "knowing or in reckless disregard" of the fact that the "alien" has either entered the United States unlawfully. Section 35(b) of Title 18 says that "[w]hoever willfully and maliciously, or with reckless disregard for the safety of human life, imparts or conveys . . . false information . . . concerning and attempt or alleged attempt being made . . . to do any act which would be a crime prohibited by this chapter" commits a crime. The defendant's argument that one cannot conspire to violate statutes such as these is novel; were it not possible to conspire to violate such statutes, Congress would not have passed ancillary statutes such as §1594 prohibiting just such conspiracies.

The court agrees with the defense that one cannot "negligently" conspire with someone else, but the second superseding indictment did not charge the defendant with "negligently" conspiring with Buie, nor did the government argue that the defendant had "negligently" conspired with Buie. The court instructed the jury that to find the defendant guilty of conspiracy, it must find that the defendant "*knowingly* became a member of the conspiracy with an intent to advance the conspiracy." Dkt. No. 187 at 26 (emphasis added). The

22

defendant's discussion of cases that address "negligently" participating in a conspiracy also is perplexing.

The defendant observes that the Supreme Court has cited LaFave in holding that a conspiracy requires both the intent to agree and the intent to effectuate the object of the conspiracy. Dkt. No. 229 at 4 (quoting United States v. Gypsum, 438 U.S. 422, 444 n.20 (1978)). That is a correct observation, and presumably the defendant made it in response to the court's statement at the instruction conference that LaFave was not binding authority. The fact that the Supreme Court has cited LaFave does not make that treatise binding. But the more relevant point is that the court instructed the jury on both of those types of intent; it instructed the jury that it must find both that the defendant "knowingly" became a member of the conspiracy *and* that he did so "with an intent to advance" the conspiracy.

Aside from the fact that it is unsupported by any precedent, the defendant's argument ignores that Count Five did not charge the defendant and Buie with conspiring to recruit, harbor and entice solely in reckless disregard of the fact that force, fraud or coercion would be used to cause the victims to engage in commercial sex act. Count Five charged alleged that the defendant and Buie conspired to knowingly recruit, entice, harbor, transport, provide and obtain female victims "knowing *and* in reckless disregard of the fact" that force, fraud or coercion would be used to cause them to engage in commercial sex acts. Dkt. No. 17 at 5. It charged in the conjunctive. The jury found the defendant guilty of that count, as charged. Dkt. No. 189 at 2.

23

As the government points out, the government presented evidence that Buie actually *knew* that the defendant was using force, fraud and coercion to get victims to engage in commercial sex acts. As the court recounted in ruling on one of the government's motions *in limine*, at a pre-testimony proffer on January 12, 2024 (during trial), Buie testified to the court that "she had witnessed at least one incident where the defendant had engaged in violence against another wom[a]n and that she had 'intervened' in an unstated number of situations to try to prevent the defendant from being violent with another wom[a]n/other women." United States v. Spencer, Case No. 21-cr-253, 2024 WL 152609, at *3 (E.D. Wis. Jan. 14, 2024)). During her trial testimony, Buie told the jury that at one point, she told law enforcement that one of the victims had told Buie that the defendant had broken her arm. Dkt. No. 216 at 31. She testified that one of the victims referred to the defendant as a pimp who used violence. Id. at 34. She testified that another victim told Buie of the defendant's violence toward her. Id. at 35. She testified about a Facebook message exchange in which the defendant admitted to being a "professed women beater." Id. at 37. She described an incident in which she intervened when the defendant leaped over a computer screen and began to put hands on a victim because that victim owed him money. Id. at 43- 44. She testified at length about a September 2019 Facebook message exchange and some audio clips of conversations in which she told the defendant that a woman named "Mary" did not want to go back out on the street because she was "dope sick" and had to walk a distance in her socks in the rain and cold but the defendant told Buie to

post an ad for the woman and to make her get back out; this, despite Buie having told the defendant that the woman was "in tears." Id. at 46- The evidence demonstrated that Buie not only recklessly disregarded evidence that the defendant was using force, fraud and coercion to engage in sex trafficking, but that she *knew* that he was doing so

The court will deny the defendant's Fed. R. Crim. P. 29 motion for acquittal on Count Five of the second superseding indictment.

B.    Defendant's Motion for a New Trial

The defendant says that he is entitled to a new trial under Fed. R. Crim. P. 33 for seven reasons:

> (1) the prejudicial spillover of evidence in support of the conspiracy that was otherwise inadmissible on the substantive counts; (2) newly discovered evidence including the recantation of [AV-4] (3) erroneous evidentiary rulings; (4) improper and prejudicial curative instructions; (5) prosecutorial misconduct; (6) the non-appearance by multiple defense witnesses; and (7) a jury pool that lacked diversity.

Dkt. No. 229 at 7. The defendant asserts that "[i]t may even be that none of these bases may, on their own warrant a new trial. However, the Court must consider the cumulative effect of each of these bases." Id. at 8 (citing United States v. Eberhart, 434 F.3d 935, 938 (7th Cir. 2006)).

The defendant also "seeks a Court order for the production of documents related to [his] claims regarding newly discovered evidence," which he asserts "are relevant and necessary for the defense to pursue this motion." Id. He says that "[g]iven the breadth of factual issues raised the defense also anticipates that an evidentiary hearing will be necessary for the Court to resolve any

25

conflicting claims." Id. at 9. Because the defendant's post-trial discovery request and request for an evidentiary hearing relate to his argument that newly discovered evidence warrants a new trial, the court will address the requests in that section.

### 1. *Standard of Review*

Federal Rule of Criminal Procedure 33(a) states that, on "the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." When considering a Rule 33 motion, the court is not required to view the evidence in the light most favorable to the government. United States v. Van Eyl, 468 F.3d 428, 436 (7th Cir. 2006). The court may independently consider witness credibility. United States v. Sanders, 690 F. App'x 424 (7th Cir. 2017). The court must grant the motion where the evidence "preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Washington, 184 F.3d 653, 657 (7th Cir. 1999); see also United States v. Chambers, 642 F.3d 588, 592 (7th Cir. 2011). A court should not lightly grant a Rule 33 motion. United States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994). "[T]he exercise of power conferred by Rule 33 is reserved for only the most 'extreme cases.'" United States v. Peterson, 823 F.3d 1113, 1122 (7th Cir. 2016) (quoting United States v. Linwood, 142 F.3d 418, 422 (7th Cir. 1998); United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)).

26

2. *Acquittal on Count Five Results in a Prejudicial Spillover on the Remaining Counts*

The defendant first argues that if the court acquits him on Count Five, the interests of justice warrant a new trial, in part, because the evidence of the acquitted conspiracy charge tainted the jury's consideration of the other counts. Dkt. No. 229 at 9. The defendant acknowledges that if the court denies his Rule 29 motion for acquittal on Count Five, this argument is moot. Id. Because the court has denied the defendant's Rule 29 motion, his spillover argument is moot.

3. *Newly Discovered Evidence*

The defendant argues that three post-trial "developments" support his motion for a new trial. First, he explains that during a happenstance encounter a month after trial with one of the defendant's lawyers, one of the victim witnesses—AV-4—recanted her trial testimony, explaining that she felt pressured by the government to go along with its version of the events. Second, the defendant says that the defense team learned that another of the victim witnesses—AV-2—had multiple conversations with the prosecutors, and that the prosecutors wrote a letter advocating for a favorable outcome in her pending state-court case because of her cooperation. Third, the defendant says that the government provided him with a supplemental disclosure post-trial, revealing that Buie had violated her bond multiple times and had had a mental health incident in the weeks leading up to trial.

27

a.    Legal Standard

To obtain a new trial based on newly discovered evidence, the defendant must show that the evidence "(1) came to [his] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it been heard by the jury." United States v. Mitrione, 357 F.3d 712, 718 (7th Cir. 2004), cert. granted and judgment vacated on other grounds, 125 S. Ct. 984 (2005). To justify a new trial on witness recantation grounds, the defendant must show that there was "perjured testimony" that meets those four qualifications. Id. When the newly discovered evidence is a witness recantation, the defendant first must make a threshold showing that there was, in fact, perjured testimony—in other words, he must make a threshold showing that the "recantation is true." See Olson v. United States, 989 F.2d 229, 231 (7th Cir. 1993).

b.    AV-4's Post-Trial Statements

i.    **Parties' Arguments**

The defendant asserts that in a chance, post-trial encounter with a member of the defense team, AV-4 recanted her trial testimony, "stating in sum that [the defendant] did not force her to sell sex or give him proceeds of her sex work." Dkt. No. 229 at 10 (citing dkt. no. 229-1 at 4). The member of the defense team describes the encounter in a memorandum attached to the defendant's motion; the memorandum states that the encounter occurred on February 17, 2024, dkt. no. 229-1 at 1, which would have been thirty days after the jury returned its verdict. The defendant relates that during defense

28

counsel's encounter with AV-4, AV-4 "stated that she felt pressured to testify and go along with the government's version of events." Dkt. No. 229 at 10 (citing Dkt. No. 229-1 at 3). The defendant says that AV-4 explained during the encounter how, "once she was arrested and detained in advance of the trial, she was visited almost every day by either the prosecutors or law enforcement," and that during those meetings "she felt pressured by the government to say things that weren't true about [the defendant]" and that it was implied "that she would face criminal prosecution herself, like . . . Buie did, if she did not testify as she was expected to." Id. (citing Dkt. No. 229-1 at 3).[5] AV-4 purportedly told defense counsel that the defendant never forced her to engage in sex work, that she gave him the money from her sex dates because "she wanted to," and that he "always helped her feel safe." Dkt. No. 229-1 at 3-4. The defendant says that when AV-4 "expressed that she had good things to say about [the defendant], she reported being told that it wouldn't matter if she had good things to say because 'the judge already hated [the defendant] and already hated his attorneys.'" Dkt. No. 229 at 10-11 (citing Dkt. No. 229-1 at 3). The defendant asserts that AV-4 said she "requested to speak to her attorney

_____

[5] On December 27, 2023—twelve days before the defendant's trial was to begin—the government filed a motion for a material witness warrant, advising the court that AV-4 had missed a scheduled meeting with case agents and the prosecutors, that she had indicated she was not going to comply with the trial subpoena, that she previously had failed to appear in compliance with a subpoena to testify before the grand jury and that she had expressed concern for her own safety and that of her son. Dkt. No. 134 at 2. The court granted the motion and on December 29, 2023, AV-4 was arrested and ordered detained pending the defendant's trial by Magistrate Judge Stephen C. Dries. Dkt. No. 135. Judge Dries ordered that AV-4 was "subject to release by Judge Pepper once testimony is complete." Id. at 2.

29

during her incarceration," and her "request was ignored." Id. at 11 (citing Dkt. No. 229-1 at 3).

The defendant argues that the substance of AV-4's statements "constitutes newly discovered evidence that undermines confidence in the jury's verdict." Dkt. No. 229 at 12. Addressing Mitrione's four-factor test for seeking a new trial based on a witness recantation, the defendant argues that (1) "[AV-4's] recantation only came to the defense's knowledge after trial;" (2) "[the recantation] could not have been discovered sooner with due diligence;" (3) "[the recantation] goes to the heart of the issue in this case—whether [the defendant] used force fraud or coercion to cause [AV-4] to engage in commercial sex acts;" and (4) "had [AV-4] presented this testimony, the verdict probably would have been different and not just as to Count Four [*i.e.*, the substantive sex-trafficking count relating to AV-4]." Id. at 13. The defendant argues that "[w]ere the jury to credit [AV-4's] claims that the government pressured and threatened an important witness to give certain testimony, it would likely color its assessment of any testimony proffered by the government." Id.

The government responds that "AV-4's purported 'recantation' does not constitute newly discovered evidence, does not justify an evidentiary hearing, and does not warrant a new trial." Dkt. No. 239 at 10. It asserts that the defendant "has not presented anything that qualifies as a 'recantation' according to well-established law (or common sense)." Id. The government argues that while courts treat witness recantations with skepticism, id. at 11

30

(citing <u>Johnson v. Novak</u>, Case No. 20-CR-232, 2020 WL 1531444, at *4 (E.D. Wis. Mar. 31, 2020); <u>United States v. Kamel</u>, 965 F.2d 484, 494 n.25 (7th Cir. 1992); <u>United States v. Santiago</u>, 837 F.2d 1545 (11th Cir. 1988)), they "treat[] *victim* recantations with an even greater degree of skepticism than those of other witnesses," <u>id.</u> (emphasis added by the government) (citing <u>O'Laughlin v. O'Brien</u>, 577 F.3d 1, 4 (1st Cir. 2009); <u>Walton v. Ryan</u>, Case No. CV-11-00578, 2014 WL 1713625, at *4 (D. Ariz. May 1, 2014)). The government reports that it was "unable to find any precedent for granting a new trial based solely on a victim's recantation," and that "[a]t least one treatise confirmed [the absence of such precedent]." <u>Id.</u> at 11-12 (citing Tim A. Thomas, <u>Recantation of testimony of witness as grounds for new trial – federal criminal cases</u>, 94 A.L.R. Fed. 60, at §7 (originally published in 1989)).

The government argues that "the defendant has not even presented a cognizable recantation—that is, a signed and sworn affidavit by a recanting witness." Dkt. No. 239 at 12. "Instead," the government recounts, "the statement presented here is an unsigned and unsworn memorandum by the defendant's lawyer." <u>Id.</u> The government recounts that courts have found a *witness'* unsworn and unsigned statement to be insufficient to warrant a new trial. <u>Id.</u> (citing <u>In re Davis</u>, 565 F.3d 810, 825-26 (11th Cir. 2009); <u>United States v. Pearson</u>, 203 F.3d 1243, 1274-76 (10th Cir. 2000); <u>United States v. Ward</u>, 544 F.2d 975, 976 n.2 (8th Cir. 1976); <u>United States v. DiPaolo</u>, 659 F. Supp. 120, 122 (W.D.N.Y. 1987), <u>aff'd</u>, 835 F.2d 46 (2d Cir. 1987)). It observes that "the unsigned, unsworn statement at issue here is not even a statement of

31

the witness herself," but "is a hearsay statement from the defendant's own lawyer about a conversation she had with AV-4 two months before she wrote the memorandum recounting the conversation." <u>Id.</u> at 13. The government contends that "it is difficult to imagine how an unsigned, unsworn memorandum of defense counsel recounting a conversation with a vulnerable witness could be even remotely close to sufficient to overturn a jury verdict." <u>Id.</u> The government argues that because defense counsel's memorandum is not proof of perjury, "the predicate inquiry for a motion for a new trial based on recantation is not met, and the motion must be denied." <u>Id.</u> at 14.

The government asserts that "[e]ven if the Court were inclined to give any weight to defense counsel's memorandum regarding AV-4, the circumstances and context of that document unequivocally demonstrate that AV-4 did not provide perjured testimony at trial." Dkt. No. 239 at 14. It argues that the defendant has "provided nothing from which the Court could conclude . . . that the jury's verdict would probably have been different." <u>Id.</u> The government opines that it is notable that AV-4 decided not to take defense counsel up on her invitation "to follow up with [defense counsel] to provide an admissible version of her 'statement.'" <u>Id.</u> It says that "[defense counsel] apparently neither recorded AV-4's 'statement' nor apparently endeavored to take contemporaneous, verbatim notes," which "would have resulted in, at least, a slightly more reliable, contemporaneous recitation of events." <u>Id.</u> at 15 & n.5. (citing Dkt. No. 229-1 at 5). The government stresses that defense counsel's "memorandum describes statements purportedly made by a person

32

experiencing a significant mental health crisis brought on by a 'bad reaction to some drugs.'" Id. at 15 (citing Dkt. No. 229-1 at 2). The government says it was able to obtain a recording of an emergency services call in which a witness observing AV-4 in the state in which defense counsel found her explained that AV-4 was darting in and out of traffic and "foaming at the mouth." Id. (citing Dkt. No. 241-7). The government asserts that "[t]his is not the picture of a person in a 'right' state of mind to provide any semblance of a reliable statement." Id. at 15-16.

The government argues that "the substance of AV-4's purported statements to [defense counsel] also belie their reliability." Dkt. No. 239 at 17. For example, while defense counsel's memorandum describes AV-4 telling defense counsel that after the trial no one from the government told her about the verdict, dkt. no. 229-1 at 2, the government provided text messages between AV-4 and a victim witness coordinator from the U.S. Attorney's Office showing that days after the trial concluded, AV-4 asked about the verdict and the victim witness coordinator responded, "He was guilty on all counts. He will be sentenced in May," dkt. no. 241-1 at 1.[6] It argues that AV-4's trial testimony was "entirely consistent" with her sworn testimony to the grand jury, which

---

[6] The government also asserted that in "Exh. A," it had provided text messages between AV-4 and its victim witness coordinator, and text messages between AV-4 and an FBI agent, which, it said, "refute AV-4's purported statement that she did not have a phone because she got rid of it based on a fear that the government would arrest her again." Dkt. No. 239 at 18 (citing to defense counsel's memo about the encounter, Dkt. No. 229-1 at 5). "Exhibit A" is at Dkt. No. 241, but the text messages in that exhibit appear to be dated January 10 through 23, 2024—before defense counsel's encounter with AV-4.

took place two years before the trial and when AV-4 was not in custody. Dkt. No. 239 at 18-19.[7] And, the government argued, defense counsel's account of AV-4's recantation contradicted AV-4's post-trial testimony texts with government representatives saying that she would not lie and explaining that she had not realized she was being trafficked by the defendant at the time it was happening. Id. at 19-20 (referencing the texts at Dkt. No. 241-3).

The government ends by saying that because the defendant "has not presented anything that the law even considers competent evidence of a recantation," he has not met "the predicate requirement of showing that his trial was tainted by perjured testimony." Dkt. No. 239 at 20.

## ii.  **Discussion**

As a reminder: to justify a new trial on witness-recantation grounds, the defendant first must make a threshold showing that there was "perjured testimony" at trial as evidenced by a witness recantation. Mitrione, 357 F.3d at 718. The defendant must show that the proffered witness recantation is true, and that the trial testimony the jury heard was false. What the defendant has proffered does not make that showing. The defendant has proffered his lawyer's unsigned, unsworn statement describing an encounter with AV-4 that occurred a month after trial. Because any evidentiary value the defendant's proffered "recantation" might have is undermined by its substance, the circumstances under which it purportedly came to light and the fact that it is not an affidavit

---

[7] The government provided the transcript of the grand jury testimony. Dkt. No. 241-2.

from the witness herself but instead an unsworn and unsigned statement from the defendant's lawyer, the defendant has not met his threshold burden of demonstrating that AV-4's trial testimony was false.

The proffered memorandum is not a cognizable witness recantation—it is not an affidavit, signed and sworn to by a recanting witness. The memorandum is not signed (by either AV-4 or by defense counsel), is not sworn to (by either AV-4 or by defense counsel) and is not AV-4's statement but defense counsel's hearsay statement. The memorandum is dated April 16, 2024—two months after the encounter. Dkt. No. 229-1 at 1. Defense counsel did not prepare the memorandum using a recording of her conversation with AV-4; she stated at the end of the memorandum that she prepared the memorandum from handwritten notes that she took the day *after* the interaction with AV-4. Dkt. No. 229-1 at 1, 5.

The memorandum might have had more evidentiary value had counsel prepared it using a recording of the conversation, or prepared it on the day of the interaction, or taken notes *during* the interaction, or had AV-4 prepare a written statement, or had AV-4 read and sign defense counsel's notes. The defendant shrugs off these concerns, saying that the defense team "proffered this memorandum to provide the government and Court with a summary of what happened, anticipating that [defense counsel] may have to testify about the encounter." Dkt. No. 258 at 10-11. He says that if the court or the government wants defense counsel's notes, the notes have been preserved. Id. at 11. But because it is the defendant who is seeking a new trial on witness-

recantation grounds, *he* bears an initial burden of demonstrating that the recantation is true and that the related trial testimony was perjured. The defense team's choice to ground the motion in a series of unsigned, unsworn hearsay statements based on notes taken the day after the encounter is not sufficient. See Mitrione, 357 F.3d at 718; see also United States v. Chapman, 851 F.3d 363, 382 (7th Cir. 2017) (finding that because "an un-notarized written declaration by [the defendant's] counsel restating what [a witness] had 'revealed' to counsel" was "inadmissible hearsay," and "a motion for new trial may not be based on inadmissible evidence," the evidence was immaterial and not grounds warranting a new trial).

The defendant's assertion that he presented the unsigned, unsworn statement because defense counsel thought she could be called to testify assumes that there will be an evidentiary hearing. "[T]he law places the decision of whether to hold an evidentiary hearing squarely within the district court's discretion." United States v. Rossini, Case No. 15 CR 515-1, 2020 WL 433893, at *7 (7th Cir. Jan. 28, 2020) (citing United States v. Berg, 714 F.3d 490, 501 (7th Cir. 2013)). "Conservation of judicial resources is a proper basis to deny a request for an evidentiary hearing." Id. (quoting United States v. Osborne, 931 F.2d 1139, 1164 (7th Cir. 1991)). For the reasons discussed in this order, the court concludes that it would be a waste of judicial resources to hold an evidentiary hearing.

Defense counsel's own report of AV-4's physical and mental state at the time she made the statements counsel reports also renders the statements

36

insufficient to prove that the recantation is true and the trial testimony perjured. In her memorandum of the encounter, defense counsel says that she found AV-4 shoeless, "standing in the middle of the street," "walking in and out of busy traffic," "wearing a baby blue short-sleeve t-shirt in below-freezing weather." Dkt. No. 229-1 at 1. She says that AV-4's "feet were blackened with dirt, as if she had been barefoot outside for a while," and that AV-4 was unsure where her belongings were. Id. Counsel describes how, after counsel gave AV-4 her jacket and led her out of the freezing weather into a building vestibule, AV-4 abruptly "said she wanted to find her belongings," "stood up, pulled [the] jacket off . . . , and ran back outside—again without a coat or shoes." Id. Defense counsel explains that after tracking AV-4 down, she brought AV-4 back to her house and discussed with AV-4 the trial at which the defendant was convicted of sex-trafficking AV-4. Defense counsel says that during the conversation, AV-4 explained that earlier in the day, she "had a bad reaction to some drugs." Id. at 2; see also Dkt. No. 241-7 (recording of an emergency services call from February 17, 2024 in which a witness describes AV-4 as "laying on the ground," possibly "dead," "running in the middle of the road," shedding clothes, and "foaming at the mouth"). AV-4's mental and physical state on the date she made the statements to defense counsel casts doubt on their veracity and renders them insufficient to prove that the recantation is true and that AV-4's trial testimony (given when she was in custody, being fed and clothed and out of the elements and presumably not under the influence of controlled substances) was perjured.

37

The defendant concedes that AV-4 "likely was not entirely honest" with defense counsel. Dkt. No. 258 at 11. He argues, however, that AV-4's "shifting positions" are relevant to her credibility and show that "she's willing to provide false statements in situations when it suits her." Id. He says that whether AV-4 is "uncomfortable because she's 'trapped' in the home of her trafficker's lawyer (as the government supposes) or thrown in jail by the government unless and until she testifies (as actually happened during the trial)," AV-4's different stories show that she will "say what she thinks the person she's speaking to wants or expects to hear." Id. at 11-12. He says that is a credibility concern that was not known before trial. Id. at 12.

This argument ignores the fact that once a jury has returned a guilty verdict, in the context of a Rule 33 motion for a new trial based on an alleged recantation, the *defendant* must meet the threshold burden of showing that the recanted statements are true and the trial testimony was perjured. Given counsel's own description of AV-4's physical and mental statement on February 17, 2024, the defendant has not come close to meeting his burden to show that AV-4's February 17, 2024 statements to defense counsel were true, while the statements that she gave under oath in the courtroom during trial were perjured.

The memorandum recounts that during the encounter, defense counsel identified herself as the defendant's lawyer. It recounts that at one point during the encounter AV-4 ran away from the defendant's lawyer and that the lawyer tracked AV-4 down. Dkt. No. 239 at 16-17. It is possible that defense counsel's

38

association with, and zealous legal defense of, the defendant—who had been convicted a month earlier of sex-trafficking AV-4 and who AV-4 had told the government before trial and had testified at trial had been violent toward her on multiple occasions—colored AV-4's statements to defense counsel during the encounter. The court recounted in footnote 5, supra, that before trial, AV-4 refused to comply with the trial subpoena, telling the government and Judge Dries that she was afraid of the defendant. The evidence the government provided in response to the defendant's Rule 33 motion shows that after testifying at trial, AV-4 apparently contacted the FBI to express fear that the defendant might retaliate against her for her testimony through one of his friends who was recently released from prison. Dkt. No. 241 at 2 ("I don't wanna be killed I want ya'll to understand that these are really dangerous people."). AV-4's multiple statements—before and after trial—that she was afraid of the defendant further render the statements insufficient to make a showing that the recantation is true and the trial testimony false.

The statements AV-4 made to defense counsel in February sharply contrast with her trial testimony. Counsel's memorandum recounts that AV-4 told defense counsel that the defendant never forced her to engage in sex work, and that when she did give the defendant money from her sex dates, she did so because "she wanted to, not because he ever forced her." Dkt. No. 229-1 at 4. But during her sworn trial testimony, AV-4 several times explained how the defendant repeatedly used violence and the threat of violence to cause her to give him the money that she received from her commercial sex dates. Dkt. No.

213 at 27, 36, 40. She testified that when she tried to keep money from the dates for herself—either by hiding it or by giving the defendant only some of the money she received from clients as opposed to all of it—the defendant would take the money through force and violence. Id. at 41-44. There are many other discrepancies. As the defense team observes in its motion, perhaps some of the things AV-4 said at trial were inaccurate or even untrue. Perhaps some of the things AV-4 said to defense counsel in February 2024 were inaccurate or untrue. But to meet the threshold showing for obtaining a new trial based on witness recantation, the defendant had to show more than just that AV-4 has been inconsistent in her accounts of events, or even that her credibility is questionable. The defendant had to make a showing that the recantation is true and that AV-4's trial testimony was perjured. The defendant has not made that showing.

The court will deny the Rule 33 motion to the extent that it is based on witness recantation.

     c.  AV-2's Purported Benefits in Exchange for Testimony

      i.  **Parties' Arguments**

The defendant says that after trial, he uncovered evidence suggesting that another of the government's victim witnesses—AV-2—expected and "regularly received benefits" in exchange for her cooperation and testimony. Dkt. No. 229 at 13. The defendant refers to "two specific benefits [purportedly received by AV-2] that were not disclosed to the defense, both of which were at issue during the trial." Id. at 14. The first relates to state charges that AV-2

had pending in Circuit Court in Washington County, Wisconsin. The defendant says that when "defense [counsel] cross-examined [AV-2] about those charges, [AV-2] disputed expecting any benefit in that case for her cooperation," and the government stated during a sidebar that it "has had no involvement with [AV-2's Washington County] case." Id. (citing Dkt. No. 212 at 138). The defendant says that "the defense has obtained information since the trial indicating that the government has been in contact with [AV-2's] attorney." Id. He asserts that "[d]uring [AV-2's] February 23, 2024, Washington County court appearance, about a month after the trial concluded, [AV-2's] attorney reported to the state prosecutor that he had spoken with the federal prosecutors several times about [AV-2's] cooperation." Id. (citing Dkt. No. 229-3). He says that AV-2's attorney "also reported that the federal prosecutors had written a letter advocating for [AV-2] based on her cooperation at [the defendant's] trial." Id. (citing Dkt. No. 229-2). The defendant argues that at minimum, this information "suggests that contrary to [AV-2's] testimony, she expected and received a benefit," and that this information "is also *Brady*[8] material, which the government has a continuing duty to disclose, even after a trial." Id. at 14-15 & n.1 (citing Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987)).

The second benefit the defendant claims AV-2 received in exchange for her cooperation relates to "[AV-2's] custody status at the time of her grand jury testimony." Dkt. No. 229 at 15. The defendant recounts that at trial he "introduced evidence . . . that [AV-2] was released from [state-court] custody

---

[8] Brady v. Maryland, 373 U.S. 83 (1963).

the very next day [after giving her grand jury testimony].” Id. (citing Trial Exh. 578; Dkt. No. 217 at 82). He asserts that while “[t]he government disputed that it had anything to do with [AV-2’s] detention or her release[, t]his dispute misses the point.” Id. The defendant hypothesizes, “Suppose that “[AV-2] had planned to tell to [sic] law enforcement that her prior statements were untrue, [the defendant] wasn’t trafficking her, and that she made up the story to get herself out of trouble. And then she learned that she could both get out of jail and get off supervision if she maintained her story and cooperated with law enforcement.” Id. The defendant asserts that such information “[would] go to [AV-2’s] bias, and it should have been included in the government’s Brady/Giglio[9] disclosure.” Id.

The defendant explains that he “has sought to obtain the records of [AV-2’s] August 2021 probation hold from the Department of Corrections (“DOC”),” but that the “DOC has not provided the requested records.” Dkt. No. 229 at 16. He says that because he “likely does not have the authority to subpoena these records absent a court order, as they are confidential records of a victim,” he “requests that the Court issue a subpoena to the Department of Corrections for records related to [AV-2’s] August 2021 probation hold, including the officer’s chronological logs, any other record identifying the basis of the arrest, the decision to detain, and the decision to release.” Id. at 16-17. The defendant also wants to the court to request through the subpoena “any communication with law enforcement or government officials.” Id. at 17. The defendant asks

---

[9] Giglio v. United States, 405 U.S. 150 (1972)

the court to order "the government to disclose all records and communication it has relating to [AV-2's] August 2021 detention and release and its efforts to procure her appearance both before the grand jury on August 24, 2021, and for an interview on August 21, 2021," including "the writs of habeas corpus ad testificandum and any communication with MSDF [the Milwaukee Secure Detention Facility where AV-2 was detained prior to her grand jury testimony], the DOC, the U.S. Marshals, or any other law enforcement entity about procuring her appearance on those dates." Id. at 17.

The defendant acknowledges that Fed. R. Crim. P. 17 subpoenas are "generally employed in advance of trial," but says that "courts have recognized that Rule 17 subpoenas are permitted 'for post-trial motions and sentencing.'" Dkt. No. 229 at 17 (citing United States v. Winner, 641 F.2d 825, 833 (10th Cir. 1981); 2 Wright & Henning, Fed. Prac. & Proced. §275, at p. 242 (4th ed. 2009)). The defendant cites United States v. Boender, Case No. 09-CR-186, 2010 WL 1912425, at *2 (N.D. Ill May 12, 2010), in which a district court in the Northern District of Illinois used a four-factor test from the Tenth Circuit for evaluating Rule 17 subpoena requests in the post-trial setting. The defendant argues that the court should apply the same framework for evaluating the propriety of his requested subpoena. Applying the four-factor test, he argues that the court should order the subpoena because (1) "[t]he information sought is relevant . . . because it bears on [AV-2's] bias and credibility;" (2) "[t]he defense has been unable to obtain the records any other way;" (3) "[t]he defense cannot properly prepare for its post-trial motion without evaluating the

43

records;" and (4) "[t]he application is made in good faith and the request is not a general fishing expedition." Id.

In response to the defendant's newly discovered evidence claims relating to AV-2, "and the supposed benefits she received in certain state criminal cases due to her cooperation," the government asserts that the argument is "based on speculation and innuendo, as well as hearsay statements from AV-2's [state-court] defense attorney." Dkt. No. 239 at 20. The government says that though the defendant has alleged that the federal prosecutors "have spoken to [AV-2's state-court counsel] 'several times' about [AV-2's] 'cooperation' and that they have 'written a letter *advocating for [AV-2] based on her cooperation at [the defendant's] trial*," these allegations are "based on two more unsigned and unsworn memoranda, one from Investigator William Gowin [the defendant's investigator], and the other from [defense counsel]." Id. (citing Dkt. No. 229 at 14) (emphasis in original).

The government maintains that the investigator's memorandum recounts his overhearing a conversation between AV-2's state court lawyer and the assistant district attorney, during which AV-2's state court lawyer, among other things, "urged the ADA that AV-2 was 'instrumental in [the government] getting a conviction [against the defendant].'" Dkt. No. at 239 at 20-21 (citing Dkt. No. 229-3). The government says that defense counsel's memorandum recounts her conversation with AV-2's state court lawyer, in which he purportedly "told [defense counsel] that the USAO [United States Attorney's Office] drafted a 'very nice' letter on behalf of AV-2, 'outlining how instrumental

44

her cooperation had been in [the defendant's] prosecution." Id. at 21 (citing Dkt. No. 229-2). The government says that defense counsel "does not appear to have requested a copy of that letter from [AV-2's state-court counsel], nor confirmed whether the ADA ever saw it," nor did defense counsel "reach out to the [government] to request the same." Id. The government asserts that "the truth puts any assertion of USAO 'advocacy' or undisclosed benefits to rest." Id.

The government says that "a month after [AV-2's state-court counsel] apparently claimed to an ADA to have spoken with the USAO 'several times,' [counsel] reached out to [the USAO's victim witness coordinator] for the *first* time to request a letter regarding AV-2's testimony [in the trial of this case]." Dkt. No. 239 at 21. The government reports that counsel "asked that the letter be provided the *same day*." Id. (citing Dkt. No. 241-4). The government states that after receiving the request, one of the federal prosecutors emailed counsel and explained that the request

> came too late for a response, and that in any event, [state counsel] was unlikely to "achieve much more by waiting" for a letter from the USAO as any letter the USAO could provide would simply confirm that AV-2 had testified and would not "provide an 'endorsement' or advocacy of a particular outcome for victims' unrelated court cases."

Id. (citing Dkt. No. 241-5). The government says that when counsel "responded that sentencing needed to be postponed anyway and repeated the request for a letter," the federal prosecutors "provided [him] a letter containing a factual recitation of AV-2's participation in this matter." Id. (citing Dkt. No. 241-6). The government asserts that that letter does not contain any "'advocacy' by the USAO on AV-2's behalf." Id.

The government says that, "[a]bsent false implications and innuendo, there is no 'newly discovered' evidence regarding benefits AV-2 purportedly received from her cooperation." Dkt. No. 239 at 22. It maintains that, "given how much trial time was spent on AV-2's bias due to benefits she purportedly received by cooperating against the defendant, there is no reasonable argument that the factual letter to [AV-2's state-court counsel] *following* the trial was either 'material' or 'would probably have led to an acquittal' had it been heard by the jury." Id. (citing Mitrione, 357 F.3d at 712).

Responding to the defendant's request for post-trial discovery and an evidentiary hearing relating to AV-2's 2021 detention and release, the government argues that the issue "was fully explored at trial, and no post-trial events warrant additional discovery, an evidentiary hearing, or a new trial on that issue." Dkt. No. 239 at 22. The government argues that "[t]he defense explored the connection between AV-2's August 2021 incarceration and her testimony extensively at trial" and "implied repeatedly that the two were connected and that the USAO had something to do with either her hold or her release." Id. (citing Dkt. Nos. 212 at 130-131, 223; 217 at 81; Trial Exh. 578). The government argues that because the defendant's "current motion presents nothing new on this issue, yet asks for post-trial discovery on something the defense was perfectly positioned to explore pre-trial, [t]he court should deny the motion for a Rule 17 subpoena, the motion for an evidentiary hearing, and the motion for a new trial." Id.

The government observes that "it is not clear that Rule 17 subpoenas are available post-trial." Dkt. No. 239 at 23. But because at least one district court in the Seventh Circuit has utilized a four-factor framework for evaluating Rule 17(c) subpoena requests in the post-trial setting, the government assumes for argument's sake that Rule 17(c) subpoenas can be issued post-trial. Id. (citing Winner, 641 F.2d at 833; Boender, 2010 WL 1912425, at *1). It says that the test for evaluating the propriety of a post-trial Rule 17(c) subpoena includes the following elements:

> (1) that the information is evidentiary and relevant; (2) that it is not otherwise procurable *in advance* through the exercise of due diligence; (3) that the party seeking production cannot properly prepare for post-trial motions or sentencing without advance inspection; and (4) that the application is made in good faith and is not simply intended as a general "fishing expedition."

Id. at 24 (citing Boender, 2010 WL 1912425, at *1 (quoting Winner, 641 F.2d at 833)) (emphasis added by government "to highlight the language omitted from the defendant's motion"). Id. The government emphasizes that when outlining in his brief Winner's four-factor test, the defendant left out the words, "in advance," which it argues are key to the test's second element.

The government asserts that "[w]ith respect to the issue of AV-2's August 2021 incarceration, the defendant fails on every factor." Dkt. No. 239 at 24. As it relates to the second factor—that is, that the Rule 17(c) subpoena the defendant now seeks was not otherwise procurable in advance through the exercise of diligence—"the defense clearly and unequivocally knew *before trial* that AV-2 was incarcerated at MSDF in August 2021, that she spoke to the government twice during that incarceration, and that she was released shortly

47

after the second interview." Id. The government argues that "[t]he defendant had also clearly decided prior to trial that purported benefits AV-2 received were going to be an important aspect of his defense," because it "was a major theme of his opening statement, his cross examination of AV-2, his case-in-chief, and his closing argument." Id. But "the defendant apparently made no effort before trial to find evidence to confirm his speculation about the reason for AV-2's release in August 2021;" "[h]e did not, for example, seek a Rule 17(c) subpoena for these records pre-trial." Id. at 25. The government speculates that the defendant might argue that he did not seek a subpoena for the records pre-trial "because he did not receive the Grand Jury transcript of AV-2's testimony until immediately before trial." Id. The government argues that this argument would be unpersuasive because "[e]arly discovery in this case" indicated that AV-2 was detained at MSDF around August 2021, that the USAO interviewed her on August 25, 2021 and that the defendant was indicted just a few months later, giving the defense reason to believe that "there was a significant probability that AV-2 testified before the Grand Jury on August 25, 2021." Id. The government argues that "[e]ven if the defendant did not draw that conclusion, he was on notice that AV-2 was released from custody shortly after meeting with the USAO on August 25, 2021," and thus "had ample time to seek discovery" regarding whether "her release was due to" statements she made to law enforcement. Id. at 25-26. The government argues that because the defendant had pre-trial notice and opportunity but chose to wait until after

trial to file a Rule 17(c) subpoena, "the defendant fails the second prong of the Winner test." Id. at 26.

As to the fourth prong, which requires that "the application is made in good faith and is not simply intended as a general 'fishing expedition,'" the government asserts that the defendant's argument is premised on his assumption that people like AV-2 who "abscond from supervision for two years" do not get released, but instead get "punished." Dkt. No. 239 at 26. The government contends that assumption—that AV-2's release from detention must have been connected to her grand jury testimony because most people in her position would have had their probation revoked—"is the definition of speculation, and to grant a Rule 17(c) subpoena based on that speculation would be to sanction the type of fishing expedition disallowed under the case law." Id. (citing United States v. MacKey, 647 F.2d 898, 901 (9th Cir. 1981); United States v. Morris, 287 F.3d 985, 991 (10th Cir. 2002)). The government argues that as to the first prong—that the information surrounding AV-2's grand jury testimony and release from detention must be "evidentiary and relevant"—even if the defendant's speculation was accurate and AV-2 was released from state-court detention in return for her federal grand jury testimony, that fact "would have no bearing on [her] credibility." Id. at 27. The government points out that AV-2 testified repeatedly at trial that she "was unaware of receiving or being offered any benefit based on her repeated statements to law enforcement about her victimization." Id. (citing Dkt. No. 212 at 224). The government asserts that "even if . . . the probation office 'decide[d]

49

to release the probation hold' once AV-2's testimony was complete, that would be irrelevant unless AV-2 *knew* that her release depended on her testimony and further that it depended on a statement incriminating the defendant." Id. It argues that because AV-2 did not know that her release depended on her grand jury testimony, whether she subsequently received a benefit in exchange for that testimony has no bearing on her credibility. Id.

Finally, the government seeks to distinguish the cases cited by the defendant in support of his request for a Rule 17(c) subpoena, arguing that, "[u]nlike in those cases, the defendant here merely *speculates* that there *might* be evidence somewhere *outside the government's possession* that would allow him to impeach AV-2's statement about the impact that her August 2021 cooperation had on her probation at that time." Dkt. No. 239 at 28 (emphasis in original) (citing Dkt. No. 229 at 15-16). The government argues that the defendant "explored this speculation extensively at trial, . . . strategically, through insinuation rather than by attempting to confirm his speculation through a Rule 17(c) subpoena in advance." Id. at 29. The government argues that that strategy was not successful and asserts that the defendant's motion for a post-trial Rule 17(c) subpoena effectively seeks a "do-over" by claiming that his "renewed (but not new) speculation is 'newly discovered evidence.'" Id.

        ii.    **Discussion**

The following discussion is split into two parts. The first addresses the defendant's argument that post-trial communications between the government's lawyers and AV-2's lawyer in her ongoing state-court case

demonstrate that AV-2 expected to receive, and did receive, benefits in exchange for her trial testimony. The second part addresses the defendant's contention that the court should afford him further opportunity to investigate through post-trial discovery its theory that AV-2's August 2021 release from MSDF was related to her grand jury testimony in the defendant's case.

At trial, defense counsel cross-examined AV-2 about her pending charges in Washington County Circuit Court, asking her whether she expected to receive any benefit in that case in exchange for her cooperation and testimony in the defendant's federal trial. See Dkt. No. 212 at 137-38. In a sidebar during defense counsel's cross of AV-2, one of the government's lawyers stated that "the government had no involvement with [AV-2's state-court] case;" after the sidebar, the defendant's lawyer asked AV-2 whether she knew that her state-court lawyer could seek from her state-court judge a sentence reduction for her cooperation with the government. Id. at 138, 141. AV-2 responded, "Now I do. I'll sure tell him, thank you." Id. at 141.

The defendant now says that after the trial, his lawyers uncovered evidence that, "[a]t a minimum, . . . strongly suggests that contrary to [AV-2's] testimony, she expected and received a benefit." Dkt. No. 229 at 14-15. To support this contention the defendant proffers two more unsigned, unsworn hearsay statements—what the defense refers to as "memoranda"—the first written by one of the defendant's lawyers, the second by his defense team's investigator. Dkt. Nos. 229-2, 229-3.

51

Defense counsel's memorandum is a paragraph long (four sentences in total), and describes an April 10, 2024 conversation between her and AV-2's state-court lawyer. Dkt. No. 229-2. (Recall—the trial took place in January 2024, so this conversation occurred three months later.) During the conversation, AV-2's state-court lawyer "told [defense counsel] that the U.S. Attorney's Office drafted a 'very nice' letter on behalf of [AV-2] outlining how instrumental her cooperation has been in [the defendant's] prosecution." Id. The memorandum does not say whether defense counsel asked AV-2's state-court lawyer for a copy of the letter, or whether she asked him to sign an affidavit attesting to the content of their conversation. The government reports that defense counsel did not contact the prosecution for a copy of the letter.

The government attached to its opposition brief a copy of the letter. Dkt. No. 241-6. The letter is dated March 26, 2024 (over two months after the defendant's trial) and begins, "On March 19, 2024, you [AV-2's state-court lawyer] asked if I [one of the federal prosecutors] could provide written confirmation that your client, [AV-2], cooperated and testified in a federal investigation." Id. The letter then provides the following account of AV-2's involvement in the defendant's case:

> [AV-2] is a victim in a sex trafficking case that was indicted and tried to a jury. *United States v. Spencer*, 21 CR 253. Based on the record evidence, [AV-2] was victimized by [the defendant] during the time period spanning between approximately February 2013 and December 2019.

> As part of the investigation of this case, [AV-2] testified in the grand jury and at trial. Her most recent testimony occurred on January 9, 2024 when she testified during [the defendant's] jury trial. On January 19, 2024, the jury convicted [the defendant] of four counts

of sex trafficking in violation of 18 U.S.C. § 1591 and one count of conspiracy to engage in sex trafficking in violation of 18 U.S.C. § 1594. Count Two of the indictment, of which [the defendant] was convicted, related to [the defendant's] trafficking of [AV-2].

[AV-2] was cooperative with all requests that the case agents and I made of her, including participating in multiple interviews with case agents, testifying in grand jury, and testifying at trial.

Id.

The defendant's second piece of newly discovered evidence relating to the government's purported post-trial communications with AV-2's state-court lawyer is an unsigned, unsworn memorandum from the defense team's staff investigator. Dkt. No. 229-3. In the memorandum, the investigator reports that he attended the February 23, 2024 plea and sentencing hearing in AV-2's Washington County case. Id. at 1. The investigator recounts that before the hearing began, he overheard AV-2's state-court lawyer ask the assistant district attorney whether the U.S. Attorney's Office had contacted him regarding AV-2's status as a sex-trafficking victim. Id. When the ADA "demurred," AV-2's lawyer purportedly "suggested coordination with the U.S. Attorney's Office." Id. The investigator says that during the hearing, the state court rescheduled AV-2's plea and sentencing for a later date. Id. Afterward, the investigator reports overhearing AV-2's lawyer ask the state-court prosecutor, "Haven't you spoken to the U.S. Attorney's Office?" Id. The investigator reports that when the prosecutor responded, "No, have you?" AV-2's lawyer said, "'Yes, several times,' and went on to explain the large case [AV-2] provided testimony for." Id.

The investigator's memorandum then jumps to the date of AV-2's rescheduled plea and sentencing, March 20, 2024. Dkt. No. 229-3 at 1. The investigator says that while waiting in the hallway outside the courtroom, he heard a conversation between another assistant district attorney and AV-2's state-court lawyer. Id. He reports overhearing the lawyer tell the ADA that "the U.S. Attorneys [sic] Office believed [AV-2's] assistance was 'instrumental in getting a conviction'" and ask the ADA whether "it would make any difference 'if [he] ha[d] her (AUSA) [Assistant United States Attorney] contact you [the ADA]?'" Id. The investigator says that he did not hear the prosecutor give "an audible reply" to the question. Id. During the hearing, the state court judge "acknowledged that the court had received a letter from [AV-2's lawyer]"[10] and the state-court lawyer "stated that he anticipated movement by the State specific to [AV-2's] testimony in federal court in January." Id.

Again: to obtain a new trial based on newly discovered evidence, the defendant must show that the evidence: "(1) came to [his] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it been heard by the jury." Mitrione, 357 F.3d at 718. To support his claim that AV-2 expected a benefit in return for her trial testimony, the defendant points to two hearsay statements from the documents described above: (1) the investigator's account of AV-2's state-court lawyer telling a state prosecutor in February 2023 that he

---

[10] Neither party explains the content of the letter from AV-2's lawyer to the state-court judge.

had had conversations with the USAO about AV-2's cooperation in the defendant's federal case; and (2) AV-2's state-court lawyer telling one of the defendant's federal defense counsel in April 2024 that the USAO "drafted a 'very nice' letter on behalf of [AV-2]." Dkt. No. 229 at 14 (citing Dkt. Nos. 229-2, 229-3). It is unclear how either of these pieces of evidence conflict with or impeach AV-2's January 9 trial testimony that she was unaware that her cooperation with the federal government could benefit her in her ongoing state case.

During the defendant's trial, when defense counsel asked AV-2 whether she was aware that her state defense counsel could ask the state judge to give her credit for her federal cooperation, she said, "Now I do. I'll sure tell him, thank you." Defense counsel now suggests that AV-2's state-court lawyer's decision to contact the USAO in February 2024—*after* AV-2's testimony and *after* the defendant's trial was over—to request a letter detailing AV-2's involvement in the defendant's case shows that AV-2 knew *before* she testified that she could benefit from her federal cooperation. The defendant makes this suggestion despite the more likely scenario supported by the evidence—that after learning during the defendant's federal trial from the defendant's federal lawyer that she could ask her state lawyer to try to seek credit in her state case for her federal cooperation, AV-2 did exactly what she told defense counsel she'd do. She went to her state-court defense attorney and asked him whether he could leverage her federal testimony to get her a benefit in state court. This court cannot discern how the state defense lawyer's conduct two months *after*

55

AV-2 testified shows that *before* she testified, she anticipated a benefit from that testimony.

The defendant also argues that the fact that the federal prosecutor provided AV-2's state-court lawyer with "a letter advocating for [AV-2] based on her cooperation at [the defendant's] trial" suggests that AV-2 expected and received a benefit for her cooperation with the government. Even if one construes the federal prosecutor's letter as the government advocating for leniency in AV-2's state-court case, the fact that the government provided that alleged advocacy *after* AV-2 testified at the defendant's trial does not conflict with AV-2's testimony *during the trial* that she did not anticipate a benefit for her testimony, or with the government's representation *during the trial* that it was not involved in AV-2's ongoing state-court case. Nor is the letter—even if it is construed as advocating for AV-2 in her state case—material to the count charging the defendant with sex-trafficking AV-2; it could not have led to an acquittal on that count because at the time the jury heard the evidence on that count, no such letter existed. The jury was entitled to credit AV-2's trial testimony, including her testimony that she did not expect any benefit for her testimony.

Nor does the court read the government's post-trial letter as "advocating" for AV-2 or asking the state court to give her some benefit. The defendant asserts that the letter constituted government "advocacy" in exchange for AV-2's trial testimony. But the letter contains only a factual account of AV-2's cooperation in the defendant's federal case. The letter states that AV-2

56

"cooperated and testified in a federal investigation." Dkt. No. 241-6. That is true. It states that AV-2 "is a victim in a sex trafficking case that was indicted and tried to a jury." Id. That is also true. It states that AV-2 "was cooperative with all requests that the case agents and [the federal prosecutor] made of her[.]" Id. The government's letter is a post-testimony recount of what AV-2 did, not a request that the state court take any action on AV-2's behalf. There is no way the government's post-trial factual recitation of AV-2's participation in the defendant's federal case could have affected how the jury weighed AV-2's credibility.

The defendant has given the court no reason to believe that the jury would not have found the defendant guilty of sex-trafficking AV-2 had the jury known at the time of their deliberations that a couple of months later, AV-2's state defense attorney would contact the federal prosecutors seeking a letter recounting her participation in the case and that the prosecutors would have provided such a letter. Again, AV-2 as much as told the jury that, newly armed with the knowledge that she might be able to leverage her federal cooperation in her state case (knowledge provided to her by the defendant's lawyer during cross-examination), she was going to ask her lawyer to do so. Yet the jury still found the defendant guilty of sex-trafficking AV-2. The court will not grant the defendant a new trial based on these post-trial communications between the government and AV-2's state-court lawyer.

The defendant's second argument relating to newly discovered evidence and AV-2 doesn't so much involve newly discovered evidence as it does

57

evidence that the defendant imagines might exist and which, if it does exist, the defendant wants to obtain. During trial the defendant highlighted that AV-2 was in state custody in August 2021, immediately before and at the time of her grand jury testimony, and that on the day after she testified before the grand jury, she was released from state custody and discharged from extended supervision. Dkt. No. 229 at 15 (citing Trial Exh. 578; Dkt. No. 217 at 82). The defendant now asks the court to suppose that when AV-2 first told law enforcement that she had been sex-trafficked by the defendant, she was telling a fabricated story in an attempt to avoid incarceration—and then, later on, when AV-2 "learned that she could both get out of jail and off supervision if she maintained her story and cooperated with law enforcement," she decided to stick to the false narrative. See id. at 16. In hopes of learning whether this speculative account might have some basis in fact, the defendant asks the court to issue a post-trial Rule 17(c) subpoena to the Wisconsin Department of Corrections "for records related to [AV-2's] August 2021 probation hold, including the officers' chronological logs, any other record identifying the basis of the arrest, the decision to detain, and the decision to release," as well as "any communication with law enforcement or government officials." Id. at 17.

The parties acknowledge that neither the Supreme Court nor the Seventh Circuit have held that Rule 17(c) subpoenas are available *after* trial, but both argue under the four-part test established by the Tenth Circuit in Winner, which adapted the Supreme Court's four-part test from United States v. Nixon,

418 U.S. 683 (1974), for assessing the propriety of *pre-trial* Rule 17(c) subpoena requests.

The <u>Winner</u> test's second factor requires the party seeking the post-trial production to show that the information sought was not "otherwise procurable in advance through the exercise of due diligence." <u>Id.</u> The words "in advance" admittedly are ambiguous, but <u>Nixon</u>, the Supreme Court case from which the <u>Winner</u> court fashioned its test—makes clear that "in advance" means "in advance *of trial*." <u>Nixon</u>, 418 U.S. at 699 ("[T]he moving party must show . . . (2) that [the documents] are not otherwise procurable reasonably in advance of trial by exercise of due diligence[.]"). In his initial brief, the defendant purports to satisfy the second factor by asserting that "[t]he defense has been unable to obtain the records any other way." Dkt. No. 229 at 18. But the defendant does not explain what attempts he has made to get the information or why he did not seek a Rule 17(c) subpoena *before* trial.

In his reply brief, the defendant explains that he did not seek records relating to AV-2's August 2021 release from MSDF because he did not know before trial that in August 2021 AV-2 was incarcerated at MSDF, or that she was released from MSDF after giving her August 25, 2021 grand jury testimony. Dkt. No. 257 at 14. The defense asserts that "it believed [AV-2] was out of custody [in August 2021] and had an active warrant, and that in exchange for her cooperation, she was not arrested on that warrant." <u>Id.</u> The defendant says that "[i]t was only after [AV-2] testified [at trial] that the defense learned not just that she was in custody [in August 2021] at [the time of her

59

grand jury testimony and her statements to the government], but also that she was released the day after providing her testimony." Id. at 14-15.

Defense counsel's cross-examination of AV-2 confirms that prior to trial the defense did not know that AV-2 was in state court custody in August 2021, when she gave her initial statements and her grand jury testimony. During cross examination, defense counsel asked AV-2 whether she had met with and spoke to FBI task force officers and federal prosecutors in August 2021. Dkt. No. 212 at 130. She confirmed that she had and confirmed that in August 2021 there were existing warrants for her arrest. Id. at 130-31. But when defense counsel asked AV-2, "You were not arrested on those warrants, were you?" she responded that she was, that "she went to MSDF for two weeks, and [then] was discharged off [her] probation." Id. at 131. Apparently surprised that AV-2 had been arrested in August 2021 and was in state custody, defense counsel responded, "So it's your testimony after providing those statements against [the defendant in August 2021], you were taken into custody and arrested?" Id. AV-2 clarified that *prior* to giving her grand jury testimony, she had been in custody at MSDF for two weeks, and that she was discharged after giving her grand jury testimony. Id. This interaction is consistent with defense counsel's assertion that the defendant "believed that [AV-2] was out of custody at the time of those statements[,] . . . had an active warrant, and that in exchange for her cooperation, she was not arrested on that warrant." Dkt. No. 257 at 14. It was apparently news to the defendant that AV-2 had been in

60

custody leading up to her grand jury testimony and had been released from custody subsequent to giving grand jury testimony.

But the question is not whether the defendant knew those facts before trial; it is whether, by exercising due diligence, the defendant *should* have known those facts before trial and should have acted *before* trial by seeking discovery, through a Rule 17(c) subpoena request or otherwise. Before trial, defense counsel knew that in August 2021 AV-2 had made statements to federal officials and had testified before the grand jury. Defense counsel also knew before trial that AV-2 had two outstanding arrest warrants—they appear to have suspected that those warrants might have been terminated after AV-2 gave her grand jury testimony. Had defense counsel exercised due diligence ahead of trial to determine AV-2's status in August 2021, they would have discovered that AV-2 had been discharged from probation/extended supervision and released from MSDF at that time. The defendant says that he could not have learned about AV-2's incarceration at MSDF any other way than a Rule 17(c) subpoena. But there were public records that the defense team could have accessed that would have shown that fact.

Defense counsel first filed an appearance in the defendant's case in December 2021. Dkt. No. 2. The government says that its early discovery to defense counsel included "a nine-page report of an interview of AV-2 dated August 23, 2021, that involved an FBI agent, an AUSA, an FBI Task Force Officer, and a victim specialist," as well as a "five-page report of an interview dated August 25, 2021." Dkt. No. 239 at 25. A search of AV-2's name on

61

Wisconsin's publicly available state court docket reveals a 2013 state case with information concerning where AV-2 was residing in August 2021. <u>State v.[AV-2]</u>, Case No. 2013CF133 (Waukesha County Circuit Court). The court docket for the case includes an August 30, 2021 entry that reads, "Discharge Certificate;" an August 31, 2021 docket entry that reads, "Notice of Status Change—Defendant was Discharged from Probation/Extended Supervision;" and a September 10, 2021 docket entry providing, "Change of address notification for [AV-2] . . . ADDRESS INFO . . . Current: . . . Sherman Ave, South Milwaukee . . . *Prior: 1015 N 10th Street, c/o Milwaukee Secure Detention Facility, Milwaukee, WI 53205*[.]" <u>Id.</u> (emphasis added). These public docket entries reveal that AV-2 was at the Milwaukee Secure Detention Facility prior to being discharged from probation/extended supervision in late August 2021.

The defendant effectively concedes that had defense counsel exercised due diligence before trial to determine AV-2's status in August 2021, counsel would have discovered that AV-2 was discharged from probation/extended supervision and released from MSDF at that time. In response to the assertion in the defendant's reply brief that counsel did not know before trial that AV-2 was incarcerated at MSDF in August 2021, the government filed a motion for leave to file a sur-reply to provide additional information. Dkt. Nos. 260 (motion for leave to file sur-reply), 261 (proposed sur-rely). The defendant responded to that request, stating that it did not oppose the government's request for leave to file a sur-reply but also responding to certain points raised in the sur-reply. Dkt. No. 266. The court granted the government's motion to file its proposed

62

sur-reply, noting that the defendant had used his response to the sur-reply to provide what amounts to a sur-sur-reply. Dkt. No. 270.[11]

In its sur-reply, the government says that the "[d]efendant's assertions about his lack of knowledge of the timing of AV-2's incarceration in August 2021 (and the implications that the Government failed to disclose this information) are contradicted by the record." Dkt. No. 261 at 2. The government says that on December 20, 2023—over a week before trial—the defendant turned over to the government a batch of his exhibits, one of "which was a record from the Department of Corrections showing AV-2's custody information." Id. at 2-3 (citing Dkt. No. 263). The government argues that "[t]hat document unequivocally shows that AV-2 was admitted to MSDF on August 13, 2021 and was released from MSDF on August 25, 2021." Id. at 3 (citing Dkt. No. 263). The government says that prior to trial the defendant also disclosed an exhibit list which included the same Department of Corrections record containing AV-2's custody information. Id. (citing Dkt. No. 264). The government argues that "[t]hese records contradict Defendant's claim that he only learned about AV-2's August 2021 incarceration *during* AV-2's testimony." Id. (emphasis in original).

In response, the defendant "maintains that [he] did not learn of AV-2's custody status at the time of her grand jury testimony until the trial in this matter." Dkt. No. 266 at 1. The defendant admits that he "did have records

---

[11] Likely that that is why neither the Federal Rules of Criminal Procedure nor this court's local rules expressly allow sur-replies—sur-replies invite sur-sur-replies, which invite sur-sur-sur-replies, *ad infinitum.*

showing AV-2's DOC custody dates, which are publicly available," but he asserts that he "had only analyzed that DOC custody history for the timeframe alleged in the indictment, which stopped as to AV-2 in May 2020." Id. at 1 (citing Dkt. Nos. 263; 17 at 2). The defendant recounts that at trial he "used those records to focus on AV-2's actions in the timeframes following her release from prison as evidence that her sex work was voluntary and independent of [the defendant]." Id. But he concedes that he "should have connected those dots," admitting that had he exercised due diligence before trial in reviewing those documents to determine AV-2's status in August 2021, he would have discovered that she was discharged from probation/extended supervision and released from MSDF at that time. Id. at 2.

So—although the defendant was unaware that AV-2 was in custody at MSDF in August 2021 when she first met with the government and gave her grand jury testimony, Wisconsin's publicly available online state-court docket reveals that fact and the defendant had AV-2's Department of Corrections records reflecting her custody information ahead of trial but failed to "connect the dots." The defendant was on notice that AV-2 was released from MSDF shortly after meeting with the USAO and giving her grand jury testimony. Had the defendant wished to investigate whether that release from MSDF was somehow related to AV-2's August 2021 statements to the government or her grand jury testimony, the defendant had ample time to do so before trial—by requesting a Rule 17(c) subpoena or otherwise.

Obtaining a Rule 17(c) subpoena post-trial requires showing that the information sought was not otherwise procurable in advance of trial through the exercise of due diligence. <u>Winner</u>, 641 F.3d at 833. The defendant has not made that showing, and the court will not grant the defendant's motion for a post-trial Rule 17(c) subpoena and a related evidentiary hearing.

        d.     Coconspirator's Undisclosed Pre-Trial Behavior

        i.     **Parties' Arguments**

The defendant asserts that after trial, the government disclosed certain evidence bearing on Ericka Buie's character for truthfulness, including "a May 2023 lie to Meta House[12] staff after being discharged for curfew violations" and evidence indicating "that Buie was dishonest with pretrial services about her drug use during January 2024." Dkt. No. 229 at 19-20. The defendant recounts that "Buie testified on January 12, 2024, and January 16, 2024;" he asserts that "[o]n January 17, 2024, her sweat patch yielded a positive result for cocaine," which she denied using. <u>Id.</u> at 20. The defendant argues that "[t]his evidence is not just newly discovered evidence, it's also *Brady/Giglio* material that should have been disclosed before trial." <u>Id.</u> (citing <u>United States v. Combs</u>, 267 F.3d 1167, 1174-75 (10th Cir. 2001)). Although the defendant concedes that these instances of Buie's untruthfulness "may not themselves warrant a new trial," he argues that "they are a factor, amongst other more

---

[12] Meta House is a facility in Milwaukee which assists women recovering from substance abuse disorders. www.metahouse.org/about.

compelling factors, that when taken together, warrant a new trial in the interests of justice." Id.

The government says that pretrial services' post-trial report about Ms. Buie "could arguably be considered both new and evidence, because it is the only potentially admissible fact that the parties have learned since trial." Dkt. No. 239 at 29. But while the defendant argues (1) that the government violated Brady and Giglio by failing to disclose this information earlier and (2) that the information warrants a new trial, the government argues that the defendant is incorrect on both points.

The government asserts that "[t]o obtain a new trial under *Brady*, a defendant must establish that (1) the prosecution suppressed evidence; (2) such evidence was favorable to the defense; and (3) the suppressed evidence was material." Dkt. No. 239 at 29-30 (citing United States v. White, 970 F.2d 328, 337 (7th Cir. 1992)). The government argues that "it did not suppress evidence because the government had no knowledge of the information disclosed by pretrial services before it saw pretrial services' February 1, 2024, Release Status Report appear on the docket." Id. at 30 (citing Dkt. No. 195). The government says that at that point, it downloaded and forwarded the report—which was filed under seal and accessible only to the court and the government—to defense counsel as discovery. Id.

According to the government, "[i]t is well settled that the prosecution's obligation in a criminal proceeding to disclose information is limited to information known to the prosecution," and argues that the question is

66

whether information in the probation department's control but not disclosed to the government is considered to have been "known" by the government. Dkt. No. 239 at 30 (citing Mendoza v. Miller, 779 F.2d 1287, 1297 (7th Cir. 1985)). The government acknowledges that a Tenth Circuit decision—United States v. Combs, 267 F.3d 1167 (10th Cir. 2001)—supports the notion that it can be assumed that the prosecution is privy to information in pretrial services' hands, but the government argues that the Combs court "pointedly chose not to resolve what it perceived as a tension in the case law on this topic." Id. (citing Combs, 267 F.3d at 1175). The government points out that since the Combs decision, "the Third Circuit has held that information in the probation department's control is *not* imputed to the government," and that "[a] district court in this circuit reached the same conclusion." Id. (citing United States v. Lacerda, 958 F.3d 196, 219 (3d Cir. 2020); United States v. Jordan, Case No. 12-CR-102, 2014 WL 2004146, at *3 (S.D. Ind. May 15, 2014)). The government argues that "there is little reason to credit dicta of the Tenth Circuit over a clear holding of the Third Circuit and more recent decision from a sister court in this Circuit." Id. at 31.

The government also argues that "the information about Ms. Buie was cumulative, would only have potential relevance for impeachment, and was not, therefore, material." Dkt. No. 239 at 31 (citing United States v. Davis, 960 F.2d 820, 825 (9th Cir. 1992); United States v. Chappell, 990 F.3d 673, 678 (8th Cir. 2021) (internal citation omitted)). It asserts that "Buie's credibility was explored in detail by the defense[,] [she] acknowledged that she lied on several

67

occasions . . . , and the defendant explored the potential that she was biased in favor of the government because of the plea offer she received." Id. (citing Dkt. No. 216 at 20-22, 92-95). The government argues that it is unlikely that the "lies to pretrial services about her drug use would have meaningfully impacted the jury's assessment of her credibility." Id. at 31-32. As a final note, the government recounts that the defense theory was not that Buie was a liar but instead that she was "*truthful* with law enforcement in her denials about her and the defendant's involvement in sex trafficking, and that she only lied in the lead-up to trial to garner a beneficial plea deal from the government." Id. (citing Dkt. No. 218 at 102-03). It asserts that evidence of Buie's drug use and untruthful statements to pretrial services "would have been of questionable benefit to the defendant's approach to Ms. Buie as a witness." Id.

The defendant replies that because Pretrial Services has a duty to disclose bond violations to the government (citing 18 U.S.C. §3145(5)), he "assumed, perhaps erroneously, that the government was aware" of Buie's lack of truthfulness with Meta House staff and with pretrial services. Dkt. No. 257 at 16. He says that "[e]ither way, as with the post-trial revelations about [AV-4], the revelation of Buie's untruthfulness is another factor, amongst many others, warranting a new trial in the interest of justice." Id.

### ii. **Discussion**

Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1967). "To make a

68

successful *Brady* claim, a defendant must establish the following: '(1) that the prosecutor suppressed evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material.'" United States v. White, 970 F.2d 328, 337 (7th Cir. 1992) (quoting United States v. Hartmann, 958 F.2d 774, 790 (7th Cir. 1992)). "[T]he rule requiring prosecutors in criminal proceedings to disclose information is limited to information known to the prosecution." Mendoza v. Miller, 779 F.2d 1287, 1297 (7th Cir. 1985) (citing Giglio, 405 U.S. 150).

The defendant's argument fails at the first prong of the Brady test—he has not established that the prosecutors suppressed evidence. The parties have identified no Seventh Circuit law establishing that knowledge in the possession of pretrial services is imputed to the government, but that's beside the point.[13] The defendant "assumed" that pretrial services had made the government aware of the information about Buie's lack of candor with Meta House and pretrial services, but it is not clear why the defense would have made that assumption. The February 1, 2024 report—which the government turned over to the defense after it was docketed—does not state that pretrial services conferred with the government before filing it. Dkt. No. 195. That is likely

---

[13] The court has reviewed the Third Circuit's decision in Combs and, with respect, believes that court's analysis incorrectly relied on a series of cases that imputed to the government knowledge in the possession of other *executive branch* agencies. In the federal system, both the Pretrial Services and Probation offices are part of the United States District Court—the *judiciary* branch. See, *e.g.*, https://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-services-mission.

69

because the February 1, 2024 report does not recommend that the court revoke Buie's bond, or modify the conditions of her bond, or take any action at all. At the time the report was written, Buie was scheduled to appear a week later to change her plea. The report is addressed to the *court*; its purpose was to update the *court* about Buie's pretrial release conduct ahead of Buie's change-of-plea hearing, which at that point was scheduled for February 8, 2024. There was no need for pretrial services to consult with the government before preparing or filing the report; if the government thought the information in the report warranted some action by the court, it would have been able to make that request at the change-of-plea hearing. There is nothing in the report to warrant the defendant's assumption that pretrial services consulted with the government about the information in that report before preparing or filing it.

The defense cites 18 U.S.C. §3145(5) for the proposition that pretrial services has an obligation to disclose bond violations to the government. Dkt. No. 257 at 16. The court suspects the defendant meant to reference 18 U.S.C. §3154(5), which requires pretrial services to "[i]nform the court and the United States attorney of all apparent violations of pretrial release conditions . . . and recommend appropriate modifications of release conditions." Pretrial services did exactly that in preparing and filing the February 1, 2024 update; the statute does not require pretrial services to inform the government of any alleged bond violations *before* filing a report or notifying the court.

Because the government could not suppress information it was not aware existed, the defendant's <u>Brady</u> claim relating to Ericka Buie's February

1, 2024 Pretrial Services report fails. The same is true for the defendant's argument that the information in the report constituted information requiring pretrial disclosure under Giglio, 405 U.S. 150 (1972)). The government cannot disclose pretrial information that it did not become aware of until after trial.

The defendant also argues that the report constitutes newly discovered evidence warranting a new trial. Again, the defendant must show that the evidence "(1) came to [his] knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it been heard by the jury." Mitrione, 357 F.3d at 718.

The update revealed that between February and May 2023, Buie had been at Meta House, a sober living and intensive outpatient treatment facility, but that she had been discharged in May 2023 due to curfew violations. Dkt. No. 195 at 2. It reported that she had been untruthful with the Meta House staff about why she'd violated curfew. Id. The update recounted that in December 2023 (shortly before the trial was to begin), Buie had experienced a mental health incident for which she had received treatment. Id. at 3. Finally, the update reported that Buie had been untruthful with her probation officer about a sweat patch—applied January 1, 2024 and removed January 17, 2024—that yielded a positive result for controlled substances. Id. at 4.

The defendant has shown the first Mitrone factor—that this information came to his attention only after trial—and the second factor—that he could not have discovered it sooner with due diligence. But he has not demonstrated the

third or fourth factors—that the information was material or that it would probably have led to an acquittal had it been heard by the jury.

The government elicited testimony from Buie that she had been diagnosed with bipolar psychosis and that at the time of the trial it was controlled with medication but that in the past, it had been uncontrolled. Dkt. No. 216 at 17-18. It elicited testimony from her that she had not been truthful with law enforcement about whether drug trafficking or prostitution had been happening at her house. *E.g.*, id. at 20-21. It elicited testimony that she lied during interviews with the government. Id. at 21-22. Buie's bipolar disorder featured prominently in her testimony about how she met the defendant. Id. at 23-25. The government elicited testimony that Buie was jealous of the sexual relationships the defendant had with other women. *E.g.*, id. at 71-74. The defense elicited the fact that Buie did not want to be in court, testifying. Id. at 85. The defense suggested that Buie had embellished her trial testimony—particularly the testimony that she was suspicious that the defendant had been violent with other women. *E.g.*, id. at 91-93. It elicited from Buie the fact that her plea agreement exposed her to a much-reduced statutory maximum penalty than she'd faced at the time she was charged. Id. at 95-96. The defense elicited from Buie the fact that she was angry at the defendant. Id. at 96- 97. The defense thoroughly explored Buie's own participation in the sex-trafficking offenses. Id. at 98-102.

The jury knew, then, that Buie suffered from bipolar psychosis disorder, that she had lied to law enforcement and the prosecutors, that she was jealous

72

of the defendant's sexual relationships with other women, that she did not want to testify at the trial, that she had testified to things she'd not said in earlier interviews, that she was facing reduced punishment as a result of her plea, that she was angry at the defendant and that she, herself, had been integrally involved in sex trafficking. It begs belief that, though possessed of all this information, the jury appears to have credited Buie's testimony, but if it had known that she had been terminated from Meta House for curfew violations, suffered a mental health crisis a couple of weeks before the trial and had tested positive for controlled substances in the period during which the trial took place and been untruthful about it, it would have acquitted the defendant.

Because the defendant has not demonstrated that the information in the February 2024 pretrial services update would have led to an acquittal had it been heard by the jury, the defendant is not entitled to a new trial on this ground.

4.    *Hearsay Rulings*

The defendant argues that the court's hearsay rulings during trial "deprived [him] of his right to present a complete defense" and warrant a new trial under Rule 33. Dkt. No. 229 at 21. He argues that the court erred when (1) ruling that certain Facebook messages between AV-4 and the defendant— which the defendant proffered as exhibits—were self-serving hearsay; (2) ruling that the Facebook messages in the proffered defense exhibits did not fit Federal Rule of Evidence 803(3)'s hearsay exception for showing then-existing states-of-

73

mind; (3) ruling that the Facebook messages did not fit the rule of completeness exception to the rule against hearsay; and (4) ruling that excerpts from AV-2's interview with the Glendale Police Department (GPD) were admissible as prior consistent statements under Fed. R. Evid. 801(d)(1)(B)(ii). Id. at 21-23.

The defendant's first three arguments relate to errors the court allegedly made when ruling on the admissibility of certain Facebook messages in proposed defense exhibits 551A-551O, and 552B. The court has twice explained the reasoning for its ruling on the admissibility of those Facebook messages. The defendant acknowledges as much in his brief: "[T]he defense does not include this section of the mind that it will cause the Court to reverse its position on these rulings, though it certainly wouldn't oppose the Court doing so. Rather, the defense includes this section to preserve the argument." Dkt. No. 229 at 21.

The messages are inadmissible hearsay that do not fit Fed. R. Evid. 803(3)'s then-existing state-of-mind hearsay exception, nor the rule-of-completeness hearsay exception. During trial, the defendant orally presented argument on the admissibility of these exhibits, with supporting caselaw. Dkt. No. 213 at 525-28. The court rejected those arguments in an oral ruling. Id. at 643-53. The defendant again argued for their admissibility, asking the court to reconsider its ruling in his "Motion for Reconsideration Regarding the Admissibility of Exhibits." Dkt. No. 168. The government responded to that motion, dkt. nos. 172, 180, and the court again rejected the defendant's

74

arguments in an oral ruling during trial, dkt. no. 216 at 125-42. The defendant's post-trial motion provides the court no reason to reverse those rulings. The defendant's related arguments are preserved in the record. The court will not repeat its reasoning for a third time.

But the defendant's fourth argument—that court erred in finding that excerpts from AV-2's interview with the GPD were admissible as prior consistent statements under Rule 801(d)(1)(B)(ii)—did not receive the same level of attention at trial as the Facebook conversations, so the court will address here the defendant's contention that the court erred in admitting three exhibits containing video clips from AV-2's 2016 interview with the GPD.

a.　AV-2's Interview with the Glendale Police Department

i.　**Background**

During the government's redirect of AV-2, the government offered into evidence three exhibits containing video clips from AV-2's 2016 interview with the GPD. The government's theory of admissibility for the video clips was that they were prior consistent statements admissible under Fed. R. Evid. 801(d) to counter the defendant's suggestion on cross-examination that AV-2 had a motive to lie. The defense objected to the admissibility of the clips under Rule 801(d), arguing that they did not qualify as prior consistent statements "because the statement did not pre-date an 'express or implied charge that the declarant recently fabricated it or acted from a recent improper motive.'" Dkt. No. 229 at 27 (citing Fed. R. Evid. 801(d)(1)(B)(i); <u>Tome v. United States</u>, 513

U.S. 150 (1995)). The defendant argued that "it was [his] position that [AV-4's] motive to lie predated and infected all her statements and her testimony." Id.

The court ruled that AV-2's statements from the video clips fit Rule 801(d)(1)(B)(ii)'s hearsay exception, which, the court observed, allows admission of what otherwise would constitute inadmissible hearsay for purposes of "rehabilitat[ing] a declarant's credibility when the witness has been attacked." Dkt. No. 212 at 202. The court explained that on cross-examination, defense counsel attacked AV-2's credibility, and therefore that the videos were admissible as prior consistent statements to rehabilitate AV-2's credibility. Id.

### ii. **Parties' Arguments**

The defendant cites to a Fifth Circuit case for the proposition that "Rule 801(d)(1)(B)(ii) cannot swallow the important temporal limitation of Rule 801(d)(1)(B)(i)." Dkt. No. 229 at 27 (citing United States v. Portillo, 969 F.3d 144, 175-76 (5th Cir. 2020)). He argues that "courts have applied Rule 801(d)(1)(B)(ii) only in instances in which a witness's credibility is attacked in ways other than those set forth in 801(d)(1)(B)(i)." Id. The defendant says that, "[f]or example [the court] might apply [Rule 801(d)(1)(B)(ii)] to rebut a charge of inconsistency," or "where an opposing party accuses the witness of misremembering an event." Id. at 27-28 (citing United States v. Purcell, 967 F.3d 159, 197 (2d Cir. 2020); United States v. Cox, 971 F.3d 479, 487 (6th Cir. 2017)). He argues that "[Rule 801(d)(1)(B)(ii)] cannot apply to rebut a claim of motive to fabricate unless the consistent statement was made before that motive arose." Id. at 28. The defendant says that because "[AV-2's] motive to

76

appear a victim existed when she first made a statement against [the defendant]"—which was before the 2016 video clips—those video clips did not meet Rule 801(d)(1)(B)(ii)'s exception to the rule against hearsay. Id. The defendant argues the video clips were "hearsay that was used to impermissibly bolster [AV-2's] testimony." Id. And because "impermissible bolstering is especially prejudicial in a case like this, where the government's case relies extensively on the credibility of its witnesses," the defendant argues that the court's allegedly erroneous hearsay ruling "weighs in support of granting a new trial." Id.

The government responds that the court properly admitted the videos. Dkt. No. 239 at 35. The government points out that "Rule 801(d)(1)(B)(ii) permits a party to introduce a witness's prior statement to rehabilitate the declarant's credibility when attacked 'on another ground.'" Id. at 37. It recounts that "[i]n this case, the defense attacked AV-2's credibility repeatedly on a variety of grounds." Id. "The defense called her liar, referenced prior bad acts, and discussed purported inconsistencies in her testimony." Id. The government argues that "[i]t was . . . appropriate to admit AV-2's prior statements to rehabilitate her testimony regardless of when the defense argues her purported motive to lie arose." Id. at 37-38 (citing United States v. Davis, 896 F.3d 784, 788-89 (7th Cir. 2018); Purcell, 967 F.3d at 197; United States v. J.A.S., Jr., 862 F.3d 543 (6th Cir. 2017)).

The government says that it "did not seek to introduce portions of the interview in which AV-2 disclosed to the GPD the substance of what the

defendant had done to her." Dkt. No. 239 at 38. It acknowledges that had it done so, "the defendant may have been able to argue the government impermissibly 'bolstered' [AV-2's] testimony." Id. The government asserts that it "only introduced statements AV-2 made about her hesitancy to be a witness against the defendant and her desire to just get away from him without being labeled a 'snitch' or the cause of him going to jail." Id. Because "[t]hese statements directly refuted the defendant's assertion that AV-2 incriminated him because she wanted to make herself a victim," and "served to rehabilitate her credibility after it was attacked for generally lying, breaking the law, and being inconsistent," the government argues that "Rule 801(d)(1)(B)(ii) clearly applied."[14] Id. at 38-39.

The government maintains that because the court properly admitted AV-2's 2016 statements to the GPD about her motive not to be a witness against the defendant, "their admission is not grounds for a new trial here." Dkt. No. 239 at 40. It argues that "[t]his is especially true because the defendant pressed a theory about AV-2's lack of credibility that lacked any factual basis in the record." Id. The government contends that "other than nebulous suspicions about why AV-2 was not charged in certain instances, or why she received lower penalties than he believed she should have, the defendant proffered no evidence that AV-2 *actually* benefitted from any of her statements against him." Id. While at trial the government objected to this line of

---

[14] The government also argues that the court could have properly admitted AV-2's statements under Federal Rules of Evidence 801(d)(1)(B)(i) and 803(3). Dkt. No. 239 at 39-40.

questioning, arguing that "the defendant had no good-faith basis for these arguments," and that they were therefore "inappropriate and unfairly prejudicial," the government recounts that "the Court gave the defendant 'latitude' to continue exploring the issue," and "the defendant did so at length." Id. (citing Dkt. No. 212 at 120-21). The government asserts that given this context, "the nature of the defendant's questioning of . . . AV-2 created a risk of presenting an extremely misleading narrative for the jury." Dkt. No. 239 at 41. The government says that "it would have been unfairly prejudicial for the court to exclude the clear evidence that directly refuted the defendant's attacks on AV-2's credibility, particularly considering the multiple grounds for admissibility." Id.

iii.   **Discussion**

The defendant signaled during his opening statement that a major theme of the defense would be AV-2's allegedly questionable credibility. During the opening statement, defense counsel told the jury that "[the government's case] all started with a massive lie, a lie from a woman [AV-2]." Dkt. No. 212 at 30. Defense counsel predicted, "The evidence is going to show that [AV-2] has a very troubling connection with the truth. She has lied nearly every time she's had an opportunity with law enforcement. Little lies, big lies, nothing but lies." Id. The defense asserted that AV-2 had learned that she could avoid criminal charges if she told investigators a "story about how she was beaten and forced into prostitution, how [the defendant] got her hooked onto heroin to do so." Id. at 31. The defense told the jury, "[Y]ou'll get more than a motive to lie and a

79

history of lying from this woman. You'll see direct evidence that she's been lying to the investigators and the prosecutors all along." Id.

During its cross-examination of AV-2, the defense built on this theme, attacking AV-2's credibility from multiple angles. The defense attacked her credibility based on instances in which she misidentified herself to law enforcement, dkt. no. 212 at 110-17, specific instances of her criminal conduct, id. at 119, and inconsistencies in her testimony regarding the defendant's use of heroin to control her, id. at 108-09; 141-44. The defense explored extensively its theory that AV-2 hoped to trade her trial testimony and cooperation for government support in her ongoing state-court case. Id. at 134-41. This contention fit the defense narrative that AV-2 was offering her testimony against the defendant to avoid her own criminal liability, as she had done in the past. Finally, defense counsel introduced statements that AV-2 made to the GPD in 2016, id. at 141, 157-58, later suggesting in closing argument that those statements were lies fitting the defense theme that AV-2 had a practice of telling law enforcement that she was being victimized by the defendant in order to get herself out of legal trouble, dkt. no. 218 at 70-73.

Following defense counsel's lengthy cross-examination of AV-2, in an effort to rehabilitate AV-2's credibility the government sought to admit under Rule 801(d)(1)(B) other statements AV-2 made during her 2016 encounter with the GPD. In the government's proffered statements of AV-2, she told the GPD officers that she did not want the defendant to get in trouble as a result of the information she was giving them, that she did not want to be a cooperating

witness, that she did not feel there was a way out of her situation and that she did not want anyone knowing what she disclosed because she did not want to "snitch." Dkt. No. 212 at 220-22. The government recounted that "the defense ha[d] made multiple arguments that [AV-2] had a motivation to tell law enforcement a fabricated story about [the defendant] controlling her, a fabricated story about what he did to her," and argued that its proffered clips from AV-2's 2016 encounter with the GPD "directly refute[d] the motivation [the defendant] claim[s] she had because she says . . . that she . . . doesn't think law enforcement will do anything and she doesn't think it will benefit her and she doesn't want to be responsible for telling on him." Id. at 197-98.

Finding that AV-2's statements from the video clips fit Rule 801(d)(1)(B)(ii)'s hearsay exception, the court overruled the defendant's hearsay objection to the exhibits. Dkt. No. 212 at 202. The court explained that 801(d)(B)(ii) "says that a consistent statement is not hearsay if it's offered to rehabilitate the declarant's credibility as a witness when attacked on another ground." Id. at 201. The court remarked that the defense "unquestionably" attacked AV-2's credibility on grounds unrelated to statements she made to law enforcement when the defendant alleged that AV-2 made the statements regarding the defendant for purposes of getting herself out of trouble. Id. at 201-02.

Federal Rule of Evidence 801(d)(1)(B) states:

(d) **Statements That Are Not Hearsay**. A statement that meets the following conditions is not hearsay:

(1) **A Declarant-Witness's Prior Statement**. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

. . .

> (B) is consistent with the declarant's testimony and is offered:

>> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

>> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

In arguing that the government's excerpted video clips from AV-2's 2016 interview with GPD cannot meet 801(d)(1)(B)(ii)'s hearsay exception because the statements do not predate AV-2's alleged motivation to lie, the defendant—both at trial and here—relies on Tome, 513 U.S. 150. Dkt. No. 212 at 197; 229 at 26-28. Tome stands for the proposition that under Rule 801(d)(1)(B), a consistent statement offered to rebut a charge of recent fabrication or improper influence or motive must have been made before the alleged fabrication or improper influence or motive arose. Tome, 513 U.S. at 158. But as the Seventh Circuit pointed out in Davis, 896 F.3d at 788-89, "the language analyzed in Tome is now found in Rule 801(d)(1)(B)(i)." Id. at 788-89. Accordingly, the Seventh Circuit has said that "it [is] unclear whether the rule from *Tome* applies to Rule 801(d)(1)(B)(ii) as it unequivocally does to Rule 801(d)(1)(B)(i)." Id. at 789. Given that uncertainty, the Seventh Circuit has dismissed as "a debatable requirement" the interpretation that to fit Rule 801(d)(1)(B)(ii) the

82

proffered statement must predate the alleged motive to lie—the interpretation of Rule 801(d)(1)(B)(ii) for which the defense argues here. Id. at 789.

The defense has provided no reason for the court to reconsider its conclusion that the exhibits containing AV-2's excerpted statements from her 2016 encounter with GPD fit into Rule 801(d)(1)(B)(ii)'s hearsay exception for consistent statements used to rehabilitate the declarant's credibility as a witness when attacked on another ground—despite defense claims that AV-2 made the statements after she purportedly developed her motive to lie. During cross-examination of AV-2, the defense returned to its opening theme: that AV-2 was a liar—not just lying about the defendant when she felt that lying about him could help her out of her own legal issues—but a liar in general. Dkt. No. 212 at 110-17 (instances of AV-2 misidentifying herself to law enforcement); 117-18 (attempting to get in evidence over an objection of AV-2 committing theft on camera at a Home Depot and explaining during sidebar that "[AV-2's] credibility is an issue in this case. She was on camera stealing something. . . . It is a specific instance of untruthful conduct."); 119 (instances of AV-2's own past bad acts); 140-44 (inconsistencies in AV-2's testimony about her drug use). While the defense argued that AV-2 told lies specifically about the defendant when attempting to escape her own criminal liability—as explained above, that was a major theme of the defense—it also argued that AV-2 was, in general, a liar not to be believed. Id. at 110 ("Q. [AV-2], what do you call a person who tells lies? A. A liar."). Because defense counsel cast AV-2 not only as a liar when talking about the defendant to law enforcement but as a liar

83

when discussing matters unrelated to the defendant, the video excerpts from AV-2's 2016 conversation with the GPD (in which AV-2 made statements consistent with her testimony on direct that her purpose in talking about the defendant was not a hope that she might benefit her in her own ongoing legal issues) fit Rule 801(d)(1)(B)(ii)'s hearsay exception as past consistent statements offered to rehabilitate AV-2's credibility as a witness when her credibility was attacked on another ground. Because the court did not err when overruling the defendant's hearsay objection and finding that the exhibits met Rule 801(d)(1)(B)(ii)'s hearsay exception, that ruling does not provide a basis for granting the defendant's motion for a new trial.

### 5.    *Curative Instructions*

The defendant asserts that during trial "the government twice sought a curative or limiting instruction . . . for what it perceived to be improper questioning or inferences from questions," and the court twice "gave a curative instruction without giving notice that it was going to do so and what its instruction would be." Dkt. No. 229 at 28. The defendant contends that this constituted error for two reasons. First, he argues that the defendant's questions of the witnesses "were not improper and the inferences they raised were proper, logical, consistent with the evidence, and consistent with common sense." Id. Second, he says that "the Court did not give the defense notice that it was going to issue a curative instruction or what the content of that instruction would be," resulting in "instructions that misstated the law and incorrectly implied that defense counsel was being misleading." Id.

84

a.    AV-3's Witness Fees

i.    **Background**

The defendant argues that the first instance of the court giving an improper curative instruction "occurred on the fourth day of trial during the cross examination of [AV-3]." Dkt. No. 229 at 29. He asserts that, "[p]rior to trial, the government made multiple *Giglio* disclosures to the defense," including disclosures indicating "that the United States Attorney's Office had submitted four separate $40 applications for witness fees for [AV-3's] trial preparation meetings with the prosecutors," and that "the FBI and U.S. Attorney's Office employees provided [AV-3] with food and a winter coat." Id.[15] During cross-examination, the defense "asked [AV-3] about the treatment she received from the prosecutors and agents," including questions about whether the prosecutors were "nice" to her, "told [her] that the things that happened to [her] were wrong" and "continued to help [her]." Id. (citing Dkt. No. 214 at 250-51). Although the government did not object to those questions, it did object when the defense asked AV-3 whether the prosecutors had "fed [her] and paid [her] for [her] time with them over the last few weeks on occasion." Id. (citing Dkt. No. 214 at 250-51).

When the government objected, the court called a sidebar. The court asked the defense what it was referring to and the defense responded that the government had "provided a *Giglio* disclosure saying [the prosecutors]

---

[15] Defense counsel did not mention during trial that as part of its Giglio disclosures, the government had revealed that AV-3 had been provided food and a winter coat.

submitted applications for compensation for [AV-3's] trial preparation sessions." Dkt. No. 214 at 251. The government responded that the fee was statutory, that every witness is entitled to a $40 fee to reimburse the witness for time and travel and that it would be seeking a curative instruction. Id. The court agreed with the government that the $40 fee was statutory and that the government was not, as the defense had phrased it, "paying someone for their time." Id. The court then gave the following curative instruction:

> Members of the Jury, [defense counsel] asked the witness whether or not the Government had paid her for her time over the last couple weeks. There's a federal law that requires that when someone is a witness and they come to court, they get a witness fee. It's a small fee to help offset the fact that they are missing work or have to drive down here or whatever the case may be.

> The Government has confirmed that they paid their witness that witness fee. They have to under the law, but that is not paying somebody for their testimony or paying someone for their time.

Id. at 252.

On the next day of trial, before the jury entered the courtroom, the court made a further record about the statutory basis for the fee alluded to by defense counsel on the previous day. Dkt. No. 215 at 7-8. The court recounted that 28 U.S.C. §1821, "which relates to a per diem and milage and subsistence," provides that "the witness in attendance in any court of the United States . . . shall be paid the fees and allowances provided by this section." Id. at 7. The court continued, "[The statute] then . . . goes through what the per diem payment is. It goes through what the subsistence payment is, basically comes down to the $40 witness fee, but that's mandatory under 28 USC 1821." Id. Defense counsel sought to clarify, explaining that his question

meant to address the $40 payments that AV-3 received for her pretrial preparation meetings with prosecutors—not the payments she received for her attendance at trial. Id. at 8. The defense said those pretrial preparation payments were relevant because they were "something that she is receiving, and it has the potential to go to her bias." Id. The court disagreed, opining that those payments do not go toward her bias "because the Government's required to pay it to her regardless." Id. The court added that had the government not paid the fees, "they'd be in violation of the law" and thus the payments had nothing to do with AV-3 expecting to receive some sort of benefit from the government. Id.

During the jury instruction conference, the court addressed a Seventh Circuit Pattern Jury Instruction about interviewing witnesses—Pattern Instruction 3.02. Dkt. No. 217 at 127. The government asked whether the court would include a modification to the instruction regarding the testimony concerning witness fees—something along the lines of the court's previous curative instruction on the issue. Id. The court responded that it was not inclined to give another instruction on the issue because, while it felt its previous instruction was appropriate, additional instruction could lead to confusion. Id. at 127-28. The defendant made a further record about the court's previous curative instruction, arguing that while "[t]he statute that the Court cited [18 U.S.C. §1821] requires witnesses . . . who are coming to court to testify in a matter before a court are entitled to receive . . . payment," "the statute does not provide that a witness is to be compensated under that

87

provision for meetings and trial preparation with the lawyers for the Government and law enforcement." Id. at 128. The defendant clarified that his question relating to the $40 payments AV-3 received "wasn't intended to suggest that she was expecting something for her testimony that day" but, rather, was intended to suggest that she had received payment "for her multiple meetings with law enforcement leading up to her testimony." Id. The defense said that whether AV-3 was receiving the payments for her witness preparation meetings with the government or for her trial testimony might be "a distinction without a difference," it nonetheless wanted to make that clarification. Id. at 128-29.

### ii.　Parties' Arguments

The defendant asserts that "[a]s the defense stated during the instruction conference, 28 U.S.C. § 1821 does not provide for witness [sic] to receive a fee for their pretrial preparation meetings with prosecutors . . . it directs that witnesses *attending court* shall receive the witness fees allowed by the statute." Dkt. No. 229 at 31. He argues that "the government's use of § 1821 witness fees for pretrial preparation of witnesses was a benefit that the government sought to provide some of its witnesses," but not all witnesses. Id. at 32. The defendant argues that the government "provided the fee only to the alleged victims: people living in extreme poverty who were reluctant to cooperate with the prosecution." Id. The defendant argues that the fees are "incentive[s] relevant to [AV-3's] bias." Id.

The defendant asserts that "defendants have the right to cross-examine witnesses and expose 'a witness' motivation in testifying.'" Dkt. No. 229 at 32 (quoting <u>United States v. Beck</u>, 625 F.3d 410, 419 (7th Cir. 2010); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986)). He contends that "[e]xposure of these motivations lies at the 'core' of the confrontation right." <u>Id.</u> (citing <u>Beck</u>, 625 F.3d at 419; <u>United States v. Presbitero</u>, 569 F.3d 691, 703 (7th Cir. 2009)). The defendant argues that because "[AV-3's] financial interest in cooperating with the government goes precisely to [her motivation in testifying], he "should [have] be[en] given reasonable latitude in cross-examining" her on the matter. <u>Id.</u> (citing <u>United States v. Manske</u>, 186 F.3d 770, 777 (7th Cir. 1999)). He asserts that he was not only denied reasonable latitude in cross-examining AV-3 about her bias but was "punished . . . for exploring her bias." <u>Id.</u> The defendant argues that the court's instruction "told the jury that [his] lawyer was being misleading, when that was simply not the case." <u>Id.</u>

The government responds that "[t]he court's instructions on witness fees accurately stated the law and appropriately avoided jury confusion." Dkt. No. 239 at 43. It argues that the defendant is mistaken in his assertion that "the relevant authority only requires, and indeed only authorizes, the government to pay witnesses an attendance fee when they appear in court for trial." <u>Id.</u> (citing Dkt. No. 229 at 31). The government states that the defendant provides no support for his argument "that the government was selective in its payment of witness fees"—it asserts that it "submits vouchers for every legally eligible witness (unless they decline) who physically appears for a pre-trial preparation

89

conference and who is not a law enforcement officer or a paid expert." Id. at 43 n.9.

Witness fees, the government argues, are not "only payable when witnesses appear in court to testify"—rather, they "apply to pre-trial conferences as well." Id. at 43. It says that "[s]ection 1821(b) of Title 28 requires a witness fee of $40 for each day of a witness' 'attendance.'" Id. "The implementing regulation that defines the circumstances that count as 'attendance' is found in [28 C.F.R. § 21.1 to § 21.4]." Id. at 43-44. The government recounts that the C.F.R. explains that "witnesses are entitled to a witness fee and expenses whenever they attend a 'judicial proceeding.'" Id. at 44 (citing 28 C.F.R. §21.4). According to the C.F.R., a "judicial proceeding" includes "pre-trial conferences," which, in turn, are defined as "a conference between the Government Attorney and a witness to discuss the witness' testimony . . . [t]he conference must take place after a trial, hearing or grand jury proceeding has been scheduled but prior to the witness' actual appearance at the proceeding." Id. (citing 28 C.F.R. §§21.1(c); 21.1(d)).

The government argues that this definition demonstrates that the court's instruction was correct. It argues that because "[t]he law requires the payment of witness fees for pre-trial conferences," "it was complying with its legal obligations" when it "submitted vouchers to obtain the witness fee for AV-3." Dkt. No. 239 at 44. The government argues that "[its] submission of vouchers was also required by an explicit Department of Justice Policy that relates to the use of fees and expenses of witnesses," which policy "applies not only to the

90

United States but also to the Federal Defenders and CJA Counsel." Id. The government says that "[t]he clear statutory and regulatory language, as well as the explicit DOJ policy, completely undermine the defendant's argument," id. at 45, and concludes that neither the court's curative instruction nor its "directions curtailing defense counsel's attempt to imply that the government was conferring a voluntary benefit on AV-3 by paying legally required witness fees" provide "a basis for a new trial," id.

iii.     **Discussion**

The defendant argues that the court's curative instruction misstated the law. Again, that curative instruction said:

> Members of the Jury, [defense counsel] asked the witness whether or not the Government had paid her for her time over the last couple weeks. There's a federal law that requires that when someone is a witness and they come to court, they get a witness fee. It's a small fee to help offset the fact that they are missing work or have to drive down here or whatever the case may be.
>
> The Government has confirmed that they paid their witness that witness fee. They have to under the law, but that is not paying somebody for their testimony or paying someone for their time.

Dkt. No. 214 at 252. The defense says that its question to AV-3 referenced the payments she received for her *pretrial* preparation meetings with the prosecutors, not the payments AV-3 received for the day or days she appeared to give trial testimony, and it argues that while 28 U.S.C. §1821 does provide that fact witnesses must receive payments for their attendance in court at trial, the statute "does *not* provide for [a] witness to receive a fee for their *pretrial preparation meetings* with prosecutors." Dkt. No. 229 at 31 & n.5 (emphasis added).

91

The defendant focuses exclusively on subsection (a) of §1821, which

provides:

> (a)(1) Except as otherwise provided by law, a witness in attendance at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.

> (2) As used in this section, the term "court of the United States" includes, in addition to the courts listed in section 451 of this title, any court created by Act of Congress in a territory which is invested with any jurisdiction of a district court of the United States.

28 U.S.C. §1821(a)(1)-(2). Subsections (1) and (2) do not require payment of

witness fees for pretrial preparation meetings between fact witnesses and

government prosecutors held outside of court. Subsection 1821(b), however,

states that

> (b) [a] witness shall be paid an attendance fee of $40 per day *for each day's attendance*. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

Id. §1821(b) (emphasis added). The implementing regulations define what the

statute means by "each day's attendance."

Sections 21.1 through 21.4 of title 28 of the Code of Federal Regulations

are the implementing regulations which correspond to 28 U.S.C. §1821. "Fees

and allowances of fact witnesses," provides for "[t]he fees and allowances of fact

witnesses . . . attending at any *judicial proceeding*[.]"[16] 28 C.F.R. §21.4

---

[16] Although 28 U.S.C. §1821(b) requires a "$40 payment for each day's attendance," 28 C.F.R. §21.4 mandates that fact witnesses are entitled to "an attendance fee of $30 per day for each day's attendance." The government

(emphasis added). Subsection 21.1(c) defines "judicial proceeding" as including "pre-trial conferences," and subsection 21.1(d) defines "pre-trial conferences" as "[a] conference between the Government Attorney and a witness to discuss the witness' testimony," adding that the conference "must take place after a trial, hearing or grand jury proceeding has been scheduled but prior to the witness' actual appearance at the proceeding." Id. §§21.1(c)–(d).

Reading 28 U.S.C. §1821 together with the corresponding implementing regulations reveals that fact witnesses like AV-3 are entitled to a daily statutory fee for meeting with prosecutors to discuss their trial testimony in advance of a scheduled trial. The court's curative instruction was a correct statement of the law—the $40 payments for which the government submitted vouchers were *not* fairly characterized as "paying AV-3 for her time;" the government was required to notify AV-3 that she was legally entitled to the payments, regardless of whether she was meeting with the government before trial to discuss her testimony, or testifying in court at trial. Suggesting that the $40 payments were equivalent to the government paying AV-3 for her time was misleading.

The defendant asserts that the government "sought to provide [only] some of its witnesses" with the "§ 1821 witness fees for pretrial preparation of witnesses." Dkt. No. 229 at 32. He suggests that the government was strategic in the way it leveraged the $40 witness fees, "provid[ing] the fee only to the alleged victims: people living in extreme poverty who were reluctant to

---

explains that the discrepancy is due to the regulation not being updated to correspond to the amount in the statute, dkt. no. 239 at 44, and this $10 difference is immaterial to the analysis of the defendant's argument.

cooperate with the prosecution." Id. The defendant argues that the $40 fees were "incentive[s] relevant to [AV-3's] bias" toward the government, incentives which explained AV-3's motivation for cooperating with the government and testifying at trial. Id. Therefore, the defendant argues, the court should have given the defense "reasonable latitude in cross-examining" AV-3 on the $40 fees she received for pretrial preparation meetings with the government. Id.

The defendant makes this particular argument for the first time in his post-trial motion. At the time the government made the objection, counsel argued only that the government had provided the fee applications as part of its required Giglio disclosures. Dkt. No. 214 at 251. (In fairness, the court did not allow defense counsel to argue further at that time.) When the court raised the issue again the next morning, defense counsel explained that he had been trying to question AV-3 about the fees she received for meeting with the prosecutors ahead of trial and the expectations that created. Dkt. No. 215 at 8. Never did the defendant argue that the government had paid these fees to some witnesses but not to others. Nor did the defense make that argument at the instruction conference (during which the court declined to modify the pattern instruction to address the witness fees).

Nor has the defendant provided any support for his new allegation that the government strategically leveraged the $40 witness fees as an incentive to get the victim witnesses to testify at trial, or to testify in the way the government allegedly wanted them to. The government explains that it "submits vouchers for every legally eligible witness (unless they decline) who

94

physically appears for a pre-trial preparation conference and who is not a law enforcement officer or paid expert." Dkt. No. 239 at 43 n.9. The court has explained that the government is required by law to submit such vouchers when non-government-actor-fact witnesses—not only AV-3, but also the civilian, non-victim witnesses—appear for pre-trial preparation conference. 28 U.S.C. §1821(b); 28 C.F.R. §§21.1–21.4. The defendant has identified no evidence—no discovery, no <u>Brady</u> or <u>Giglio</u> disclosure—to support his claim that the witness fee was provided only to impoverished, reluctant victim-witnesses.

The defendant argues that it was unfair for the court to give an instruction to the jury that his lawyer "was being misleading." Dkt. No. 229 at 32. But defense counsel's question *was* misleading, even if he did not intend it to be. When a jury hears a question designed to elicit a baseless inference, courts are encouraged to issue a curative instruction. <u>See, *e.g.*</u>, <u>United States v. Adams</u>, 740 F.3d 40, 46 (1st Cir. 2014) ("Cautionary instructions, sometimes called limiting instructions, are important weapons in a trial court's armamentarium. The use of such instructions is to be encouraged. When properly deployed, they can prevent (or, at least, ameliorate) harm from potentially prejudicial evidence."); <u>United States v. Gonzalez</u>, 613 F. App'x 90, 91 (2d Cir. 2015) ("As for the curative instruction, given the lack of evidentiary support for defense counsel's statement during summation that [the witness] 'knows he's never going to face another day in jail,' the District Court did not err in instructing the jury that [the witness] had not yet been sentenced and

that defense counsel's statement was therefore inaccurate."); United States v. Manglitz, No. 96-4761, 96-4762, 1998 WL 205806, at *4 (4th Cir. 1998) ("A curative instruction can prevent an otherwise prejudicial comment from misleading the jury.").

Because the court's curative instruction addressed defense counsel's misleading question, it is not a basis for granting a new trial.

> b.     AV-2's August 2021 Probation Hold

> i.     **Background**

The second curative instruction challenged by the defendant was given during the defendant's investigator's testimony in the defendant's case-in-chief. During direct examination, defense counsel asked the investigator about AV-2's August 2021 release from custody on the day after she gave her grand jury testimony. Defense counsel showed the investigator Exhibit 578, which the investigator described as "a timeline showing [AV-2's] custody dates in August of 2021 along with dates that she provided statements to law enforcement and provided grand jury testimony." Dkt. No. 217 at 81. The investigator testified that the demonstrative exhibit "show[ed] that [AV-2] was arrested and in custody on August 13th of 2021. She provided a statement to law enforcement on August 21st and again on August 24th. She provided a statement to law enforcement and provided testimony in front of the grand jury, and she was released the next day." Id. at 82.

During cross-examination, the government asked the investigator about his testimony regarding AV-2's release from custody following her grand jury

testimony in August 2021. The government confirmed that the investigator did not have "have any information to show that [AV-2] was released because she testified," "any information to show that there was any communication between anyone at the federal government or US Attorney's Office and MSDF regarding her release" or "anything to show you that her release date was anything other than a coincidence." Dkt. No. 217 at 108.

During re-direct, the following exchange occurred between defense counsel and the investigator:

> Q.:    The prosecutor also asked you some questions about Exhibit 578 and asked you a whole series of questions about whether you had any information to suggest that [AV-3's] release on August 25—
>
> [GOVERNMENT COUNSEL]:    Objection.
>
> Q.:    Sorry, [AV-2's] release on August 25th was in any way connected to her grand jury testimony on August 24th. Do you remember those questions?
>
> A.:    I do.
>
> Q.:    And you indicated you don't have any information to suggest that her release on the 25th was in any way connected to her testimony on the 24th?
>
> A.:    No, that information is not shared with me.
>
> Q.:    You also don't have any information that her release on August 25th wasn't in any way connected?

Dkt. No. 217 at 118. The government objected immediately and asked the court for a sidebar. Id.

At sidebar, the government argued that the defense lacked a "good-faith basis for this series of questions" and that there was "no evidence in the record that [AV-2's release from MSDF] had anything to do with her [grand jury]

97

testimony." Id. The government asserted that AV-2's release was unrelated to her grand jury testimony, that the government never "ask[ed] anyone to incarcerate [AV-2] or to release her," that "[i]t happens to be the case that she testified one day before she was released on a . . . probation revocation," and that defense counsel was "misleading the jury" by "implying otherwise;" the government then asked the court to give a "limiting instruction that there is no evidence in the record that the Government had anything to do with this incarceration or this release." Id. at 118-119. After defense counsel responded, "[t]he evidence speaks for itself," the court instructed him to "[s]top asking questions about it because you are making an implication, and you don't have any evidence to support it." Id. at 119.

Once back on the record, the court gave the following curative instruction:

> Members of the Jury, I sustained that objection. And there is no evidence in the record to indicate that the federal government had anything to do with [AV-2's] release on the date that's reflected on the chart. The date reflected on the chart is accurate. The parties agree that the date of her release is accurate, but there's no evidence to indicate that the federal government had anything to do with that release date.

Id. at 119.

ii.    **Parties' Arguments**

The defendant argues that the court's instruction implied that the defense was being misleading, and that the instruction was improper and prejudicial. Dkt. No. 229 at 34. The defendant recounts that "the court did not give the defense any notice that it was going to give a limiting instruction or

what the content of that instruction would be." Id. He asserts that defense counsel's "questions of [the investigator] were not improper and the implication of the questions—that [AV-2] might have perceived a connection between her testimony and release the very next day—was logically related to the evidence." Id. at 34. The defendant argues that such questions were relevant to AV-2's potential bias in favor of the government, and that defense counsel's questions to the investigator during re-direct were "clearly a response to the many similar questions the government asked." Id. at 35.

The defendant contends that "[i]n any event, the question of who was responsible for the decisions [to detain and release AV-2] has nothing to do with what [AV-2] understood or hoped may happen if she assisted the government." Dkt. No. 229 at 35. He argues that this point is illustrated by United States v. Salem, 578 F.3d 682, 687 (7th Cir. 2009), where the Seventh Circuit remarked that "even without a note from the U.S. Attorney or the local D.A. expressly outlining a no-charges-for-testimony quid pro quo, such evidence [of the cooperating witness's plea agreement] could be admissible to show [the witness's] motive to testify against [the defendant]." Id. The defendant argues that the fact that AV-2 was released "the day after she testified before the grand jury, permits the inference that [AV-2's] earlier testimony was infected with bias." Id. The defendant argues that such bias evidence has "no special foundational requirement," "the party attempting to demonstrate bias should be able to prove any fact logically relevant to bias"

99

and the defendant "should not have been punished for eliciting it." Id. (citing

United States v. Jamison, 635 F.3d 962, 967 (7th Cir. 2011)).

The government responds that during direct examination of his investigator, the defendant introduced a timeline that implied, without factual support, "that the government was responsible for AV-2's release from custody." Dkt. No. 239 at 46. The government explains that "[b]ecause the defense drew the implication without basis the government explored the matter during cross examination, asking questions that pointed out that AV-2 was in custody in a state-run facility, on a state case, and that other than the coincidence of timing, [the investigator] had no information to support the implication that AV-2's release had anything to do with her [grand jury] testimony." Id. (citing Dkt. No. 217 at 107-08).

The government emphasizes that on re-direct, "the defendant again implied that AV-2's release had something to do with her grand jury testimony," even though by that point in the trial "AV-2 had already denied the connection," dkt. no. 239 at 47 (citing Dkt. No. 212 at 499-500), and "[the investigator] had admitted that he had no evidence to the contrary," id. (citing Dkt. No. 217 at 108). The government argues that by "asking the question again, and phrasing it in a way to imply, without any good-faith basis, that there *was* evidence connecting the release and her testimony that simply wasn't in [the investigator's] possession, the defendant created a prejudicial and misleading implication that the government was hiding evidence." Id.

The government recounts that it was at this point that it "objected and asked the Court for a limiting instruction" Dkt. No. 239 at 47 (citing Dkt. No. 217 at 118-19). The government states that the defense responded to this request by simply stating, "The evidence speaks for itself," which the government argues "essentially acknowledg[ed] that the defendant had no evidence to support the conclusion that the government had conferred a benefit on AV-2 in exchange for her testimony or that they had suppressed evidence of the same." Id. The government says that defense counsel did not object to the government's request for a limiting instruction or ask that the court preview the instruction prior to giving it, and "[h]earing no objection the Court gave a clear and measured instruction that merely served to correct the misleading implication that there was evidence, outside the record, that the 'federal government had anything to do with [AV-2's] release on the date reflected in the chart.'" Id. (citing Dkt. no. 217 at 119). It argues that "[t]he Court's instruction was accurate and limited," "served the appropriate purpose of ensuring that the jury was not misled into thinking that something was true which was not," "did not denigrate the defendant or his counsel in any way," "[n]or did the Court provide any commentary on the evidence or the coincidental timing argument the defendant was making." Id. at 48. The government asserts that the court "merely clarified that there was no evidence that the 'federal government had anything to do with that release date,'" which "was, and remains, a true and accurate statement." Id.

The government says the defendant argues that "the instruction was error that requires a new trial because the re-direct questions [to which the government objected, and which prompted the court's limiting instruction] were intended to assert the implication 'that [AV-2] might have *perceived* a connection between her [grand jury] testimony and release the very next day.'" Dkt. No. 239 at 48 (citing Dkt. No. 232 at 34) (emphasis in original). It argues that defense counsel's question to its investigator on re-direct "had nothing to do with AV-2's perceptions" but rather "asked whether [the investigator] 'also [didn't] have any *information* that her release on August 25th wasn't in any way connected [with her grand jury testimony from the previous day]." Id. (citing Dkt. No. 217 at 118) (emphasis in original). According to the government, "[t]hat question did not address AV-2's perceptions," and the government argues that the question "was clearly meant to imply that there might be evidence that the release *was* connected to her testimony, but the jury was not being allowed to hear it and, thus, the government was hiding something." Id. The government asserts that "[t]he implication that the government was hiding evidence was not 'logically related to the evidence,' but was instead both misleading and prejudicial." Id. (citing Dkt. No. 232 at 34).

The defense responds that the whole issue "only became a problem because the defense was never informed that [AV-2] was in custody at the time of her earlier statements and grand jury testimony." Dkt. No. 257 at 20-21. It asserts that the circumstances under which AV-2 cooperated "bear directly upon her bias at the time she made the prior statements," that "[t]hat

102

information should have been disclosed to the defense" and that the alleged bias "was important enough to [the defendant's] case that when the defense learned of it, it tried to present evidence showing the potential for bias through its investigator, Bill Gowin." Id. at 21. The defendant insists that "the issue was not whether the prosecutors were responsible for [AV-2's] release. It's whether [AV-2] understood that there might have been a benefit—like her release from custody and discharge off supervision—if she aided the government." Id. He says, "That topic was fair game." Id.

The defendant maintains that the curative instruction didn't "just prevent" him from trying to elicit evidence of bias, but "punished him for it." Id. at 22. He says the instruction "discredited the defense before the jury in a way that the government then pounced on in its rebuttal argument," which "unduly prejudiced [him]." Id. The defendant also argues that even if defense counsel's question permitted an inference that the government was responsible for AV-2's detention and release, the government has no right to be defensive, because "the government was responsible for doing just that with [AV-4] for the trial. It's not a stretch to believe that it might to the same thing with a different witness." Id. at n.6.

### iii. **Discussion**

The defendant argues for the first time in his *reply* brief that before trial, the government should have advised the defense of the fact that AV-2 was in custody at the time she testified before the grand jury. The court already has discussed the fact that prior to trial, the defense had in its possession a

103

document showing that AV-2 was in custody at MSDF when she gave her grand jury testimony. And "arguments raised for the first time in [a party's] reply brief are waived because they leave no chance to respond." White v. United States, 8 F.4th 547, 552 (7th Cir. 2021) (citing Wonsey v. City of Chicago, 940 F.3d 394, 398 (7th Cir. 2019); United States v. Vitrano, 747 F.3d 922, 925 (7th Cir. 2014)). The court will not address this argument further.

Once the defendant realized, mid-cross-examination, that AV-2 had been released from state custody and discharged from extended supervision the day after giving her grand jury testimony—in the words of the defense, once it "connected those dots"—the defendant sought to explore before the jury the implications of this timing. It did so in its case-in-chief by presenting through its investigator a timeline showing AV-2's custody dates in August 2021 along with dates that she provided statements to law enforcement and provided grand jury testimony. Dkt. No. 217 at 81. The defense investigator explained that the timeline showed that AV-2 was arrested and booked into MSDF on August 13, 2021, provided statements to law enforcement on August 21 and 24, "provided a statement to law enforcement and provided testimony in front of the grand jury, and she was released the next day." Id. at 82. After the investigator had provided a summary of the timeline, defense counsel confirmed the investigator's last statement, asking, "She was released from custody the day after providing her grand jury testimony?" to which the investigator responded, "Correct." Id.

During its cross-examination of the investigator, the government confirmed that while the investigator had information showing that AV-2 was released from state custody on the day after she gave her grand jury testimony, he didn't "have any information to show that she was released because she testified," "any information to show that there was any communication between anyone at the federal government or US Attorney's Office and MSDF regarding her release" or "anything to show . . . that her release date was anything other than a coincidence." Dkt. No. 217 at 108.

It was against this backdrop that defense counsel asked on re-direct, "You also don't have any information that her release on August 25th *wasn't* in any way connected [to her testimony on the 24th]," id. at 118 (emphasis added), implying that "just because you don't have information connecting the two events doesn't mean it doesn't exist."

The defendant now argues that the question was not intended to imply that the government had something to do with AV-2's detention or release from MSDF in August 2021, but to imply that perhaps AV-2 *perceived* that the government had something to do with her detention or release around the time of her August 2021 grand jury testimony. In other words, the defendant claims that its question, "You don't have any information that [AV-2's] release [from MSDF] on August 25th wasn't in any way connected [to her August 24th grand jury testimony?" was intended to elicit evidence about AV-2's *perception* of the events surrounding her August 2021 detention and release from MSDF and not

105

whether there was, in fact, a connection between the two events and evidence to prove it.

Defense counsel may have been trying to get at the fact that the timing of AV-2's release could have caused AV-2 to perceive that she was released from MSDF because of her cooperation. As he states, he may have "merely sought to imply that [AV-2] might have viewed her release as being connected in some way to her grand jury testimony and cooperation with law enforcement." Dkt. No. 229 at 37. But that's not what he asked. He did not ask whether someone could look at the timeline and draw the conclusion that the release resulted from the cooperation; he asked whether the investigator had any information indicating that AV-2's release was not related to the cooperation. The obvious implication of the phrasing of that question—of the phrasing of the entire line of questioning, both in the direct and re-direct examination of the investigator—was that AV-2's August 2021 release from MSDF custody *was* connected to her cooperation with the government.

Another obvious inference arising from the phrasing of defense counsel's questions, and the phrasing of the investigator's answers, is that the government—but not defense counsel, the defense investigator or the jury—was privy to information that AV-2's release from state custody was related to her grand jury testimony. Dkt. No. 217 at 118 ("Q. And you indicated you don't have any information to suggest that her release on the 25th was in any way connected to her testimony on the 24th? A. No, that information *is not shared with me.*"). Though it may have been unintentional, the exchange between

106

defense counsel and the investigator implied that AV-2's release from MSDF was related to her government cooperation but that the government had refused to share that information with the defense. Defense counsel conceded that apart from the timing, the defense had no information or evidence linking the cooperation and the release, yet still pursued an unsubtle line of questioning implying that such information or evidence existed but that the government had not turned it over. Because defense counsel had no good-faith basis for implying that such information or evidence existed or that the government had failed to produce it, the court curtailed the line of questioning and gave the jury a curative instruction.

In a footnote in his reply brief, the defendant asserts that even if defense counsel's question *did* permit the inference that the government was responsible for AV-2's "detention and release," the government has no right to complain because "[a]fter all, the government was responsible for doing just that with [AV-4] for the trial." Dkt. No. 257 at 22 n.6. He asserts that it is "not a stretch to believe that [the government] might do the same thing with a different witness." Id. This argument is one of the most concerning examples of the defendant alleging or implying, in the absence of any evidence, that the government engaged in deliberate misconduct. First, the defendant appears to be alleging in this footnote that the government had AV-2 arrested and held in the MSDF for the purpose of obtaining statements and grand jury testimony from her—with no allegation or evidence that the government had subpoenaed AV-2 but that she had refused to comply with that subpoena. He provides no

explanation of why the government would need to have AV-2 arrested and held in a state detention facility for persons on supervision to obtain her statements to law enforcement or her grand jury testimony. Second, the argument equates the government obtaining from the court a material witness warrant for a witness who had declared that she would not comply with a trial subpoena (which is what happened with AV-4) with the government intentionally concealing or refusing to disclose that it engineered AV-2's release from custody as a quid-pro-quo for her statements to law enforcement and her testimony to the grand jury. The first is not an ethical violation; the second is.

The defendant asserts that that the court did not give him notice that it was going to give a limiting instruction or explain what that instruction was going to be—either in this instance or in the instance of the instruction about the witness fee. The government responds that the defendant neither objected to the request for the curative instruction nor asked the court to preview it. That's true, as far as it goes. But the court concedes that it didn't give defense counsel much opportunity to do either of those things. Defense counsel responded to the government's argument by saying that the evidence spoke for itself, after which the court immediately instructed defense counsel to stop asking about the issue. It did not give him the opportunity to make additional argument, nor did it say during sidebar that it was going to grant the government's request for an instruction or seek the parties' input on the content of that instruction. But the defendant has cited no authority holding that a court must give a party notice that it is going to give such an

instruction, or that it must advise a party of the content of that instruction. Nor has he cited any authority holding that a court's failure to notify a party that it is going to give an instruction, and failure to advise the party of the content of that instruction, is grounds for a new trial.

Rule 33 requires a new trial "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." United States v. Maclin, 915 F.3d 440, 444 (7th Cir. 2019) (quoting United States v. Flournoy, 842 F.3d 524, 530 (7th Cir. 2016)). The defendant says that the curative instruction implied that the defense was being misleading, that it discredited the defense before the jury and that it gave the government the opportunity to argue that the defense was misleading. The court cannot agree. The court told the jury that it had sustained the objection. It told the jury that there was no evidence in the record that the federal government had anything to do with AV-2's release on the date reflected on the charge. It told the jury that that date of release was accurate, and that the parties agreed that the date was accurate, but instructed the jurors that there was no evidence indicating that the federal government had anything to do with that release date. The court did not tell the jury that the defense had done anything improper or inappropriate. Given the volume of evidence the government presented against the defendant, there is no reasonable probability that this four-sentence instruction—even if it was erroneous—had a prejudicial effect on the jury's verdict, or that it discredited the defense.

6. *Allegations of Prosecutorial Misconduct*

The defendant makes the serious allegation that the prosecutors engaged in two instances of prosecutorial misconduct. The first instance concerns the content of the government's rebuttal argument, during which, the defendant claims, the prosecutor engaged in a series of personal attacks on defense counsel. The second alleged instance relates to the defense motion *in limine* which asked the court to preclude the government from eliciting evidence of one of the defendant's alleged aliases.

a. Legal Standard

"To determine whether alleged prosecutorial misconduct occurred and calls for reversal, [courts] first read the challenged remarks in isolation and decide whether they were improper." United States v. Gan, 54 F.4th 467, 479 (7th Cir. 2022) (citing United States v. Carswell, 996 F.3d 785, 796 (7th Cir. 2021)). If the court finds that the remarks were not improper, the challenge fails. Id. But if it finds a remark improper, the court "then consider[s] [the remark] in the context of the entire trial record to evaluate whether the remark deprived a defendant of the right to a fair trial." Id. This inquiry "take[s] into account: '(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut.'" Id. at 479-80 (citing Howard v. Gramley, 225 F.3d 784, 793 (7th Cir. 2000); Darden

v. Wainwright, 477 U.S. 168, 181-82 (1986)). "The weight of the evidence is the most important factor." Id. (citing Carswell, 996 F.3d at 796).

> b. Government's Closing Rebuttal Argument

> i. **Parties' Arguments**

The defendant argues that the government's closing rebuttal argument "forcefully denigrated the integrity of defense counsel in this case." Dkt. No. 229 at 36. He asserts that "[o]n fourteen different instances over 17 pages of transcript, the prosecutor called defense counsel misleading." Id. (citing Dkt. No. 218 at 108-25). He says that "the government seized upon the Court's curative instruction about [AV-2's] August 2021 probation hold as evidence of counsel's dishonesty." Id. (citing Dkt. No. 218 at 112). Defense counsel asserts that his "questions did not mislead anyone," "[n]or did [he] imply that the government lawyers were involved in the decision to detain or release [AV-2] when she was released." Id. at 37. He argues that "the Court's instruction did damage the defense's credibility" and that "the government seized upon that damage in its rebuttal." Id.

The defendant argues that the government's repeated attacks on the defense's integrity during its rebuttal argument were especially improper because "a prosecutor's comment 'carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.'" Dkt. No. 229 at 38 (citing United States v. Holmes, 413 F.3d 770, 775 (8th Cir. 2005) (quoting United States v. Young, 470 U.S. 1, 18-19 (1985)). The defendant observes that "courts have

111

recognized that statements like this, made during the government's rebuttal argument, are especially problematic because they are the last remarks the jury hears, and the defense does not have the opportunity to respond." Id. (citing Holmes, 413 F.3d at 776; United States v. Carter, 236 F.3d 777, 788 (6th Cir. 2001); United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996); United States v. Johnson, 968 F.2d 768, 772 (8th Cir. 1992)). He contends that because "[t]he government's attacks . . . were repeated, untethered from the evidence, in front of the jury, and made at the last possible moment when the defense could not respond," the "interests of justice" warrant a new trial. Id. at 39.

The government responds that "[t]he prosecutor criticized defense counsel's arguments and summary of the evidence but did not personally attack defense counsel." Dkt. No. 239 at 51. It argues that the instances "in which the prosecutor allegedly 'called defense counsel misleading'" were "focused not on defense counsel personally, but on *the arguments* defense counsel made during his closing and the defendant's theory of the case." Id. The government asserts that in each instance "when the prosecutor referred to something being misleading, a red herring, or a distraction, the prosecutor cited to the record evidence that disproved the defense's theory." Id. It maintains that "[b]ecause the[] arguments focused on 'the weakness of the defense theory in the face of specific evidence,' they were not improper" even though the arguments also "criticized defense counsel's tactics." Id. (citing Gan, 54 F.4th at 481; United States v. Bloom, 846 F.3d 243, 254 (7th Cir. 2017)).

The government argues that "the defendant's motion quotes only one allegedly offending remark." Id. In that remark, "the prosecutor noted that Exhibit 578 [the timeline of AV-2's probation hold arrest, her meetings with the government and grand jury testimony and her release] was misleading because it suggested, without evidence, that AV-2 was released from custody because of her cooperation." Id. The government states, "When the prosecutor said that the inference was not supported by any facts in evidence, it was not a personal attack on defense counsel's integrity. Rather, it was a response to the implication made by the defense's arguments." Id. It argues that the prosecutor's use of the word "misleading" was "part of a longer response to the defendant's argument about AV-2's credibility, which was a central point of the defendant's theory of the case" and says that "it is clear that the prosecutor's use of the word 'misleading' was in reference to the defense's theory of the evidence, and not to the defense counsel's personal integrity or characteristics." Id. at 52-53. The government contends that the fact "that the prosecutor cited the Court's limiting instruction is of no moment" because "the instruction accurately reflected the evidence" and "[t]he prosecutor's reference to it was meant to remind the jury that the defense's theory about a particular fact was speculation, rather than evidence." Id. at 53.

The government argues that the "remainder of the prosecutor's rebuttal . . . . addressed the evidence and the defense's theory of that evidence." Dkt. No. 239 at 53. It says that every government reference to arguments in defense counsel's closing "was tied directly to a specific argument made by defense

113

counsel and the specific evidence the jury should consider in evaluating the same. Such arguments were not personal attacks on defense counsel." Id. The government asserts that this "conclusion is only bolstered by the fact that the defense did not object to any portion of the rebuttal." Id. (citing United States v. Trutenko, 490 F.2d 678, 680 (7th Cir. 1973); United States v. Mullins, 446 F.3d 750, 758 (8th Cir. 2006)).

The defendant responds by emphasizing the opening lines of the rebuttal: "Distractions, red herrings, false and misleading implications. That's what you just heard. That's what you've heard from the defense throughout this entire case. Distractions, red herrings, and false and misleading implications." Dkt. No. 257 at 22 (citing Dkt. No. 218 at 108). He recounts that the prosecutor closed her rebuttal by stating that the defendant "wanted the jury to ignore the evidence and 'instead believe the completely false, baseless, misleading implications that he has fed you throughout this trial and particularly in closing argument.'" Id. at 22-23 (citing Dkt. No. 218 at 124-25). The defendant says:

> These were foul blows. They were not responses to arguments or theories. They were not criticism of tactics. They were attacks at counsel. While some may have been directed at the defense's arguments, the thesis of the government's rebuttal to the jury was that [the defendant's] lawyer had misled them.

Id. at 23. As for the government's argument that the defense did not object during rebuttal, the defendant responds that failure to object isn't determinative, and says that "[i]n hindsight, counsel obviously should have objected and was plainly deficient in failing to do so." Id. at 24. He says that

114

while the prosecutor's "personal attacks" are not the only reason he should be granted a new trial, the comments "did cross the line." Id.

ii. **Discussion**

"Attorneys should not attack opposing counsel personally, but they may criticize opposing counsel's tactics and the strength of the evidence." Gan, 54 F.4th at 480 (citing Bloom, 846 F.3d at 254). The Gan court "found no reversible error where a prosecutor called defense counsel's arguments made up, absolutely false, ridiculous, or ludicrous," reasoning that such comments "were largely focused on the lameness of the defense rather than defense counsel personally." Id. (citing United States v. Washington, 417 F.3d 780, 786-87 (7th Cir. 2005)) (internal quotations omitted). The Seventh Circuit "also found no error where a prosecutor said that defense counsel was 'putting up a smoke screen' and that cross-examination was so repetitive as to 'border on a waste of the jury's time.'" Id. (citing Bloom, 846 F.3d at 254).

The defendant argues that defense counsel's integrity was repeatedly attacked throughout the prosecutor's closing rebuttal argument and that these repeated attacks warrant a new trial. Dkt. No. 229 at 36. He asserts that "[o]n fourteen different instances . . . the prosecutor called defense counsel misleading." Id. In his opening brief, he directs the court's attention to only one instance in which the prosecutor characterized something as "misleading." Id. (citing Dkt. No. 218 at 112).

The prosecutor's first use of the word "misleading" to which the defendant draws the court's attention came toward the beginning of the

prosecutor's rebuttal argument. During the defendant's closing argument, defense counsel revisited the theme that the government's case against the defendant was largely predicated on AV-2's habit of lying to law enforcement to escape her own legal problems. He told the jury that according to the case agent, "[t]his all started with one woman in a desperate situation on October 1, 2016, [AV-2]." Id. at 70. He told the jury that on that date, AV-2 had been arrested, had outstanding warrants, was facing new charge, and so she "told a story." Id. That story, defense counsel said, was that the defendant "was trafficking" AV-2, taking her money, controlling her life, being violent with her. Id. at 71. Defense counsel attacked AV-2's credibility (as one would expect); his arguments regarding AV-2's credibility span ten pages of transcript. Dkt. No. 218 at 70-80. And he told the jury that AV-2's 2016 story—which he characterized as a lie—"created a domino effect." Id. at 78. He said it initiated the investigation into the defendant, and that it worked for AV-2. Id.

    In her rebuttal, the prosecutor summarized that argument, then laid out the record evidence which, in the prosecutor's view, disproved that argument. Dkt. No. 218 at 110-112. She characterized the defense argument that AV-2 must have lied because charges against her were dropped as "misleading." Id. at 111-112. And then she said, "[i]t's misleading in the same way that it's misleading when defense counsel put up a chart about [AV-2's] grand jury testimony." Id. at 112. She asked the jurors to search their memories, reminding them that in August 2021 AV-2 was at the MSDF, and that the day before she was released, AV-2 testified before the grand jury. Id. She reminded

116

them that while she was in the detention facility, AV-2 was interviewed by police, and said, "defense counsel tried really hard to imply that the Government had something to do with her being in there or being released from there because, you know, it happened at the same time." Id. The prosecutor concluded,

> But you heard the Court's instruction about that. There's no evidence to suggest that anyone from the Government had anything to do about that. And you heard Investigator Gowin admit that MSDF is a state facility for state revocation, and that the Government doesn't have a contract. The federal government doesn't have a contract with that facility to keep people in or let people out. There's no evidence anyone from the Government had anything to do with that.

> And you heard Investigator Gowin not know how long the Government had been looking for [AV-2] in this case before then, a case that had been pending and being investigated according to the defense for over a decade. No evidence of that either. But no reason, no explanation for why in 2021 suddenly the Government is pursuing [AV-2] other than that's when they found her. No evidence to support those false, misleading, baseless implications that they want to use to confuse you.

Id. at 112-113.

The Seventh Circuit first requires the court to review these remarks in isolation to determine whether they were improper. The prosecutor's summary of the evidence was accurate. Defense counsel's arguments seem most focused on the two statements which referred to him directly. In one, the prosecutor said that it was misleading when "defense counsel" presented the charge about AV-2's grand jury testimony, and in the second, she stated that defense counsel "tried really hard to imply" that the government had something to do with AV-2's incarceration at MSDF or the timing of her release. Although these

117

remarks did mention defense counsel, they were not improper. Attorneys frequently recount to juries arguments made by opposing counsel and then give reasons why the jury should reject those arguments. The implication always is that the evidence doesn't support opposing counsel's arguments, that opposing counsel had no basis for making the arguments. Here, the prosecutor did not say that defense counsel lied to the jury, or that defense counsel was being underhanded. She used the word "misleading;" she said that counsel was trying to lead the jury to a destination that the evidence did not support.

Even if the prosecutor's statements were improper, the <u>Gan</u> factors do not support the conclusion that the prosecutor engaged in misconduct. The first <u>Gan</u> factor asks whether the prosecutor misstated the evidence. As the court has said, she did not, and defense counsel does not argue that she did. The second factor asks whether the prosecutor's remarks implicate specific rights of the accused. Defense counsel asserts that the court's curative instruction, and the government's use of it in rebuttal, "discredited" the defense. In this sense, the prosecutor's comment that defense counsel "tried real hard to imply" that the government had anything to do with AV-2's release, and her reliance on the curative instruction, indicated that defense counsel had tried to draw an inference without evidence to support it. But as the court has discussed, the phrasing counsel used *did* attempt to draw such an inference, and there was no evidence to support it. The prosecutor may not have needed to reference defense counsel in making this argument, but that reference did not implicate the defendant's Sixth Amendment rights.

118

The third Gan factor asks whether the defense invited the response. On a broad level, the defense invited response to its theory that AV-2 lied to get out of trouble and that that lie spawned the entire case against the defendant. On a narrower level, defense counsel did not argue in closing that the government had anything to do with AV-2's release from MSDF, or even that AV-2 may have believed that the government had something to do with it. But defense counsel did reference "[t]his exhibit here that you saw during trial" which "show[ed] you the custody timeline of [AV-2]." Id. at 76. He referred to "the custody calendar timeline." Id. at 80, line 15. The government's statement about defense counsel's chart regarding the grand jury testimony being "misleading" may have been, in part, a response to those references (though likely more a reflection of the prosecutor's frustration at the defense implication that the government had AV-2 released from MSDF in exchange for her cooperation and then deliberately failed to disclose that fact).

The fourth Gan factor directs the court to take into account its instructions. The court has discussed the instruction it gave. The court has addressed the defendant's challenge to that instruction. In referencing it, the government correctly characterized its content. The fifth Gan factor is the weight of the evidence against the defendant. This factor is not a close call; the government presented testimony from four victims, corroborating text and Facebook messages and audio recordings, law enforcement testimony from officers who were not involved in the federal investigation, testimony from two civilian witnesses who observed the defendant's behavior with victims and the

testimony of an expert witness—all corroborating that the defendant used force, threats of force, fraud and coercion to cause women to engage in commercial sex acts. The final <u>Gan</u> factor requires the court to consider the defendant's opportunity to rebut; the defendant had no such opportunity at the trial.

The first, second, fourth and fifth <u>Gan</u> factors weigh against a finding of prosecutorial misconduct, and the third factor leans that way. Only the sixth factor—that the defendant had no opportunity to rebut—weighs in favor of a finding of misconduct. That the rebuttal did not cross the line from proper argument critique to improper personal attack is illustrated by several of the cases cited by the defendant. In <u>Holmes</u>, 413 F.3d 770 (8th Cir. 2005), when considering comments made by the prosecutor in his rebuttal, the Eighth Circuit found that the prosecutor "was accusing defense counsel of conspiring with the defendant to fabricate testimony." <u>Id.</u> at 775. Admittedly the prosecutor in this case did forcefully cast defense counsel's arguments as "false, misleading, baseless implications," proffered by counsel to "confuse [the jury]." Dkt. No. 218 at 112-13. But the prosecutor did not imply that defense counsel fabricated evidence or conspired with the defendant to do so.

The prosecutor's comments more closely resemble those which the Seventh Circuit reviewed for possible prosecutorial misconduct in <u>Gan</u>, 54 F.4th 467 and in <u>Washington</u>, 417 F.3d 780. In <u>Gan</u>, the prosecutor referred to the defense's arguments and theory of the case as "a trip to fantasyland," "absolutely ridiculous" and "garbage" "designed to distract you." <u>Gan</u>, 54 F.4th

at 480-81. The prosecutor told the jury that it "should treat [defense counsel's closing argument] like garbage, and . . . should throw it out." Id. at 481. The prosecutor further characterized defense counsel's tactics as "try[ing] . . . to embarrass [the witness] about her personal life and the illnesses within her family," and described how in the face of this treatment, the witness "stood firm and she told you the truth." Id. The Seventh Circuit concluded that none of the prosecutor's statements were improper. The appellate court found that the prosecutor "centered his rhetoric on the weakness of the defense theory in the face of specific evidence" and "criticized . . . a specific phrasing of the defense's theory," but did not launch a "personal attack on the defense attorney." Id.

In analyzing whether the prosecutor's comments were improper, the Gan court observed that the prosecutor's "language closely mirror[ed] that challenged unsuccessfully in Washington, 417 F.3d at 786-87." Id. at 481. The prosecutor in Washington began his rebuttal argument by stating: "Ladies and gentlemen, I don't intend to respond to much of that nonsense. You've heard enough from the lawyers, and it's time for this defendant to be judged; but there were so many misrepresentations of the evidence that some response is necessary." Washington, 417 F.3d 786. He then "went on to characterize the majority of the defense arguments as 'made up,' 'absolutely false,' 'ridiculous,' or 'ludicrous,'" referring to particular defense theories as "just absolutely ludicrous" and "just completely made up." Id. The court found the prosecutor's rebuttal to be "hard-hitting," "full of harsh criticism of the defendant's theory of the case," "that some comments pushed the bounds of zealous advocacy" and

that "the overall tone of the rebuttal was probably overly strident." Id. at 786-87. But it concluded that "the prosecutor's arguments were largely focused on the lameness of the defense rather than defense counsel personally." Id. at 787. The court did find that some of the prosecutor's comments had a "questionable basis," specifically those that misrepresented defense counsel's statements and vouched for the reliability of two government informants. Id. But "even accepting that some of the prosecutor's comments were improper," the court found that prosecutorial misconduct claim failed given the overwhelming evidence of guilt. Id. at 787-88.

The prosecutor's statements in this case about the misleading nature of some of the arguments relating to the theory that AV-2's lie was the source of an unwarranted prosecution did not constitute prosecutorial misconduct. The statements were hard-hitting. They were very critical of the defense theory. They repeatedly identified instances in which there was no evidence to support defense arguments. But they did not cross the line into prosecutorial misconduct.

The same is true for the statements the defendant identified in his reply brief—the prosecutor's characterization of the defense closing as "distractions, red herrings, false and misleading implications" and her assertion that the defendant wanted the jury to ignore the evidence and to believe "the completely false, baseless, misleading implications that he has fed you throughout this trial and particularly in closing argument." Again, this indisputably is a sharp criticism of the defense theory and of the closing argument. But though

122

aggressive, these remarks are no more improper than those the Seventh Circuit described in <u>Gan</u> and <u>Washington</u>.

The court will not grant the defendant a new trial based on his allegations of prosecutorial misconduct.

     c.  The "Bin Laden" Alias

       i.  **Background**

Before trial, the defendant filed a motion *in limine* asking the court to preclude the government from eliciting at trial evidence of one of the defendant's alleged aliases—"Bin Laden." Dkt. No. 100. During the final pretrial conference, the court discussed the motion with the parties but reserved ruling, observing that there could be some witnesses who knew the defendant only by that moniker. Dkt. No. 210 at 52-57. At trial, the government called AV-2 as its first witness. Dkt. No. 212 at 35. Toward the beginning of her direct examination, when asked if she knew the defendant, AV-2 responded that she did. <u>Id.</u> at 39. The prosecutor then asked by what name AV-2 knew the defendant, and AV-2 responded, "Bin Laden." <u>Id.</u> at 40. Defense counsel immediately objected as the prosecutor simultaneously was asking the follow-up question, "Did you call him Ben?"[17] <u>Id.</u> The court called a sidebar.

---

[17] The trial transcript reflects that first the prosecutor asked, "Did you call him Ben?" after which defense counsel objected. Dkt. No. 212 at 40. The court's remarks at sidebar, however, reflect that the court heard the prosecutor's question and the defense objection occurring simultaneously: "THE COURT: First of all, there was an objection. I don't think you [the prosecutor] caught it."). <u>Id.</u>

At sidebar, the court recounted that the parties had discussed at the pretrial conference the defense's view that the "Bin Laden" moniker was prejudicial, that the government's view was that it was name AV-2 knew him by, and that the court had reserved ruling until it could determine how the evidence came in. Dkt. No. 212 at 40. The court recounted that the government had just asked AV-2 by which name she knew the defendant, and she had said Bin Laden. Id. Defense counsel then stated that "[t]he cat [wa]s out of the bag" and that he "d[idn't] want to draw more attention to [the alias]." Id. The court continued, "I think that is what I was waiting to see is whether or not that is how she knew him, and she said she did." Id. at 40-41. Defense counsel responded, "I want to be clear, it was a name that she knew him by. It is not the only name she knew him by. There's never been an issue of identification. It is incredibly prejudicial." Id. at 41. At that point the prosecutor said that she would not "belabor the point" and would "move on." Id. After the sidebar, the prosecutor asked AV-2 what she called the defendant, and AV-2 responded, "Ben, Bin Laden, daddy." Id.

ii.    **Parties' Arguments**

Because "[i]dentity was never an issue in this case," the defendant argues that the government's "only purpose in eliciting this evidence is that it salaciously painted [the defendant] in a bad light." Dkt. No. 229 at 40. The defendant points out that AV-2 knew him—she knew his name and the two of them "had a longstanding relationship." Id. He asserts that the fact "[t]hat she also knew him by a different name [Bin Laden] . . . does not 'aid[ ] in the

124

identification of the defendant or in some other way directly relate[ ] to the proof of the acts charged in the indictment.'" Id. (quoting United States v. Williams, 739 F.2d 297, 299 (7th Cir. 1984)).

The defendant states, "Lest there be any doubt [behind the government's intended purpose in eliciting this testimony], after the trial, the government issued a press release using the 'Bin Laden' alias in its very first sentence, prompting a cycle of news stories highlighting the name." Dkt. No. 229 at 40. The defendant asserts "[t]hat the first sentence of [the government's] press release and the title of news stories would highlight the name just amplifies how prejudicial the evidence was." Id. at 40-41. He claims that "[t]he government also did not notify the Court or defense in advance that it planned to elicit this testimony, despite the fact that the Court had reserved its ruling on it." Id. at 41. The defendant concludes that "the evidence was not introduced for a legitimate purpose," "[a]nd though brief, this small bit of evidence was so overwhelmingly prejudicial that it warrants a new trial in the interests of justice." Id.

The government first responds that it "did not intentionally elicit testimony about the defendant's alias." Dkt. No. 239 at 57. It argues that "the prosecutor's questions make clear that when the prosecutor asked AV-2 'what name did you know him by' the prosecutor expected the witness to say 'Ben.'" Id. at 57. The government says that that is why the prosecutor's "immediate next question was, 'Did you call him Ben?'" Id. (quoting Dkt. No. 212 at 40). The government also recounts the court's discussion of the issue the following

125

day, during which "the prosecutor noted that although the government had informed its witnesses of the Court's pretrial ruling, it did not 're-remind' AV-2 of it immediately prior to her testimony." Id. (citing Dkt. No. 213 at 521-22). The government asserts that "AV-2 had apparently forgotten about the prior admonition and responded with the Bin Laden alias because that was a common name by which she referred to him and heard others (including the defendant himself) refer to him." Id. at 57-58. The government emphasizes that "[it] committed to re-reminding its witnesses not to use that particular alias." Id. at 58 (citing Dkt. No. 213 at 6). It argues that "[t]his record makes clear that the reference to 'Bin Laden,' at trial, was inadvertent." Id.

The government says that "[t]he defendant's references to the press release concerning his conviction do nothing to alter that analysis and are irrelevant." Dkt. No. 239 at 58. It explains that it "referenced the alias in the press release because evidence gathered by the government showed that the defendant explicitly adopted the 'Bin Laden' alias proudly," and the government "felt [the alias] was an appropriate part of the story for the public to know, outside the context of trial." Id. The government contends that the fact that it decided to include the alias in the post-trial press release "does not change the fact that the government respected and followed the Court's rulings by making every effort to exclude that reference from the trial and from the jury." Id.

The government contends that its efforts at concealing the Bin Laden alias were "largely successful." Dkt. No. 239 at 58. It argues that "[t]he brief mention of the alias on the first day, by one witness . . . the only reference

126

made to that alias . . . did not so infect the trial with unfairness that it would require a new trial." Id. It argues that the Seventh Circuit's decision in United States v. Williams—where the court found that the prosecution's use of the defendant's alias at trial, in conjunction with other factors, warranted a new trial—"illustrates the point." Id. The government argues that in Williams,

> the alias at issue "was particularly prejudicial because no other evidence relating to the defendant's character, reputation, or criminal past was introduced at trial." The prejudice was heightened by the fact that there was little direct evidence of an important element of the crime charged, namely, "that the defendant actually knew he was transporting stolen vehicles."

Id. at 58-59 (citing Williams, 739 F.2d at 300 (internal citation omitted)). The government recounts that the Williams court stated, "[t]he trial judge in that case made it a point to say that the government's evidence was 'slim' and 'very thin,'" and it argues that "eliciting that the defendant was known *to police* by an alias that suggested 'some sort of history of or reputation for unsavory activity' was particularly damning." Id. at 59 (quoting Williams, 739 F.2d at 300, 301).

The government argues that the Williams court found that the prejudicial reference to the defendant's alias, "in light of the weakness of the case, and coupled with a separate, significant error by the prosecution in commenting on the defendant's failure to present evidence, was sufficient to require a new trial[,] and [n]one of those factors are present here." Dkt. No. 239 at 59. It asserts that in this case, "[t]here was ample properly-admitted evidence of the defendant's character and criminal background for the jury to consider," "[t]he prosecution did not comment on the defendant's exercise of his Constitutional

127

rights" "[a]nd the reference to the problematic alias was inadvertent, brief, and irrelevant." Id.

The defendant replies that the government made clear at the pretrial conference that it wanted to introduce the alias. Dkt. No. 257 at 24. He says that during the sidebar, the government did not argue that the elicitation of the alias was inadvertent or accidental. Id. And he asserts that the prosecutor's very next question after the sidebar was, "What did you call the defendant," which resulted in the witness repeating the alias (and others). Id. at 25. The defendant asserts that the government could have avoided this whole issue by not asking AV-2 anything about the defendant's name, because identity wasn't an issue; he says the government could have asked a leading question to determine whether AV-2 knew that the defendant used the name "Ben." Id.

The defendant maintains that "[t]he prejudice of this evidence cannot be overstated." Id. He says that it was "an impossible error to fix or come back from." Id. He says if the alias "Fast Eddie"—applied to the defendant in Williams—was prejudicial enough to warrant a new trial, then the alias "Bin Laden" "is prejudicial enough to warrant a new trial in [a] case alleging intimate partner violence and sex trafficking." Id.

iii.    **Discussion**

In reserving ruling on whether to preclude the government from eliciting testimony at trial regarding the "Bin Laden" alias, the court explained that it would need to "see what the context is" before deciding whether it would allow the prosecution to elicit testimony regarding the alias. Dkt. No. 210 at 52-53. It

128

said that if the "Bin Laden" alias was the *only* name by which a witness knew the defendant, it would be appropriate for the government to elicit testimony regarding the alias. Id. But, the court said, if a witness knew and could identify the defendant by a *different* name but also knew that the defendant used the "Bin Laden" alias, the government should not elicit testimony regarding the Bin Laden alias. Id.

In response to these comments at the pretrial conference, the prosecutor clarified that she believed that all the witnesses knew through their relationships with the defendant that "his name is Samuel Spencer and not Bin Laden." Dkt. No. 210 at 53. She nonetheless argued that the alias was relevant and admissible because certain witnesses understood the defendant to use that alias to terrorize them, and therefore that the defendant's adoption of the alias was relevant. Id. at 53-54. The court expressed skepticism regarding this theory of admissibility, explaining that it was "uncomfortable with 'somebody understood somebody to—'" as a theory of admissibility because it appeared to be based on "speculation and rumor." Id. at 54-55. The court said that "[i]f there's no[] evidence that [the defendant] chose that [alias] for the purpose of fear and to instill fear," other than the witnesses *perceiving* that that was the reason he adopted the alias, the government's theory of admissibility was insufficient to overcome the prejudice associated with the alias. Id. at 56. It then reserved ruling. Id. at 57.

The defendant now argues that by asking AV-2 by what name she knew the defendant, the prosecution improperly invited AV-2 to tell the jury that the

defendant went by the name "Bin Laden." He insists that the prosecution intentionally elicited the alias even though the court reserved ruling on the issue. The government denies that it intentionally elicited the alias and says that the fact that AV-2 responded to the prosecutor's question with the "Bin Laden" alias was unexpected and inadvertent.

Again, the court first must determine whether the prosecution's challenged remarks were improper. Gan, 54 F.4th at 479. Here, that means determining whether it was improper for the prosecution to ask AV-2 the open-ended question, "What name did you know him by?" thereby risking the possibility that the answer would elicit the testimony the defense sought to keep from the jury and the testimony the court said it did not believe should get before the jury unless it was necessary for the witness to identify the defendant. If the government's question was not improper, there is no prosecutorial misconduct. Gan, 54 F.4th at 479. If the court concludes the prosecutor's question was improper, then it must evaluate—in the context of the entire trial record—whether the instances in which AV-2 referred to the defendant using the "Bin Laden" alias deprived the defendant of the right to a fair trial. Id.

The government's line of questioning was not improper. There is no evidence—other that then defendant's unsupported allegation—that the prosecutor intended to elicit the alias. The prosecutor asked AV-2 if she knew the defendant and, after AV-2 confirmed that she did, asked AV-2 the name she knew him by. While this open-ended question resulted in the witness

disclosing the "Bin Laden" alias, there is no evidence that the prosecutor intended to elicit that response. The fact that the prosecutor's immediate follow-up question—even as the defense was objecting—was "Did you call him Ben?" suggests that she was expecting AV-2 to say she knew the defendant by Ben—and not by "Bin Laden."

The defendant asserts that the only possible purpose behind the prosecutor's open-ended question was to elicit the alias, given that AV-2 already had established that she knew the defendant and that identity was not an issue. But that assertion is speculative, and it ignores the fact that the defendant's real name is *not* Ben—it is *Samuel*. AV-2 was the first witness to testify at the trial, the first person from whom the jury would hear that someone named "Samuel" utilized and was known by the alias "Ben." The defendant's argument ignores the possibility—the likelihood—that the prosecutor was trying to elicit that AV-2 knew the defendant by the alias "Ben," an alias by which all the victim-witnesses and his co-conspirator knew the defendant. Dkt. Nos. 213 at 20 (AV-4 indicating that she usually called the defendant Ben); 178 (AV-1 indicating that she called the defendant Ben); 214 at 125 (AV-3 responding that she normally called the defendant Ben); 216 at 22 (Ericka Buie stating that the defendant "introduced himself as Ben"). It also was the alias that appeared in the defendant's email address and his social media accounts. Dkt. Nos. 213 at 30; 105-1 at ¶8. The government needed to let the jury know, early in the trial, that the defendant—whose given name is *not* Ben—used the alias "Ben" when interacting with the victim witnesses.

131

Contrary to the defendant's assertions, eliciting the "Bin Laden" alias was *not* the only possible purpose behind the prosecutor's line of questioning. And the fact that after the trial, the U.S. Attorney's Office issued a press release that included the "Bin Laden" alias has nothing to do with what the prosecutor expected AV-2 to say when she asked AV-2 at trial by what name AV-2 knew the defendant.

The prosecutor's question also was not improper because the court had not granted the defendant's pretrial motion to preclude the government from eliciting at trial evidence of the "Bin Laden" alias. The court had reserved ruling in case there might be a witness who knew the defendant only by the alias "Bin Laden." Certainly the court made clear that it would allow testimony about the alias only if it was the sole name by which a particular witness could identify the defendant; given the court's comments at the pretrial conference and the government's representation to the court that none of the witnesses knew the defendant only as "Bin Laden," the prosecutor could have been more cautious with the way she phrased her question.[18] But her inadvertent elicitation of the alias was not the result of an improper question.

After the "Bin Laden" alias did come out, the prosecutor said at sidebar that she did not intend to "belabor the point" and would "move on." Dkt. No. 212 at 41. She then asked AV-2 what name she knew the defendant by, and this time, the witness gave the expected answer—"Ben"—but repeated the "Bin

---

[18] As the defense points out, the prosecutor could have asked the leading question, "Do you know him as Ben?"—the question she *did* try to ask once AV-2 responded by revealing the "Bin Laden" alias.

Laden" alias. The defendant attributes nefarious intent to the fact that the prosecutor asked another open-ended question even after the sidebar conference. But as the defendant was objecting, the prosecutor had signaled to the witness that the witness should confine herself to the "Ben" answer, by asking, "Did you know him as Ben?" Having planted that seed, the prosecutor likely expected that when she asked a second time, "What name did you know him by," the witness would answer "Ben." She did, but also repeated the "Bin Laden" alias. Again, there is no evidence that the prosecutor blatantly disregarded the court's instructions and intentionally elicited the alias. And the alias did not come out again during the two-week trial. Because there is no evidence (other than the defendant's speculation) that the government intentionally elicited the alias, because the court had not ruled on the motion *in limine* and because the government avoided eliciting from any other witness, the government's line of questioning was not improper.

Even assuming that it was improper for the prosecutor to ask the open-ended question which resulted in the "Bin Laden" alias being disclosed to the jury, AV-3's brief mentions of the alias did not deprive the defendant of the right to a fair trial. In determining whether an improper remark is so prejudicial as to warrant a new trial, the court again returns to the Gan factors: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." Gan, 54

133

F.4th at 479-80 (quoting <u>Howard</u>, 225 F.3d at 793). The most important factor is the weight of the evidence against the defendant. <u>Carswell</u>, 996 F.3d at 796.

In inadvertently eliciting the "Bin Laden" alias, the prosecutor did not misstate any evidence, did not implicate specific rights of the accused and did not flout the court's instructions. Although it would have been preferable had the alias not been revealed, the resulting prejudice is minor compared to the overwhelming evidence of the defendant's guilt that came out over the course of the two-week trial. The government presented its case-in-chief over the course of four trial days, calling to the stand four victim-witnesses who each provided detailed testimony of how the defendant used violence, manipulation, drugs or some combination of the three to get her to perform commercial sex acts for his financial benefit. The fleeting instances in which AV-2 referred to the defendant as "Bin Laden"—an alias that he did, in fact, use—pale in comparison to the sheer weight and breadth of the evidence presented at trial. Even if the prosecutor's line of questioning eliciting the "Bin Laden" alias was improper (which the court has determined that it wasn't), given the overwhelming evidence of his guilt, AV-2's brief mentions of that alias early in the trial did not deprive the defendant of his right to a fair trial.

7. *Defense Witnesses Failed to Appear*

a. Parties' Arguments

The defendant argues that even in the absence of legal error, courts may order a new trial "where an important defense witness did not appear." Dkt. No. 229 at 41 (citing <u>United States v. Scroggins</u>, 379 F.3d 233 (5th Cir. 2004)

134

cert. granted, judgment vacated on other grounds, Scroggins v. United States, 543 U.S. 1112 (2005); United States v. Patterson, 41 F.3d 577 (10th Cir. 1994)). He asserts that "the defense subpoenaed two important citizen witnesses," Steven Beck and Andrea Logan, "[who] did not appear on their subpoenas." Dkt. No. 229 at 41. He says that he unsuccessfully attempted to subpoena a third witness—Ashley Tran—who "came to light during the trial." Id. The defendant claims that "[t]he testimony of these three witnesses would have shed valuable objective light on the relationships [he] had with the victims in this case" and "would have refuted some of the more incendiary allegations made by [AV-2]." Id.

The defendant describes Steven Beck as "a family friend" whom he expected to "testify that the [victim witnesses] were voluntarily engaging in prostitution during their relationships with [the defendant], that [the defendant] did not force them to engage in sex work, that [the defendant] did not obtain—much less demand—the proceeds of their sex work, and that he did not observe [the defendant] engage in violence towards the women." Id. at 41-42. As for Andrea Logan, the defendant recounts that AV-2 testified that "Logan was present for and experienced the same abuse [AV-2] experienced at the hands of [the defendant] in 2013, when [AV-2] first began working with [the defendant]." Id. at 42. The defendant says that "[t]he defense anticipated Logan stating that [AV-2's] account of what happened was entirely untrue." Id. The defendant argues that the defense first became aware of Asley Tran during trial when the government allegedly identified her "as a victim of [the defendant's]

135

trafficking." Id. (citing Dkt. Nos. 216 at 191, 293; 214 at 155). The defendant says that it contacted Tran during trial and that she "provided a statement that helped [the defendant]." Id. The defense asserts that Tran "engaged in voluntary sex work with [the defendant] and some of the other women in this case," that she "disputed the suggestion that she or any of the other women were victims of [the defendant's] sex trafficking" and "she stated that each of them engaged in sex work voluntarily, mostly to feed their drug addictions, as she had done." Id. The defense says that during her meeting with defense counsel, Tran admitted knowing that some of the women were involved romantically with the defendant "and [that she] was aware that during their relationships, [the defendant] had committed acts of domestic violence," which were "not related to their sex work." Id. at42-43. The defendant explains that "[d]espite providing the defense with this information, Tran was reluctant to testify and did not avail herself to be subpoenaed." Id.

The defense claims that "[e]ach of these witnesses would have provided testimony that shed objective light on [the defendant's] relationships with the alleged victims and the voluntariness of the alleged victims' sex work. This testimony would have bolstered the defense's theory such that had the jury heard it, [the defendant] would have been acquitted." Dkt. No. 229 at 43. The defendant argues that the interests of justice warrant a new trial "to allow the jury to hear the complete story." Id.

The government responds that though the defendant cites several cases which purportedly support his proposition that courts can grant a new trial

under circumstances where important defense witnesses fail to appear, the defendant "does not explain their facts, quote them, or provide the court with the rule it should apply in analyzing the request." Dkt. No. 239 at 59. It recounts that in one of the cases cited by the defendant—<u>Scroggins</u>—the Fifth Circuit found that

> a district court can only grant a new trial based on the absence of defense witnesses if it finds either "a manifest injustice and that [defendant] would have probably been acquitted if the jury had heard their testimonies, or that, with the additional testimony, the evidence would 'preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'"

<u>Id.</u> at 60 (quoting <u>Scroggins</u>, 379 F.3d at 257). The government explains that the <u>Scroggins</u> court denied the defendant a new trial because it found no legal error, and the Fifth Circuit remanded to the district court so that the district court could analyze whether the "interests of justice required a new trial regardless of the [lack of] error." <u>Id.</u> (citing <u>Scroggins</u>, 379 F.3d at 254, 269). "On remand," the government recounts,

> the district court found that no new trial was warranted, because: (1) the proposed witnesses would impeach the credibility of a witness whose credibility was already significantly attacked at trial; (2) the court did not find the proposed witnesses particularly credible; and (3) there was enough significant evidence of the defendant's guilt that the addition of these witnesses' testimonies would not make the evidence "preponderate heavily" against the verdict.

<u>Id.</u> at 60-61 (citing <u>United States v. Scroggins</u>, 485 F.3d 824, 833 (5th Cir. 2007)). The government says that "[t]he Fifth Circuit affirmed the district court's denial of a new trial after remand" and argues that "*Scroggins* thus does little to support the defendant's argument." <u>Id.</u> at 61 (citing <u>Scroggins</u>, 485 F.3d at 833).

137

The government recounts that the second case cited by the defendant, Patterson, "is a felon-in-possession case in which the defense was that Patterson's brother was the owner of the firearm." Id. (citing Patterson, 41 F.3d 577). The government highlights that "the defense attorney twice told the jury that it would hear from Patterson's brother, and even told them that he was 'out in the hall.'" Id. (citing Patterson, 41 F.3d at 579). "When the brother could not be found, the defense asked for a continuance, but that request was denied." Id. (citing Patterson, 41 F.3d at 578). The government explains that the "[t]he trial court later granted a motion for a new trial based on these facts, primarily because of the prejudice suffered by the defendant given the promises made in the opening, and the centrality of his testimony to the facts in the case." Id. (citing Patterson, 41 F.3d at 579).

The government observes that neither Scroggins nor Patterson are Seventh Circuit cases, so they are not binding on this court; even if they were, the government argues that "neither supports a new trial." Dkt. No. 239 at 61. According to the government, "the witnesses that the defendant claims he could not call were not fundamental to the charges at issue." Id. It says that the defendant refers to Beck as a "family friend" and asserts that Beck "purchased drugs from the defendant and assisted the defendant's trafficking. Indeed, in 2016, he drove a pregnant AV-4 to a sex date that turned out to be a sting operation, and he was stopped for questioning by law enforcement." Id. (citing Dkt. No. 213 at 123, 165-167). The government argues it is

> unclear . . . what testimony Mr. Beck could have offered that would
> have been both relevant and admissible. Any statement of his

opinion that the women working for the defendant were doing so "voluntarily" would either be speculation or hearsay. And his statements that he did not observe the defendant's violence would have been . . . of extremely little value given the extensive evidence of the defendant's violence that was presented at trial and the likely fact that he was not with the defendant all the time.

Id. at 61-62. The government further suggests that Beck would not be a credible witness given how close he is to the defendant (the victim-witnesses referred to Beck as the defendant's uncle), the fact that he is a drug user who got his drugs from the defendant and the fact that he was a coconspirator of the defendant who has at least one felony conviction. Id. The government asserts that the defendant offers no insight into why Beck did not appear at trial in compliance with his subpoena, or why it is likely that Beck would comply with a future subpoena. Id. "Given the nature of the testimony he could offer and his credibility issues," the government argues that "there is no reasonable basis to conclude that Mr. Beck's absence makes it a 'miscarriage of justice to let the verdict stand,' or that his presence would make the evidence preponderate against the verdict." Id. (citing Scroggins, 379 F.3d at 257).

The government says that "[t]he defense merely offers that Ms. Logan would testify that '[AV-2's] account of what happened was entirely untrue[ ]'" but "offers no explanation or detail for this conclusory statement—neither what Ms. Logan would have purportedly said, nor the basis for such testimony." Dkt. No. 239 at 62 (quoting Dkt. No. 229 at 42). The government observes that the defendant didn't argue that "Ms. Logan was present every day that AV-2 was trafficked or otherwise in a position to know whether AV-2's account was accurate." Id. at 62-63. And it says that "[a]s with Mr. Beck, the defendant . . .

139

fails to explain *why* Ms. Logan did not appear or what would be different at a new trial." Id. at 63. The government argues that the defendant called as a witness at trial "Kayla Peterson, for the same purpose he purports he needed Mr. Beck and Ms. Logan, but related to AV-4 rather than AV-2." Id. The government argues that Peterson's testimony—which it says the defendant tried to use "to discredit AV-4's account based on Ms. Peterson's limited observations of the relationship between AV-4 and the defendant"—"was both unpersuasive and largely irrelevant" and that "[t]here is no reason to conclude that Ms. Logan's testimony would not suffer from the same infirmities." Id. The government argues that there is no "reasonable basis to conclude that Ms. Logan's absence makes it a 'miscarriage of justice to let the verdict stand.'" Id. (citing Scroggins, 379 F.3d at 257).

As for Ashley Tran, the government contends that the defense describes her anticipated testimony to be similar to Peterson's. Dkt. No. 239 at 63. The government argues that "[f]or the same reason . . . Ms. Tran's testimony would not have so altered the evidence that the jury would have 'probably acquitted.'" Id. (citing Scroggins, 379 F.3d at 257). The government says that, "as with its arguments with respect to Mr. Beck and Ms. Logan, the defense provides no affidavit or statement of Ms. Tran" but "simply asserts that Ms. Tran provided a 'statement that helped [the defendant],'" which "unsupported allegation is not sufficient." Id. at 63-64 (quoting Dkt. No. 229 at 42).

The government also takes issue with the defendant's explanation that Tran did not appear at trial because she "was reluctant to testify and did not

140

avail herself to be subpoenaed," dkt. no 239 at 64 (citing dkt. no. 229 at 43), observing that "defendants bear the responsibility for using proper methods to secure their witnesses' presence in court," id. (quoting United States v. Grooms, 6 F. App'x 377, 381 (7th Cir. 2001)). The government adds that the defendant has not explained why he believes Tran would make herself available in the event he is granted a new trial. Id. In any event, the government asserts that "the Court need not decide the motion on th[at] basis because the defendant has not presented anything with respect to Ms. Tran that would 'probably' alter the outcome of the trial or that makes the verdict a miscarriage of justice." Id.

The government ends by arguing that "[n]one of the witnesses would have provided any admissible or relevant testimony that would have been credible and not cumulative. And none of it would have been sufficient to counter-balance the overwhelming evidence of guilt presented at trial." Dkt. No. 239 at 64.

In reply, the defendant asks the court to put itself in his shoes for a minute. Dkt. No. 257. He says,

> You've been accused of very serious crimes carrying outrageously long penalties. You know that you've done wrong but believe that the narrative being advanced by the government mischaracterizes you and your life. You know there are people who can correct perceived errors in the narrative, so you subpoena them for the trial. Your trial day finally comes, and the jury panel walks into the courtroom. The few Black jurors are struck, leaving you with a jury that doesn't resemble your community in the slightest. And then, the trial begins, and the government paints a picture of you. But at least you know that you have some witnesses who can correct that narrative. But they don't come. And the only narrative

presented to the jury—the jury that looks nothing like you—is an ugly and largely mischaracterized narrative.

That's the lens through which the Court should view [the missing witness issue and the defendant's challenge to the jury pool]. Legally, standing on their own they do not warrant a new trial. [The defendant] recognizes as much. Even together, they likely don't warrant a new trial. They're not the product of a party's wrongdoing or mistake. But they're blemishes on the trial that, when considered with the errors identified [in the defendant's motion], do warrant a new trial.

Id. at 26-27.

b.     Discussion

Before analyzing the defendant's specific arguments as to each individual missing witness, the court makes some general observations.

First, at no point during trial did the defendant ask the court to suspend or adjourn the trial to allow him to gain the attendance of these witnesses. Nor did he seek a material witness warrant under 18 U.S.C. §3144. The court first enquired about defense witnesses on January 16, 2024—the fifth day of trial— as the government was closing in on completing its case-in-chief. Dkt. No. 216 at 142. Defense counsel informed the court that Investigator Gowin was available to testify that day, as well as "one or two other citizen witnesses that would be relatively brief." Id. When the government asked who the citizen witnesses were, the defense said, "It is Mr. Beck and Ms. Logan." Id. at line 19. As it turned out, the government did not rest its case until the end of the day on January 16, and the court allowed the jury to recess before starting the defense case. Id. at 291. After the jury left the courtroom, the court asked defense counsel about the witness lineup for January 17. Id. at 293. Counsel

142

responded that the defense would present Justice Rivera, Investigator Gowin and "three to four citizen witnesses that the defense intends to call." Id. The court responded, "Beck, Logan," and defendant counsel replied, "Peterson, and then I informed the Government that there has been testimony during the trial about a fourth individual, Ashley Tran, who has been discussed. And this is someone whose name we didn't—weren't familiar with before the trial started, and there's a possibility the defense will be calling her as well." Id.

The morning of January 17, the defense first called Justice Rivera. Dkt. No. 217 at 3-67. Next, the defense called Investigator Gowin. Id. at 68, 72-120. When Investigator Gowin left the stand, defense counsel advised the court at sidebar that the defense had "one witness left." Id. at 120, line 22. The government asked who the witness was, and the transcript says that the "Court" responded that it was Kayla Peterson; the court suspects perhaps the defense gave that response. Id. at 121. The defense made no mention of Beck, Logan or Tran, even though the day before the defense had identified them as defense witnesses and even though the court discussed with the parties the schedule for an instruction conference and closing arguments. Id. There was no further mention of those three individuals at any later point in the trial.

The defendant may have had very good reasons for not asking the court to suspend proceedings to allow him to try to obtain these witnesses' attendance—perhaps he suspected the court would not have granted such a request, given that at the time of trial, the case had been pending for over two years and a jury had heard multiple days of evidence, or perhaps he had

143

information about why these witnesses did not appear and felt that he'd unlikely be able to secure their attendance with more time. The court points this out only to clarify that the defendant is not arguing that he sought time to obtain the witnesses attendance and was denied that opportunity.

Second, defense counsel did not mention Beck or Logan in his opening statement. He did not mention *any* potential defense witnesses in his opening statement. This is not a case in which defense counsel told the jury that it could expect to hear from witnesses and then those witnesses did not appear. When, during jury selection, the court asked the defense to list any witnesses it "might call," the defense listed eleven people—Investigator Gowin, Justice Rivera, Kaleigh Emons, Amanda Whipple, Brad Milosz, Jacob Johnson, Lamong Harris, Kayla Peterson, Andrea Logan, Steve Beck and Gregory Bell. Dkt. No. 211 at 165. Only three of those eleven people testified. The jury had no reason to expect to hear from Beck, Logan or Tran, and did not know that the defendant had subpoenaed Beck and Logan or that it had spoken to Tran.

Third, as to Logan and Tran—and perhaps even as to Beck—the jury heard testimony during the trial that victim witnesses were afraid of the defendant and that he had been violent with them and others. They heard that the defendant had been violent with Ericka Buie. They heard that some of the victim witnesses and Buie did not want to attend the trial or to testify. Even had the defense presented testimony from Peterson, Logan and Tran that the defendant had not been violent with them, had not trafficked them and had not been violent with the other witnesses, the jury might have rejected that

144

testimony as the product of fear or concern over the defendant's possible retribution.

Finally, the defendant's reply brief is a request for the court to base its Rule 33 ruling on sympathy, not on the law applicable to a Rule 33 motion. The court has no reason to doubt that the defendant strongly feels that the evidence at trial did not accurately characterize him, his actions or his motivations. He had a defense team that zealously, consistently and passionately worked to convince the jury that the government's evidence constituted a mischaracterization. But the court must base its legal decisions on the facts and the applicable law, not on the defendant's frustration and disappointment that witnesses he had counted on chose not to appear.

Having addressed those preliminary issues, the court turns to the defendant's arguments as to each of the three missing witnesses. The <u>Scroggins</u> framework, although from the Fifth Circuit and not binding on this court, is helpful. <u>Scroggins</u> provides that for a district court to grant a new trial based on the absence of defense witnesses, the district court must find

> *either* that the absence of [the witness or witnesses] resulted in a *manifest injustice* and that [the defendant] would have *probably been acquitted* if the jury had heard their testimonies, *United States v. Sanchez*, 969 F.2d 1409, 1414-16 (2d Cir. 1992) *or* that, with the additional testimony, the evidence would *"preponderate heavily against the verdict,* such that it would be a *miscarriage of justice* to let the verdict stand." [United States v.] Robertson, 110 F.3d [1113,] 1118 [(5th Cir. 1997)].

<u>Scroggins</u>, 379 F.3d at 257 (emphasis in original).

145

i. **Steven Beck**

The defendant says he subpoenaed Steven Beck and expected that Beck would testify that (1) the victim-witnesses were voluntarily engaging in prostitution during their relationships with the defendant; (2) that the defendant did not force them to engage in sex work and did not take or demand the proceeds of their sex work; and (3) that he never saw the defendant engage in violence toward the women. Dkt. No. 229 at 41-42. The defense has given the court no reason to believe that, given his noncompliance with the previous subpoena, Beck would appear to testify at a new trial. Even if the defense could secure Beck as a witness in the future, whatever probative value his testimony might have had is undercut by significant credibility issues and the fact that his anticipated testimony is contradicted by the testimony of the four victim-witnesses.

At trial, AV-1, AV-2, AV-3 and AV-4 testified that the defendant used romantic manipulation, violence, the threat of violence, the withholding of drugs or some combination thereof to get them to engage in commercial sex and to give him the proceeds of that commercial sex work. The testimony of each victim-witnesses corroborated the testimony of the others, reinforcing the credibility of each. Though the defendant asserts that Beck's testimony "will shed valuable objective light on the relationships [the defendant] had with the victims in this case," the fact that he characterizes Beck as "a family friend of [the defendant]" (one who AV-4 referred to as "[the defendant's] uncle Spoon," and who would, on the defendant's direction, transport the victim-witnesses to

146

commercial sex dates) calls into question his credibility. Dkt. Nos. 229 at 41; 213 at 165-166. The fact that Beck could not have been privy to every aspect of the defendant's relationships with the four victim witnesses undermines the value of his anticipated testimony that he never saw the defendant engage in violence with the victim witnesses or demand the proceeds of their sex dates. Because Beck's relationship with the defendant poses credibility concerns and his anticipated testimony conflicts with the testimony of the four victim-witnesses, there is no reasonable basis on which to conclude that Beck's testimony probably would have led to an acquittal. Nor is there a basis on which to believe that his testimony would heavily preponderate against the verdict such that it would be a miscarriage of justice to let the verdict stand.

ii.     **Andrea Logan**

The defendant states that Andrea Logan "used to live with [the defendant] and [AV-1]," and is the individual whom AV-2 "described . . . was present for and experienced the same abuse [AV-2] experienced at the hands of the defendant in 2013." Dkt. No. 229 at 42. He asserts that he "anticipated Logan stating that [AV-2's] account of what happened was entirely untrue." Id. Again, the defendant has not explained why Logan failed to comply with her trial subpoena, nor has he explained why the court should expect Logan to comply with another subpoena in the event the defendant is granted a second trial. Apart from asserting that Logan would refute AV-2's account of the abuse she and Logan suffered in 2013 at the hands of the defendant, the defendant

has provided no details about what he anticipates Logan would say were she to comply with a second subpoena.

Nor does the defendant explain why Logan's anticipated bare assertion that AV-2's account of her experience with the defendant in 2013 is "entirely untrue" would be credible. It is unlikely that Logan was privy to all aspects of the defendant's relationship with AV-2 at the time. It is unclear why the jury would credit testimony from Logan about AV-2's relationship with the defendant over AV-2's own testimony. The defense called Kayla Peterson to discredit AV-4's account of her relationship with and victimization at the hands of the defendant. Peterson testified that she never knew the defendant to be violent with AV-4 and did not believe that the defendant was sex-trafficking AV-4. But the probative value of Peterson's testimony was weak, given that it was premised on her limited observations of the defendant's relationship with AV-4. Were Logan to appear at a new trial and testify that AV-2's account of her relationship with the defendant is inaccurate, that testimony likely also would be of little value. The court has no reason to believe that Logan's testimony would probably have led to an acquittal or would preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.

### iii.    **Ashley Tran**

The defense says that it first became aware of Ashley Tran during trial. It claims that the defense contacted and interviewed Tran during trial and that she "provided a statement that helped [the defendant]." Dkt. No. 229 at 42. The

148

defendant asserts that Tran said that (1) she engaged in voluntary sex work with the defendant and "some of the other women in this case;" (2) she "disputed the suggestion that she or any of the other women were victims of [the defendant's] sex trafficking;" (3) all of the victim witnesses, like herself, "engaged in sex work voluntarily;" and (4) while the defendant was at times violent with AV-3 and AV-4, this was domestic violence, unrelated to their sex work. Id. at 42-43.

The defendant says that while Tran provided the defense with these statements, "[she] was reluctant to testify and did not avail herself to be subpoenaed." Dkt. No. 229 at 43. As with Beck and Logan, the defendant has not explained why he has reason to believe that Tran would make herself available to testify were the court to grant him a new trial. Nor does he explain why Tran's anticipated testimony would be more credible than that of the four victim witnesses. Accepting that Tran made these statements does not provide a basis for crediting them over the detailed and extensive testimony given by the victim-witnesses. As with Beck and Logan, the court has no reasonable basis on which to conclude that were Tran to deliver her anticipated testimony at trial, the defendant would probably have been acquitted, or the verdict would have been called into question such that it would be unjust to let it stand.

c.    Conclusion

When considered individually, neither Beck's, Logan's nor Tran's anticipated trial testimony provides a sufficient basis on which to grant the

defendant's motion for a new trial. This is also true when considering their anticipated testimony cumulatively. Each of them either presents significant credibility issues or offers potential testimony that would be largely cumulative. The court will not grant the defendant a new trial because these witnesses failed to appear at trial.

8. *The Jury Pool Lacked Diversity*

The defendant recounts that of his *venire* of forty-six potential jurors, only four were Black. Dkt. No. 229 at 43. He recounts that the government asked to strike for cause one of those Black jurors because the juror had a felony conviction that he failed to disclose when the court asked the *venire* if anyone had been convicted of a crime or arrested. Id. (citing Dkt. No. 211 at 260-61). The defendant says that this request to strike was "well taken and race neutral." Id. at 43-44. He recounts that on its own, the court decided to dismiss two of the other Black jurors because they testified to having medical appointments during the trial. Id. (citing Dkt. No. 211 at 264-65). The defendant says that the decision by the court "was understandable, even though the defense opposed it." Id. at 44. He recounts that after the for-cause strikes, only one Black juror remained. While he states that "[t]his result was not the fault of anyone in this case," and concedes that "this fact on its own probably doesn't warrant a new trial," he argues that "it's one factor, amongst many others, that the court may consider in deciding whether the interests of justice warrant a new trial." Id. at 43-44.

The government recites the applicable standard courts use when evaluating claims regarding a lack of diversity in a jury pool in a criminal case. It says that while the Sixth Amendment guarantees the accused that the "venire of petit jurors be chosen from a fair cross-section of the community," dkt. no. 239 at 65, "there is no requirement that a venire or a jury mirror the general population," id. (citing United States v. Raszkiewicz, 169 F.3d 459, 462 (7th Cir. 1999)). It asserts that defendants are not "entitled to a jury of any particular composition, so long as there is a fair process which generates an impartial jury." Id. To make out a *prima facie* violation of the Sixth Amendment's fair cross-section requirement, the defendant must establish that (1) the group alleged to be excluded is a distinctive group in the community; (2) the group's representation in the jury pool is not fair and reasonable in relation to the number of such persons in the population; and (3) the underrepresentation results from systematic exclusion of the group in the jury selection process. Id. at 65 (citing Duren v. Missouri, 439 U.S. 357, 364 (1979)). If the defendant establishes these three elements, the burden then shifts to the government "to show that an 'overriding, significant state interest is manifestly advanced by those aspects of the jury selection process that result in the disproportionate exclusion of a distinctive group.'" Id. at 65-66. (citing United States v. Guy, 924 F.2d 702, 705 (7th Cir. 1991)).

The defendant's brief does not mention his burden for establishing a *prima facie* violation of the fair cross-section requirement, nor does he attempt to meet that burden. He has not identified a case in which a court overturned a

jury verdict and granted a new trial on grounds that proper, for-cause strikes or a court's for-cause dismissals resulted in a jury that the defendant felt was not representative of himself or his community.

The defendant's recitation that only four of the forty-six members of his *venire* appeared to be diverse implicates his Sixth Amendment right to a jury selected from a fair cross-section of his community. The Seventh Circuit has held that "the complete lack of African-Americans on the venire alone is insufficient to satisfy the third prong of the *Duren* analysis when the venire is randomly selected from voter lists pursuant to an authorized plan." United States v. Neighbors, 590 F.3d 485, 491 (7th Cir. 2009). In United States v. Willis, 868 F.3d 549, 555 (7th Cir. 2017), the defendants argued that only one of the forty-eight members of the venire "appeared to be black." The Seventh Circuit held that, because the *venire* was drawn from individuals registered to vote, the defendants could not show "that the underrepresentation of blacks in the jury pool was due to a systematic exclusion of this group." Id. The court pointed to another of its decisions, in which it had held that "absent record evidence that the jury-selection rules for the [particular judicial district] were biased or bypassed, it was proper for the district court to reject a challenge to the racial balance of the jury." Id. (citing United States v. Fadiga, 858 F.3d 1061 (7th Cir. 2017)).

In 2019, a defendant argued that the Eastern District of Wisconsin's jury plan resulted in a master jury wheel, and a jury pool, that "systematically underrepresents minority groups in violation of the Fifth and Sixth

Amendments." United States v. Ganos, Case No. 18-cr-62, 2019 WL 13292815, at *2 (E.D. Wis. Mar. 12, 2019). Magistrate Judge David E. Jones explained that the Eastern District's plan used the voter records of each county in the district. Id. at *2. The defendant had argued that "the District's reliance solely on actual voters systematically excludes minorities from the jury-selection process." Id. at 5. Judge Jones explained that "the Jury Selection and Service Act explicitly endorses the use of actual voter lists as a primary source of the names of prospective jurors." Id. (citing 28 U.S.C. §1863(b)(2)). He also observed that "the Seventh Circuit and other courts have consistently held that using such lists does not violate Duren's third prong." Id. Judge Jones concluded that the defendant had failed to establish a prima facie violation of the fair cross-section requirement. Id.

The defendant here has failed to present any evidence that the lack of diverse jurors in his jury pool was the result of systematic exclusion in the selection process. This court frequently comments, with dismay, on the fact that the venires it sees are so lacking in diversity. After for-cause strikes have been executed, the court often allows litigants to exercise their peremptory strikes from that portion of the remaining jury pool that appears to include more diverse jurors (assuming that there are diverse jurors on the venire— sometimes there aren't). But absent evidence that the paucity of diverse potential jurors is the result of systematic exclusion, the defendant's argument as to the number of diverse jurors in the jury pool has no merit.

153

The defendant recounts that the court itself chose to strike two apparently diverse jurors because they had medical appointments. He characterizes this choice as "understandable," although he emphasizes that he objected. This argument implies that the court's striking of those two jurors violated his constitutional rights (though he says that the lack of diverse jurors was not the fault of anyone in the case). Juror Number 15 advised the court that he needed to go to therapy on Wednesdays and Fridays for a "pinched nerve in a rotator." Dkt. No. 211 at 166. He told the court that the therapy was scheduled every Wednesday and Friday and that he was "on and off seeing [his] doctor too." Id. at 167. Juror Number 40 told the court that he had therapy "on Monday, Wednesday and Fridays," that he had a stent and that he'd had a heart attack. Id. at 167. When it came time for the parties to discuss for-cause strikes, the government stated that although Juror Number 15 had mentioned "some arrests in 1980 for fighting," the government had "evidence of a misdemeanor domestic battery in 2007 that didn't come up." Dkt. No. 211 at 237.

The defense stated that that it was its position that "we shouldn't be striking jurors for cause for appointments like physical therapy, that kind of stuff." Id. at 238. It pointed out that "[i]t . . . just so happens that the jurors who have these problems or have appointments are mostly the minority jurors in the group." Id. at 238-239.

The court ended up inviting Juror Number 15 to sidebar. He had difficulty walking across the courtroom, which prompted the court to apologize

154

for making him "get up and walk here." Id. at 263. The government asked him follow-up questions about his failure to identify a domestic-violence conviction. Id. Once he'd finished answering the questions, the court said, "Thank you. Now, you get to hobble all the way back yonder." Id. at 263-264.

The government expressed concern that people with medical appointments might not be able to "be here to listen if they have appointments and other things. Are they going to come?" Id. at 265. Before making its decision on striking Juror Number 15 and Juror Number 40 because of their medical issues, the court asked whether either party had strong feelings "about selecting from the back to the front or the front to the back?" Id. The defense asked to select back to front. Id. After expressing its understanding of the defense position and stating that it understood "where we are in terms of diverse jurors," the court expressed concerns about making people miss medical appointments "for two weeks in a row for what apparently are valid medical issues." Id. 265-266. The court opined that even if "we pick them"— meaning Jurors 15 and 40—"I'm not sure we do ourselves in any favors. You saw how he walked up here, Juror Number 15. I don't think we're doing ourselves any favors." Id. at 266. The court concluded that it was going to let Jurors 15 and 40 go for cause "because of the medical issues." Id.

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court applied the Equal Protection Clause to prohibit prosecutors from exercising peremptory challenges on the basis of race. In the years since, the Seventh Circuit has explained that "[t]he anti-discrimination principle is . . . not just a privilege of

155

the criminal defendant; it constrains prosecutors, criminal defense lawyer, and civil litigants alike." Winston v. Boatwright, 649 F.3d 618, 622 (7th Cir. 2011). "Intentional discrimination by any participant in the justice system undermines the rule of law and, by so doing, harms the parties, the people called for jury duty, and the public as a whole." Id. (citations omitted). Judges like the undersigned are participants in the justice system, so a judge's intentional discrimination in striking jurors for cause would violate the defendant's constitutional rights.

Despite emphasizing the court's decision to release Jurors 15 and 40, the defendant has not alleged that the court did so because of their race. He has acknowledged that the court's reasoning was "understandable." The court stated its reasoning for releasing those two jurors and the defendant did not dispute that reasoning at trial, nor has he done so in his post-trial motion. And although the defendant understandably was concerned about being judged by a jury that did not resemble him or his community, "there is no requirement that a venire or a jury mirror the general population," United States v. Phillips, 239 F.3d 829, 842 (7th Cir. 2001); "Defendants are not entitled to a jury of any particular composition," id. (quoting Taylor v. Louisiana, 419 U.S. 522, 538 (1975)).

The defendant has not met his burden to show that either the *venire* or the court's dismissal of two diverse jurors for medical reasons violated his constitutional rights. He is not entitled to a new trial on this basis.

9. *Cumulative Effect of Alleged Errors*

In the final section of his brief the defendant asserts that his "trial was replete with events and rulings that coalesced to deprive him of a fair trial" and that "[e]ven if none of the errors warrant a new trial on their own, the Court must consider the cumulative effect of them." Dkt. No. 229 at 44. The defendant argues that "[t]he cumulative effect of the problems outlined . . . warrant a new trial in the interests of justice." Id.

"Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." United States v. Allen, 269 F.3d 842, 847 (7th Cir. 2001) (citing Taylor v. Kentucky, 436 U.S. 478 n.15 (1978); United States v. Haddon, 927 F.2d 942, 949-50 (7th Cir. 1991)). That said, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." Santos, 20 F.3d at 285 (citation omitted). To overturn a jury verdict and obtain a new trial based on "cumulative errors," a defendant must demonstrate that "(1) at least two errors were committed in the course of the trial; [and] (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the [defendant] a fundamentally fair trial." Allen, 269 F.3d at 847 (citation omitted).

The court has concluded that none of the issues the defendant has raised constituted "errors." The defendant has not demonstrated that at least two errors were committed in the course of the trial, and he cannot

157

demonstrate that any errors so infected the jury's deliberation that they denied him a fair trial.

## III.  Closing Comments

The defendant has made serious allegations of prosecutorial misconduct against the Assistant United States Attorneys who tried this case. As the government observed in its brief, defense counsel's memorandum of her conversation with AV-4 "implies a series of very significant allegations of impropriety against the government," such as preventing AV-4 from having her lawyer attend meetings and threatening AV-4 with jail time. Dkt. No. 239 at 19 n.7. The defendant has alleged in his post-trial motion that the prosecutors engaged in several types of misconduct, including failing to turn over evidence, failing to disclose information (even when it was not in the government's possession), making improper rebuttal arguments and deliberately eliciting information that the defense had asked the court to exclude. In its opening brief, the defense team anticipated that "[t]he government is likely to argue that the defense engaged in misconduct throughout the trial and that any personal attack was invited;"[19] while disputing any defense misconduct, the defense asserts that the government must hew to a higher standard than the defense

---

[19] The government did not, in fact, respond that the defense had engaged in conduct that invited reciprocal misconduct—it "vehemently" denied AV-4's allegations of impropriety, dkt. no. 239 at 19 n.7, but otherwise made no allegation that the defense had engaged in misconduct or "invited" any argument. And the court has found no evidence of any government misconduct.

and cannot "fight fire with fire," quoting <u>United States v. Mazzone</u>, 782 F.2d 757, 762 (7th Cir. 1986)). Dkt. No. 229 at 39, n.6.

The defense is correct that in <u>Mazzone</u>, the Seventh Circuit rejected the government's assertion that its improper rebuttal argument was invited by defense counsel, who had accused the government in the defense closing of "perjury, fraud, intimidation, and other improprieties" in prosecuting the defendants. <u>Mazzone</u>, 782 F.2d at 762. The Seventh Circuit said that if a defense argument is improper, "the prosecutor can object; he can, if need be, ask that counsel be held in contempt for improper argument or questions . . . ; but he cannot respond in kind and violate ethical standards himself." <u>Id.</u> at 762-63. If the prosecutor who gave the rebuttal argument *had* made improper remarks in retaliation for the defense casting aspersions on the government's conduct, her remarks would have been improper (although not necessarily automatically requiring a new trial).

That prosecutors cannot commit ethical violations in retribution for perceived defense misconduct, however, does not justify defense counsel making profligate allegations of misconduct against the prosecutors. The defendant asserts that "[a]s the Court here noted, this was a contentious trial. The parties were obviously frustrated with one another, and the Court with the parties." Dkt. No. 229 at 39.[20] Defense counsel says that "apparently during an

---

[20] On the fourth day of trial, the government asked the court to review, over the lunch break, numerous exhibits over which the parties had disputes. During the parties' arguments, the court stated—admittedly facetiously—"All of this would have been great to be teed up in a Motion in Limine. Those are nice for this sort of thing." Dkt. No. 214 at 116. The court expressed concern that the

unrecorded sidebar," the defense "inartfully accuse[d] the government of not playing fair in a way that implied misconduct," and says that "[t]he defense regrets its word choice in that instance." Id. The defense insists, however, that that one instance occurred outside the hearing of the jury and that the defense apologized, while "[t]he government's attacks . . . were repeated, untethered from the evidence, in front of the jury, and made [in the case of the rebuttal argument] at the last possible moment when the defense counsel not respond." Id.

The court said the following during the trial, and the concern it expressed then has only been magnified by the arguments in the defendant's post-trial motion:

> . . . I know that trial is exhausting. I've been there on both sides. You all have been up long hours. You have [been] working late nights. You've been doing it for an extended period of time. You haven't seen your families or your friends or anything else, and everybody is kind of worn down. But there have been some allegations made that come close to if not directly accusing the defense, accusing the prosecutors, of engaging in unethical conduct. I think that any lawyer ought to be very careful about making those kinds of allegations without having a sound basis for doing so, particularly in a practice area like this one where all of you will see each other over and over again.

> It is possible to zealously represent your client without making attacks. If you have a concern that someone has done something that is improper[,] and by you, I am referring to all four of you, you have a concern that someone has done something improper, you are more than welcome to raise that with me, and we can discuss it. A probably even better way to do it is to approach the other side first and say, hey, I just saw this, is this what I think it is and talk it through. And then if you think there's a problem, you can bring it in front of me, but I am very concerned about throwing out

_____

trial was moving very slowly, as well as expressing concerns over allegations of misconduct the parties were making against each other. Id. at 118- 119.

allegations that, well, the Government told their witness to do this or the Government coached a witness or did this, that or the other without very definitive evidence that that occurred. I hope that that will stop despite how tired people are and how hard people are working and how high the stakes are.

Dkt. No. 214 at 118-119.

In his post-trial motion, the defendant has levied multiple allegations of misconduct against the two prosecuting attorneys, without identifying a single piece of evidence supporting those allegations. He has done so despite the court's expression of concern during the trial. The defense's multiple allegations of government misconduct, made in its opening and reply briefs, were—in this court's opinion—unwarranted and unjustified.

## IV. Conclusion

The court **DENIES** the defendant's Fed. R. Crim. P. 29 motion for acquittal on Count Five. Dkt. No. 229.

The court **DENIES** the defendant's Fed. R. Crim. P. 33 motion for a new trial.  Dkt. No. 229.

The court **DENIES** the defendant's request for post-trial discovery under Fed. R. Crim. P. 17(c) and for an evidentiary hearing. Dkt. No. 229.

Dated in Milwaukee, Wisconsin this 14th day of August, 2024.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**