UNITED STATES OF AMERICA,

        Plaintiff,

                                  Case No. 21-cr-253-pp

  v.

SAMUEL L. SPENCER,

        Defendant.

---

## RESTITUTION ORDER

---

On January 19, 2024, a jury convicted the defendant of four counts of sex trafficking and one count of conspiracy to commit sex trafficking. Dkt. No. 189. These convictions mandate restitution for the victims of the defendant's trafficking. 18 U.S.C. §1593(b)(1). On December 17, 2024, after ruling on a series of post-trial motions, the court sentenced the defendant to serve 540 months (forty-five years) in prison. Dkt. No. 297. At the December 17, 2024 sentencing hearing, the court did not order restitution, instead asking the parties to work with each other over the next ninety days to try to come to an agreement on the restitution amount. Dkt. No. 306 at 73. On February 24, 2025, the government asked the court to schedule restitution hearing, reporting that the parties had been unable to reach an agreement. Dkt. No. 311. The court ordered the parties to brief their disagreements on restitution. Dkt. No. 319 at 15–16. The parties submitted briefing on the issues of what the restitution amount should be and whether the court was required to hold a

hearing.[1] Dkt. Nos. 323-325. The court finds that a hearing is unnecessary and orders the defendant to pay $2,972,175 in restitution.

## I.    Background

### A.    Procedural History

The defendant first challenged restitution in his objections to the preliminary presentence investigation report ("PSR"). Dkt. No. 286 at 17. He stated that he would work with the government to resolve the issue but in the alternative, he asked for a restitution hearing. Id. The revised PSR explained that restitution was "still to be determined," but it provided a "preliminary" amount, calculating that the defendant owed $3,180,675. Dkt. No. 285 at ¶¶96–104. The PSR author calculated this amount by multiplying the amount of money each of the four victims was required to deliver to the defendant from their sex dates each day by the number of days those four victims were trafficked by the defendant. Id. The PSR writer used the trial record to determine the two factors. Id.

Neither party addressed restitution in their sentencing memoranda. Dkt. Nos. 288 (government), 292 (defense). At the end of the December 17, 2024 sentencing hearing, the following exchange occurred:

> THE COURT:       [Defense counsel], you had mentioned in your filing that the parties were not in agreement on restitution. I don't know if you've made any progress on that or if you'd like me to set that out for the 90 days that's allowed by statute.

---

[1]The defendant is in the process of appealing his conviction; on the defendant's motion, the Seventh Circuit has stayed the appeal until the entry of any restitution order. Dkt. No. 318.

> [DEFENSE COUNSEL]: Judge, I think it is a good idea to set it out. I'll work with the Government to see if there's agreement.
>
> THE COURT: All right. Then, I will not impose restitution today, but I will ask the parties to work with each other to talk about that in the next 90 days.

Dkt. No. 306 at 73, lines 12-20.

On February 24, 2025, the government filed a motion asking the court to schedule a restitution hearing. Dkt. No. 311. The government recounted that it had no objections to the restitution amount stated in the PSR, but that the court had given the parties time to discuss a possible stipulation. Id. at ¶3. It reminded the court that the court had not scheduled a restitution hearing. Id. The government advised the court that as of that date—two months after the sentencing hearing—the parties had not been able to reach agreement; it stated that it had not heard from defense counsel, despite reaching out to counsel on February 14, 2025. Id. at ¶4. The government asked for a restitution hearing, but pointed out that because the defendant "has neither provided any rationale for the objection or proposed alternative calculations," the court also could simply issue a final restitution order ordering the defendant to pay the amount reflected in the PSR. Id. at ¶¶5-6. The court granted the motion to schedule a hearing and calendared the hearing for April 7, 2025. Dkt. No. 312.

On March 28, 2025, the government filed a motion asking the court to adjourn the restitution hearing, explaining that the day before—on March 27, 2025—it had learned from the U.S. Marshals Service that the defendant had been transferred to BOP custody and that he'd been designated to USP McCreary in Pine Knot, Kentucky. Dkt. No. 314 at ¶3. (The government

3

explained that it had been under the impression that the defendant remained in custody in the Eastern District of Wisconsin due to the pendency of the restitution decision. Id.) The government advised that it had learned from the U.S. Marshals Service that it would take at least six weeks to produce the defendant from the BOP facility. Id. at ¶4. The government also explained that it still had not heard from the defense about its position on restitution, or its position on whether a hearing was necessary. Id. at ¶6. It advised the court that on March 28, 2025—the day it filed the motion—the government had learned that lead defense counsel was on vacation. Id. at ¶8. The court granted the government's motion to adjourn, removed the hearing from the calendar and ordered that by May 2, 2025, the parties must file a joint status report advising the court whether they were ready to schedule a restitution hearing. Dkt. No. 315.

At 5:16 p.m. on May 2, 2025, the court received a status report from the government. Dkt. No. 316. The government explained that on March 31, 2025 (the day the court had issued its order removing the restitution hearing from the docket), the government emailed defense counsel "proposing, if the parties were unable to reach agreement on restitution, that the issue of restitution could be decided on written filings to obviate the need for an in-person hearing." Dkt. No. 316 at ¶4. The government said that since that date, and as recently as April 29, 2025, it had made several efforts to learn the defendant's position on this proposal. Id. at ¶5. The government reported that defense counsel had responded to the April 29, 2025 email, stating that he'd provide a

4

response by May 1. Id. The government reported that as of 5:00 p.m. on May 2, 2025, the government had not received a response from defense counsel; it had tried to reach defense counsel by phone before filing the status report but had been unable to do so. Id. at ¶6. Because the court had ordered the parties to file a status report by day's end, the government explained that it had unilaterally filed the status report. Id. at ¶7. The government argued that an in-person hearing was not required because the information contained in the PSR (which was based on the trial record) was sufficient to determine restitution, and the defense had not filed a substantive object to the calculations in the PSR. Id. at ¶8. Finally, the government suggested that if the court needed more information, the parties could provide that information in written submissions. Id. at ¶9. The government asked the court to either issue a final restitution order or set a briefing schedule. Id. at page 3.

On May 5, 2025, the court received a status report from defense counsel. Dkt. No. 317. Counsel explained that he was unable to respond to the government's proposal by the May 2 deadline because of the press of other matters, including preparation for a trial that was set to the start the morning of May 5, 2025. Id. at 1. Counsel reported that after conferring with the defendant, he had concluded that the parties would not be able to reach a stipulation on restitution. Id. He asked the court to schedule an in-person hearing and to order the defendant to be returned to the district for that hearing. Id. Defense counsel disagreed that the court could determine restitution based on the pleadings or the PSR; he asserted that the defense

5

disputed several of the government's calculations, "most of which are inconsistent with the evidence produced at trial." Id. at 1-2. He argued that those inconsistencies required an evidentiary hearing. Id. at 2. He maintained that "[t]he most efficient and constitutionally sound way to accomplish that is an evidentiary hearing." Id. Counsel suggested that ahead of any hearing, the court could have the parties "outline" their disputes to narrow the hearing's scope, but he reminded the court that the government carries the burden of establishing restitution by a preponderance of the evidence. Id.

Defense counsel recounted that the government was asking for restitution in excess of $3 million, characterizing that request as a "sanction" and asserting that such a restitution order would constitute a substantial increase to the defendant's penalties. Id. He argued that Supreme Court precedent required a jury to decide any facts that could increase a defendant's financial exposure. Id. Counsel stated:

> Importantly, the Supreme Court has held that consistent with the Sixth Amendment, "[o]nly a jury may find fact [sic] that increase the prescribed range of penalties to which a criminal defendant is exposed." *Erlinger v. United States*, 602 U.S. 821, 833 (2024). "That means a jury must find both those facts that increase a criminal defendant's exposure to imprisonment and any facts that increase his exposure to monetary fines." *Rimlawi v. United States*, 604 U.S. --, 145 S. Ct. 518 (2025) (Gorsuch, J., dissenting). As Justice Gorsuch has noted, "[i]f all that is true, it is difficult to see how a judge's factual findings might suffice to increase a criminal defendant's exposure to a restitution award." *Id.*

Id.

Although conceding that the jury had found the defendant guilty, the defendant argued that a jury did not "sanction[ ]" a three million-dollar restitution order, and he asked that his restitution hearing be held before a

6

jury. Id. at 2-3. He acknowledged that the court likely would disagree and that it is the "norm to have restitution determinations made by courts." Id. at 3. So, he said, he made the request for a jury "for the sake of the record and appellate review, consistent with Justice Gorsuch's calling in *Rimlawi*." Id. He said that regardless, the law "requires more than unsupported argument from the parties and extrapolation on unreliable accounting." Id.

Defense counsel acknowledged that "there is a wealth of information from the trial in the record," but he asserted that "much of that record undermines the government's proposed figures." Id. He provided the following example:

> For example, the PSR estimates that if [Adult Victim]-1 earned $200/day, over the 11.5-year period (4,594 days) listed in the indictment, she would have earned $918,000. But this analysis ignores, for example, that [the defendant] spent two of those years in prison, and that AV-1 repeatedly testified that for much of the relevant timeframe set forth in the indictment, she was engaging in prostitution on her own, without [the defendant's] involvement. With respect to AV-3, the government's calculations underestimate the amount of time she testified to being away from [the defendant]. And generally as to each victim, the government's figures also incorrectly calculate the "start date" of the trafficking, use an unreasonable and unsupported figure to create an average per-day earning, then extrapolate that amount in an unreasonable manner, all while ignoring the fact that the victims have acknowledged receiving some compensation from [the defendant] for their sex work (in addition to other things of value, including rent, drugs, advertising, transportation, and protection).

> Further, although some witnesses may have testified about certain matters relevant to restitution, that was not the gravamen of either their testimony nor the cross at trial, which was instead focused on the elements of the offense. Consistent with his constitutional rights to due process and confrontation, [the defendant] should be afforded an opportunity for cross examination on the issue of restitution specifically. Should the government seek to obtain a restitution award of more than $3 million, it must

present concrete and reliable evidence substantiating that by a preponderance of the evidence.

Id. at 3-4.

On May 12, 2025, the court issued an order outlining the procedure it would use for determining restitutio. Dkt. No. 319. After refuting defense counsel's assertion that restitution is a "sanction" or a "punishment," id. at 11-12, and explaining why Justice Gorsuch's comments in his dissent in Rimlawi did not overrule Seventh Circuit precedent binding on this court, id. at 12, the court recounted the restitution procedure dictated by 18 U.S.C. §3664, id. at 12-13. The court explained that the statute "does not refer to an evidentiary hearing," and that Seventh Circuit law gives the sentencing court broad discretion in calculating restitution. Id. at 14 (citations omitted). It also observed that Federal Rule of Criminal Procedure 43 does not require a defendant to be present at a restitution hearing. Id. (citations omitted). It explained that the "law does not support the defendant's assertion that he is entitled to cross-examine all the witnesses regarding restitution." Id. at 14 (citations omitted). But the court acknowledged that the restitution amounts in the PSR were preliminary and that the defendant had objected to the calculations, so it ordered the parties to submit briefing on restitution, as well as on whether an evidentiary hearing was necessary and whether there was a need for the defendant's presence at such a hearing. Id. at 15.

The court received the government's brief on June 27, 2025 (Dkt. No. 323), the defendant's brief on July 18, 2025 (Dkt. No. 324), the government's

reply on August 1, 2025 (Dkt. No. 325) and a supplemental brief from the government on September 18, 2025 (Dkt. No. 326).

      B.    <u>The Government's Brief</u> (Dkt. No. 323)

The government argues that the trial evidence supports a final order of restitution in the amount of $3,009,425. Dkt. No. 323 at 3. It contends that a hearing is not required. <u>Id.</u> at 13-16. It asserts that if the court holds a hearing, the defendant's physical presence is not required. <u>Id.</u> at 16-17.

By way of background, the government explains that before sentencing, it gave the probation officer "amounts it estimated were due and owing as restitution." <u>Id.</u> at 3. It says that it characterized those amounts as "preliminary" because, at the same time it was communicating with probation, it was trying (at that time, unsuccessfully) to communicate with the victims. <u>Id.</u> It explains that because the government is "obligated to attempt to consult with victims prior to requesting final restitution," and "because there was a possibility that the victims in this case might have had additional claims for restitution (e.g., for things like hospital bills) of which the government was unaware, the government left open the possibility of providing additional information to the Court regarding restitution." <u>Id.</u> The government says that by the date of sentencing, it still had been unable to obtain additional information from the victims. <u>Id.</u>

The government argues that 18 U.S.C. §3664(g)(1)—the Mandatory Vitim Rights Act—does not require victims to participate in restitution hearings. <u>Id.</u> It also emphasizes (citing a district court case from the Northern District of

9

Illinois) that courts must order defendants to pay restitution even where the government fails to "properly seek appropriate restitution amounts," because the statute entitles victims to restitution. Id. at 3-4 (citing United States v. Whitley, 354 F. Supp. 3d 930, 932-33 (N.D. Ill. 2019)). The government says:

> In this case, after the United States fulfilled its obligations to try to obtain the victims' additional restitution amounts, and understood that the victims were not interested in further participation in this case, the United States' preliminary restitution analysis became final. The United States did not, however, pursue a final restitution order at sentencing because the defendant's general objection indicated a desire to work toward a stipulated restitution amount. (Dkt. No. 286). Now that it is clear the parties cannot agree, the United States requests that the Court order restitution based on the information adduced in the PSR and clarified herein.

Id. at 4. The "clarification" to which the government refers is the fact that it now suggests a restitution amount about $170,000 less than the amount reflected in the PSR, resulting from the fact that "the United States re-reviewed every transcript of the victims' testimony and the attendant exhibits to endeavor to arrive at the most conservative calculation of restitution supported by the record evidence." Id. at n.1.

The government next cites to 18 U.S.C. §1593(b)(1), the "Mandatory Restitution" statute. Id. It explains that under §(b)(1), restitution in the "full amount of the victim[s'] losses" is mandated. Id. The government says that to calculate that "full amount," the court must start with the defendant's ill-gotten gains from the trafficking, "calculated as the greater of (1) the gross income or value to the defendant of the victims' services or labor; or (2) the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." Id. at 4-5 (citing 18

10

U.S.C. §1593(b)(3)). Citing caselaw from other circuits, the government says that "[t]his is true regardless of the fact that the labor at issue (commercial sex acts) is illegal." Id. at 5 (citations omitted). Citing an Eleventh Circuit decision from 2021, the government asserts that "[t]he restitution award is based on the gross earnings of the victim during the trafficking period and is not offset by any benefits given to the victim by the trafficker." Id. (citing United States v. Williams, 5 F.4th 1295, 1304-08 (11th Cir. 2021)). The government reiterates that although the "full loss amount" to a victim can include medical services, lost income, childcare and other losses proximately caused by a defendant's actions, the government's efforts post-trial to ask the victims about such losses were unsuccessful; it includes only the defendant's ill-gotten gains in its restitution calculations. Id. at n.2.

The government also emphasizes that courts—including the Seventh Circuit—have held that "[e]stimates of the amount of money a victim earned for a defendant need not be mathematically precise." Id. (citing United States v. Lewis, 791 F. Supp. 2d 81 (D.D.C. 2011) and United States v. Dickey, 52 F. 4th 680, 687 (7th Cir. 2022)). The government asserts that any evidence supported by "sufficient indicia of reliability" can be used to support a restitution calculation, including grand jury testimony. Id. at 5-6 (citing In re Sealed Case, 702 F.3d 59, 67 (D.C. Cir. 2012)). The government then discusses the specific facts it believes support the government's restitution calculation.

The government states that AV-1 testified at trial that she performed commercial sex dates for the defendant every day, and that she had to earn at

11

least $200 to $300 daily before the defendant allowed her to stop working. Id. at 6. She testified that she'd had three to four dates per day for the defendant. Id. The government cites a November 17, 2021 FBI interview in which AV-1 stated that the defendant had priced her dates at $80-100 for a fifteen-minute date or a car date, $150 for a half-hour and #200 for an hour; she told the FBI that she did quick dates or car dates only when upset with the defendant. Id. The government recounts that the jury convicted the defendant of trafficking AV-1 between approximately 2005 and July 2017 (the dates listed in the amended indictment for Count One), which the government calculates as 4,594 days. Id. The government recounts that AV-1 testified there were four periods in that timespan that she was not working for the defendant or not with the defendant. Id. The government says that it conservatively excluded the entire month for each of the four periods, reducing the total number of days worked to 4,472 days. Id. at 5–6. Multiplying AV-1's lowest estimate of $200 per day by those 4,472 days, the government argues that AV-1 earned approximately $894,400 for the defendant. Id. at 6-7.

The government recounts that at trial, AV-2 testified that she gave the defendant all the money she earned. Id. at 7. It says that AV-2 testified that between 2013 and 2019, AV-2 worked for the defendant, with periods when she did not work because she was incarcerated. Id. It recounts that AV-2 testified to performing commercial sex acts for the defendant every day, often performing more than ten dates in a day. Id. The government recounts that when she testified before the grand jury, AV-2 told grand jurors that when she

12

started working for the defendant, he set her a quota of $1,500 a day. Id. It says that in October 2016, AV-2 told the FBI that the defendant told her to charge $150-200 for a half hour and $250-300 for an hour. Id. The government recounted parts of AV-2's trial testimony supporting her assertion that the defendant had required her to give him all the money she earned—her testimony about hiding money and then having the defendant beat her when he found it, the defendant keeping her identification so that she could not pick up wired money without his knowledge, her participation in commercial sex acts even when the defendant was not around out of fear of his violence. Id. at 7-8.

The government recounts that the jury convicted the defendant of trafficking AV-2 between February 2013 and December 2019. Id. at 8. The government recounts that AV-2 was incarcerated for several periods during this timespan, decreasing the total number of days the defendant trafficked her to 795. Id. The government also recounts that AV-2 testified the defendant decreased her daily quota as she got older. Id. To account for the decrease in her daily quota, the government estimates AV-2 gave the defendant $1,500 every day during the first half of her time being trafficked by the defendant and $750 for the second half. Id. The government says, "That calculation is as follows: $893,500 (397 days @ 1,500 per day = $595,000; 398 days @ 750 per day = $298,500)." Id.

The government recounts that AV-3 testified that she performed sex dates for the defendant from mid-2014 through late 2020. Id. at 9. It says that

13

"[t]he earliest record of AV-3 and Defendant being together is a traffic stop in Milwaukee on April 27, 2014." Id. The government recounts AV-3's testimony that she stopped working for the defendant in October 2020, so the government uses the dates April 27, 2014 through October 1, 2020 as a conservative measure of the period during which AV-3 worked for the defendant—2,349 days. Id. As for the amounts earned, the government recounts that AV-3 testified that she was charging approximately $150 an hour, that she performed five to ten dates a day and that she gave all the money she earned to the defendant. Id.

Reviewing AV-3's testimony in detail, the government calculates that there were approximately 726 days during the relevant period when AV-3 was not with the defendant for various reasons, including periods she was in custody, the defendant was in custody, AV-3 was recovering after giving birth, AV-3 was doing dates on her own behalf, AV-3 was with another man or AV-3 was hiding from the defendant. Dkt. No. 9–10. Subtracting those days from the trafficking period, the government estimates that AV-3 was trafficked 1,623 days. Id. at 10. Using a "low average" of five dates a day at a "average rate of $125," the government calculates that AV-3 made a "low average" of $625 per day for the defendant (which is less than the $1,000 a day she estimated at trial). Id. at 10-11. Multiplying 1,623 days by $625 per day results in a total restitution amount of for AV-3 of $1,014,375. Id. at 11.

The government recounts that AV-4 testified at trial that she performed three to five dates per day for the defendant, seven days a week, starting on

14

January 7, 2016 and ending January 8, 2019. Id. The government says that AV-4 testified at trial that she earned between $150 and $500 a day for the defendant, and that the defendant expected her to charge $150 for a half hour and $200 for a full hour, encouraging her to make $700 a day. Id. The government recounts that AV-4 testified that she made more money when she was pregnant. Id. The government explains that, like the other victims, AV-4 testified about periods that she did not work for the defendant, such as when she was in drug rehab, or when she was working at a temp service. Id. The government also recounts testimony showing that toward the end of the trafficking period, AV-4 was giving the defendant only half of what she earned. Id.

The government says that a conservative estimate based on the evidence would be that AV-4 earned $300—"less than the midpoint between AV-4's low-end estimate of $150 and high-end estimate of $500." Id. at 12. The government calculates that the trafficking period for AV-4 was 1,097 days—January 7, 2016 through January 8, 2019—but it subtracts 220 days for the periods that AV-4 testified she was not working for the defendant. Id. That results in a total of 877 days. Id. The government also reduced AV-4's estimated amount earned daily for the period between January 1, 2018 and January 8, 2019 (the period when AV-4 testified that she began to "pull away" from the defendant), calculating that she earned only $150 during those 373 days. Id. Based on the trial testimony and these calculations, the government calculates that AV-4 earned $207,150 for the defendant: 504 days at $300 per

15

day = $151,200 (the period when AV-4 was doing more work for the defendant) and 373 days at $150 per day = $55,950 (the period during which she was "pulling away"), for a total of $207,150. Id.

Adding up the amounts calculated for each of the four victims, the government argues that the total restitution amount should be $3,009,425 (rather than the $3,180,675 in the PSR). Id. at 12-13.

The government argues that a hearing is not necessary for the court to determine what the defendant owes in restitution. Id. at 13. The government maintains that 18 U.S.C. §3664(d)(4) allows, but does not require, courts to conduct a restitution hearing. Id. It argues that the statute does not require the victims to participate in the restitution process. Id. at 12–13 (citing 18 U.S.C. §3664(g)(1)). The government advises the court that here, the "victims are not interested in participating in this case any further and are not likely to attend any restitution hearing," reminding the court of the victims' testimony about the trauma to which the defendant subjected them and the trauma they suffered from testifying at the jury trial. Id. at 14 and 14 n.3. The government cites United States v. Wyatt, 9 F.4th 440, 452–54 (7th Cir. 2021), asserting that in that case, the Seventh Circuit upheld a restitution order based on a plea agreement, without a trial or hearing. Id. at 14. The government states:

> The Seventh Circuit has also held that a defendant's due process rights are not violated by a court's cancellation of a restitution hearing. *United States v. Robl*, 8 F.4th 515, 528–29 (7th Cir. 2021); *United States v. Alverez*, 21 F.4th 499, 504 (7th Cir. 2021) (Whether to hold a hearing on restitution is within the district court's discretion). Other Circuits have similarly found that the Court need not conduct an evidentiary hearing before determining restitution so long as the Court "afford[s] the defendant some opportunity to rebut

16

the Government's allegations." *See e.g., United States v. Castillo*, 93 F. App'x 273, 275-76 (2d Cir. March. 24, 2024) (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)); *United States v. Vandeberg*, 201 F.3d 805, 813-14 (6th Cir. 2000) (holding that Section 3664 does not require the Court to hold an evidentiary hearing to resolve disputes about restitution, and noting instead that a defendant must simply be afforded an opportunity to be heard on the dispute pursuant to Federal Rule of Criminal Procedure 32).

Id. at 15.

The government says that it has found no precedent supporting the defendant's assertion that the court must hold an evidentiary hearing. Id. It says that the court must give the defendant an opportunity to be heard, but the decision about whether to hold a hearing lies within the court's discretion. Id. The government maintains that given the extensive litigation that already has occurred, an evidentiary hearing would be "cumulative, inefficient (given the likelihood that no additional victim testimony will be forthcoming), and a waste of judicial resources." Id. at 15-16.

Finally, the government argues that if the court decides to hold a hearing, it has no objection to the court ordering the defendant to be produced and says that he should be permitted to attend if he wishes to do so. Id. at 16. But it argues that the defendant's physical presence is not required. Id. at 16–17. The government cites Robl, asserting the Seventh Circuit has held that defendants are not required to be physically present for restitution hearings. Id. (citing Robl, 8 F.4th at 528). The government also cites United States v. Samuel, 663 F. App'x 508, 513–14 (9th Cir. 2016) for its purported holding

17

"that defendant's presence by video conference at the restitution hearing was sufficient and did not result in prejudice."

C.    The Defendant's Brief (Dkt. No. 324)

The defendant argues that the restitution deadline has passed, that the government has not met its burden of establishing restitution and that the court must hold a hearing. Dkt. No. 324.

Regarding the deadline for ordering restitution, the defendant argues that 18 U.S.C. §3664(d)(5) requires that if the victims' losses are not ascertainable within ten days prior to sentencing, "the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." Id. at 2–3 (quoting 18 U.S.C. §3664(d)(5)). He calculates that the ninetieth day from December 17, 2024 (the sentencing date) would have been March 17, 2025. Id. He says that "[t]he following day," the court entered a text-only order scheduling a hearing for April 7, 2025.[2] Id. He recounts that on March 28, 2025 (ten days before the April 7, 2025 restitution hearing was scheduled to take place), the government moved to adjourn the hearing, after which the court set a briefing schedule "on restitution." Id.

The defendant cites Dolan v. United States, 560 U.S. 605, 608 (2010), for the proposition that a court retains the authority to order restitution more than ninety days after sentencing only if makes clear—prior to the ninety-day

_____

[2] The court issued the text-only order on February 25, 2025; presumably the defense meant that the court issued the order the day after the government's February 24, 2025 motion asking the court to either schedule a hearing or rule.

18

deadline—that it will order restitution; in other words, the court must make clear that the only open issue is the *amount* of the restitution, not the question of whether restitution will be ordered. Id. at 3–4. The defendant argues that here, the court did not make clear that it was going to order restitution. Id. at 4. The defendant recounts the procedural history related to restitution, then says that because the court did not "'make clear' that it would impose restitution at sentencing or within the 90 days after sentencing, it lacks the authority to order restitution at this juncture, more than 90 days after the original sentencing hearing." Id. at 5.

Next, the defendant asserts that the government has failed to meet its burden to prove the appropriate amount of restitution. Id. The defendant characterizes the government's methodology as "identifying an average per-day income for each of the victims and then multiplying that amount by the number of days it believes that [the defendant] trafficked them." Id. He concedes that "courts have used this methodology to calculate restitution in other cases," but asserts that does not require the court to use the method in this case, "especially since the dates set forth in the indictment are necessarily broad and imprecise." Id. And he argues that even if the court were to use the government's proposed methodology, "the government doesn't employ it here in a manner that is consistent with the evidence in this case." Id.

The defendant argues that the government's calculations are "overstated and based on unrealistic estimates coming from victims' highly fallible calculations." Id. He recounts that each victim had a "lengthy history of drug

19

use that impeded their memories," and that they were asked at trial to estimate their earnings from years—sometimes decades—earlier. Id. at 5-6. He asserts that using a victim's "busiest or most lucrative day as a benchmark for calculations produces and unreasonable and inaccurate total calculation." Id. at 6. The defendant contends that the government did not account for the fact that the defendant did not keep all the victims' earnings. Id. He says, "Though it's true that the evidence presented established that much of the income the victims generated made its way back to [the defendant], the evidence does not support the broad claim the victims did not receive any of the money they earned." Id. The defendant also asserts that the government has not considered "that the victims used their income that they received to pay for drugs that they purchased from [the defendant]." Id. The defendant argues that the Eleventh Circuit's decision in Williams, 5 F.4th 1295, upon which the government relies, is not binding on this court and does not address the issue of victims earning income and then using it to pay the defendant for drugs. Id.

The defendant argues that the government inflated the amount of time the victims were trafficked by the defendant by assuming that the dates listed in the indictment are accurate. Id. He asserts that the dates in the indictment were not precise and that the evidence showed that there were periods in which the victims were not working for the defendant. Id. He contends that the government did not account for periods during which *the defendant* was incarcerated and he says that the government has understated the periods that victims weren't working with the defendant "or at his direction." Id. at 6-7.

The defendant emphasizes that it is not the defense's "function" to propose the correct amount of restitution, but the government's burden to prove that amount by a preponderance of the evidence. Id. at 7. But he asserts that if one applies the government's proposed methodology "in a manner consistent with the evidence, any restitution order should not exceed $328,855, which includes a maximum of $54,800 for AV-1, $9,300 for AV-2, $167,000 for AV-3, and $97,755 for AV-4." Id.

The defendant argues that although the indictment charged that he trafficked AV-1 from 2005 to July 2017, there is no evidence connecting the defendant to AV-1 until early 2011. Id. He says there is "scant" evidence linking him to her after 2013, pointing out that AV-4 testified that she had only seen AV-1 "a couple times." Id. While acknowledging that the government excluded the month that AV-1 testified that she was not with the defendant, the defendant argues that "there were obvious stretches of time after [2013] when AV-1 was not working with [the defendant]." Id. 7–8. He states that "there is no evidence those time periods were limited to *just* one month." Id. at 8. (emphasis in original). He says, "As with other victims, it seems like AV-1 came and went from [the defendant's] life over the course of their acquaintance." Id. The defendant argues:

> Thus, any calculation using the proposed extrapolation methodology should limit AV-1's time with [the defendant] to the years 2011 to 2013. Put differently, the government has not proven by a preponderance of the evidence that his trafficking of AV-1 went outside that range. Additionally, the government has not proved that AV-1 worked with [the defendant] for the entirety of that 3-year window. It's also unreasonable to say that AV-1 worked every day during the times she was with [the defendant]. Thus, in the years of

21

2011-2013, [the defendant] proposes that the Court find that AV-1 worked for [the defendant] 50% of the days, for a total of 548 days.

Id.

The defendant also challenges the government's calculation that AV-1 made $200 a day for the defendant. Id. He argues that AV-1 bought "a lot of drugs" from the defendant, citing to her testimony at trial. Id. He says that the "government's calculations do not contemplate this income that AV-1 received," and thus that government cannot prove that AV-1 made any more than $100 a day for the defendant. Id. The defendant argues that the court should calculate that AV-1 made no more than $100 per day for no more than 548 days—a maximum of $54,800. Id. at 9.

The defendant argues that the government incorrectly calculated the dates that AV-2[3] was in, and out of, custody. Id. He says that AV-2 "reported" that the defendant began to traffic her after February 14, 2013. Id. He says that AV-2 was in custody from September 8, 2013 through November 5, 2013. Id. He calculates that between February 2013 and December 2019, AV-2 was out of custody for the following periods:

- February 14, 2013 – February 25, 2013 (11 days)
- November 5, 2013 – April 27, 2014 (173 days)
- December 23, 2014 – March 9, 2015 (76 days)
- June 8, 2016 – August 1, 2016 (54 days)
- January 20, 2017 – April 30, 2017 (100 days)
- January 7, 2019 – December 31, 2019 (358 days)

---

[3] The defendant references AV-1 several times, when it appears that he means to reference AV-2. The court has tried to determine from context when he means AV-2 and when he means AV-1.

Id. at 9. He says that this is a total of 772 days. Id.

As he did with AV-1, the defendant also argues that there is no evidence the defendant had contact with AV-2 during some of these 772 days. Id. at 9-10. He asserts that there is no evidence that he had contact with AV-2 between her November 2013 release from custody and her April 2014 arrest, or during the seventy-six days from the end of 2014 through March 2015, or after her January 2017 and January 2019 releases from prison. Id. at 10. He asserts the evidence shows that in these periods, AV-2 was involved in sex work with someone else. Id. The defendant calculates that the government has not proven by a preponderance of the evidence that the defendant trafficked AV-2 any more than thirty-one days. Id. He asserts that "AV-2's claim that [the defendant] forced her to earn $1500 is unreasonable and incredible," says that this testimony is inconsistent with the testimony of other victims and says that her own text messages show that AV-2 wasn't giving the defendant all of her earnings. Id. at 11. The defendant asserts that "the government has failed to prove a per-day amount of more than $300 for AV-2," and asserts that "[f]or the 31 days AV-2 was with [the defendant], that comes out to $9,300." Id.

The defendant asserts that the government bases the total number of days AV-3 was trafficked "on the date range that it chose to include in the indictment"—April 27, 2014 to October 1, 2020, reduced by 726 days the government estimates that AV-3 wasn't with the defendant. Id. The defendant concedes that AV-3 testified that she started working with the defendant in April 2014, but he says that "even AV-3 did not view the first year of that

23

relationship as being that of a trafficker and victim." Id. He recounts that she described the first year as being a "normal relationship," and he argues that it is more appropriate to conclude that the start date for her AV-3's trafficking period was May 1, 2015. Id. He asserts that there is no evidence in the record that the defendant had contact with AV-3 after her November 27, 2019 arrest in Glendale. Id. at 11–12. He says that the period between May 1, 2015 and November 27, 2019 is only 1,671 days. Id. at 12.

The defendant agrees that the 726 days the government excludes because AV-3 was not with the defendant are accurate but says that more periods should be excluded. Id. He identifies two periods totaling thirty-five days during which he says AV-3 was in custody. Id. He argues that because "the location data shows that AV-3" was with a different trafficker for "extended periods," that data "should be extrapolated to the time periods for [which] there is no location data," concluding that AV-3 "spent about half her time with [the defendant], and the other half with [the other trafficker]." Id. The defendant argues that a "more reasonable estimate" of the days AV-3 was with the defendant would be half of the period between May 1, 2015 and November 27, 2019, or 835 days. Id.

The defendant also challenges the governments $625-per-day income calculation for AV-3. Id. He concedes that there may have been days that she earned that much or more, but proposes that "a more reasonable estimate of the average income she generated is $300." Id. He argues that he did not take all of the money AV-3 made, because she "used it to pay [the defendant] back

24

for the drugs she bought from him." Id. The defendant asserts that fact "warrants reducing the income by an additional $100, to $200." Id. The defendant proposes that the court calculate the restitution for AV-3 by multiplying $200 per day by 835 days, for a total of $167,000. Id.

In calculating the restitution for AV-4, the defendant asserts that the government did not factor in several periods (totaling thirty-four day) when the defendant was in custody. Id. at 13. He asserts that the court should reduce the government's proposed number of days worked by that thirty-four days. Id. He again asserts that it's "just not realistic" to conclude that AV-4 worked with the defendant every day—he asserts that there were days when he was with AV-3 or AV-2 "and could not have also been [with] AV-4." Id. He references AV-4's testimony about how the defendant's interactions with other women made her jealous and caused fights between her and the defendant. Id. He says that the government has proved no more than 558 days by a preponderance of the evidence Id.

As for AV-4's income, the defendant again argues that the government fails to account for the fact that AV-4 received "income" from him in the form of drugs, which she purchased with the money she made performing sex dates. Id. The defendant says that this should "reduce the government's calculation of daily income by approximately 30%." Id. He says that if the court does so, it would reduce her unreceived income for the first part of her time with the defendant to $210 a day and $105 for the second part of her trafficking. Id. at

13–14. He argues that this results in a total restitution amount for AV-4 of $97,755 (373 days at $210 + 185 days at $105 = $97,755). Id. at 14.

The defendant reasserts his argument that he is entitled to a jury trial on the issue of restitution. Id. He acknowledges that the court has rejected his request for a mini-trial and speculates that the court likely will not grant him a full trial. Id. But he argues that restitution was not the focus of the victims' testimony during trial which, he says, leaves a "void" in the government's calculations. Id. He says that the only way to fill that void is for the court to collect evidence. Id. The defendant reasons, "[t]he Court would not grant $3 million in restitution to a fraud victim simply because the victim said, at one point, that he lost $3 million to the fraud." Id. He says the government would require evidence of such a loss, and the same requirement should apply in a sex trafficking case. Id.

The defendant also maintains that "there is additional evidence, outside the record, that undermines the victims' claims that [the defendant] forced them to turn over all of their earnings." Id. at 15. He says that at trial and in the PSR, the government claimed that a victim with the initials "T.A." had said that the defendant typically give victims $30 to #40 after every date. Id. The defendant says this is consistent with statements by other individuals—some of whom testified and some of whom didn't; he says that "[a]t $100/date, that amount would reduce many of the victims' losses by 30-40%," which he says would reduce the restitution total by $1.2 million. Id.

26

After reiterating that the statute would not require his presence at an evidentiary hearing, the defendant asks to be present for any hearing the court schedules, stating that such a hearing's outcome "substantially alters the sanctions he faces." Id.

D.    The Government's Reply Brief (Dkt. No. 325)

The government asserts that the defendant's "argument that the government and/or the Court have somehow compromised the victims' right to restitution by not finalizing it sooner strains credulity because it ignores that the defendant knew and acknowledged prior to sentencing that he would have to pay restitution to his victims and that the delay in ordering restitution is directly attributable to his strategic choices." Dkt. No. 325 at 1. The government cites the defendant's objections/submissions regarding the PSR, in which he acknowledged that restitution was mandatory but disputed the amount. Id. at 1-2 (citing Dkt. No. 285 at 11)[4]. It recounts that the court referenced the defendant's acknowledgment during the sentencing hearing, asking whether the parties had made any progress in reaching agreement on the restitution amount. Id. Observing defense counsel had responded that he was going to try to work with the government to reach agreement, the government says that it was "under no obligation to reach a consensus with the defendant about restitution" but that it "did not press for an order and agreed to remain open to discussions." Id. The government asserts that the

---

[4] This citation is incorrect; it appears that the government meant to cite page 11 of Dkt. No. 286, the addendum to the PSR. The defendant's actual statements to the presentence writer appear at page 17 of Dkt. No. 286.

"sole reason" that the restitution amount was not set at sentencing was because the defendant had asked for more time to try to reach an agreement with the government. Id.

The government argues that since then, "the defense has chosen not to engage with the government." Id. It says that it tried more than once to contact defense counsel but got only one response—and that response said that the defense would get back to the government later (and did not). Id. The government represents that "the parties have never had a single conversation about restitution." Id. It accuses the defendant of now trying to "exploit that strategy and turn the government and the Court's flexibility into a loophole." Id. at 3.

The government says that the defendant relies on the Supreme Court's decision in Dolan to argue "that the only circumstance under which the Court could have ordered restitution more than 90 days after sentencing would have been if it had previously stated its intent to order restitution. And he argues that the Court failed to do so." Id. The government disagrees, stating that the only reason the court didn't more explicitly state its intent to order restitution at the sentencing hearing "was that everyone present—the defendant included—already took this fact for granted." Id. The government says it did not anticipate that the defendant later would argue "that the delay he created bars the Court from acting because the Court did not reiterate that which he already knew and had tacitly accepted." Id. The government asserts that the

28

defendant's argument that restitution is time-barred "due to his own actions is disingenuous." Id.

The government also argues that the defendant misstates the holding of Dolan. Id. It quotes Dolan's statement that "a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—*at least* where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution . . . ." Id. (quoting Dolan, 560 U.S. at 607) (emphasis in original). It says that Dolan "left open the possibility of additional scenarios for later restitution, underscored by the Court's thorough . . . explanation of why the deadlines set forth in the Mandatory Victims Restitution Act (18 U.S.C. § 3664) should be understood as 'seek[ing] speed by creating a time-related directive that is legally enforceable but does not deprive a judge . . . of the power to take the action to which the deadline applies if the deadline is missed . . . [.]'" Id. (citing Dolan, 560 U.S. at 611). The government cites Dolan's explanation that the MVRA creates no penalty for a missed deadline and that courts do not ordinarily impose sanctions for noncompliance with timing provisions if statutes don't contain them. Id. The government maintains Dolan held that the primary purpose of 18 U.S.C. §3664 is to ensure that victims receive the restitution in a timely manner, not to allow a defendant to avoid paying restitution on procedural grounds. Id. at 4 (citing Dolan, 560 U.S. at 612–13).

As for the defendant's challenges to the government's restitution methodology, the government asserts that the defendant "offers no justification

for his incredulity other than to point out the victims' history of drug use and the passage of time, using the facts to imply that the victims must be inaccurate historians." Id. at 6. It asserts that the defendant has identified no record evidence suggesting that the victims exaggerated or did not know when they worked or what they earned. Id. The government reminds the court that the jury has rejected the defendant's defense—that the victims were working voluntarily and that they kept the money they earned. Id. at 7. It urges the court to rely on the victims' estimates, "which are demonstrably reliable because they are both internally consistent—from their first interviews on through grand jury and trial—and consistent with one another's accounts." Id.

The government emphasizes that the defendant has cited no authority for his proposition that the court should offset restitution by the amounts the victims "paid" the defendant for drugs. Id. It cites two cases rejecting the argument. Id. (citing Williams, 5 F.4th 1295 (11th Cir. 2021) and United States v. Bixler, 2022 WL 247740 at *11 (6th Cir. Jan. 27, 2022)). The government explains that in Williams, the Eleventh Circuit found that offsetting restitution was prohibited by the text of the statute because the "statute directs courts to order restitution to sex trafficking victims in the amount of the '*gross* income or value to the defendant of the victim's services or labor.'" Id. (quoting 18 U.S.C. §1593(b)(3)) (emphasis in original).

The government asserts that even if the court had the discretion to exempt "the value of the drugs the defendant plied his victims with," the court shouldn't do so "because reducing restitution by this amount would trivialize

30

the power differential between he defendant and his victims." Id. The government argues that the defendant recruited his victims because he knew they had substance use disorders, so that he could control them by manipulating their access to drugs. Id. It says, "The drugs he gave them were not gifts or an even exchange, but rather one of his most powerful control tactics." Id. at 7-8. The government cites the testimony of three of the victims to support this point. Id. at 8-13.

The government cites multiple Seventh Circuit decisions holding that restitution is not a criminal punishment that must be decided by a jury. Id. at 13 (citations omitted). It reiterates that the court *may* hold a hearing, but that it is not required to do so. Id. at 14.

E.    The Government's Supplement (Dkt. No. 326)

On September 18, 2025, the government filed a supplement to alert the court that AV-4 had passed away. Dkt. No. 326 at 1–2. The government states that AV-4's tragic passing should not substantively affect restitution because "18 U.S.C. § 3663A(a) provides that, in the event of a victim's death, restitution due and owing to that victim is owed to the victim's estate." Id. The government states that it is attempting to identify AV-4's next of kin. Id. at 2.

## II.    Legal Standard

Restitution for the "full amount of the victim's losses, as determined by the court," is mandatory for violations of 18 U.S.C. §§1591(a)(1) and (b)(1) and §1594(c). 18 U.S.C. §1593(b)(1). The "full amount of the victim's losses" includes "the greater of the gross income or value to the defendant of the

31

victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." §1593(b)(3). It also includes any costs and future costs incurred as a result of the trafficking. 18 U.S.C. §2259(c)(2); §1593(b)(3) (incorporating §2259(c)(2)).

Section 3665 of Title 18 describes the procedure for determining restitution. The statute first requires the court to order the probation officer to obtain and provide "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. §3664(a). It requires the probation officer's report to include "to the extent practicable, a complete accounting of the losses to each victim . . . and information relating to the economic circumstances of each defendant." Id. Next, the statute requires the court to disclose that information to both the government and the defense. 18 U.S.C. §3664(b). Next, no later than sixty days before sentencing, the government (after consulting with the victims to the extent possible) must provide the probation officer with "a listing of the amounts subject to restitution." 18 U.S.C. §3664(d)(1). "If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing . . . the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. §3664(d)(5).

Calculating restitution "cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." Paroline v. United States, 572 U.S. 434, 459 (2014). The court must determine restitution "without considerations of the economic circumstances of the defendant." 18 U.S.C.

32

§3664(f)(1)(A). "The government need only establish the amount by a preponderance of the evidence—enough that the fact-finder believe[s] that the existence of a fact is more probable than its non-existence." United States v. Dickey, 52 F.4th 680, 687 (7th Cir. 2022) (internal quotation omitted); 18 U.S.C. §3664(e). Courts may rely on any credible evidence, including testimony at trial and presentence report interviews, in determining restitution. Robl, 8 F.4th at 529. "No victim shall be required to participate in any phase of a restitution order." 18 U.S.C. §3664(g)(1). "The provisions of [§3664], chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to" restitution proceedings. 18 U.S.C. §3664(c).

Section 3664(d)(4) states that "[a]fter reviewing the report of the probation officer, the court may require additional documentation or hear testimony." But the statute does not refer to an evidentiary hearing. "The district court has 'broad discretion to determine the procedures for calculating the amount of restitution.'" Robl, 8 F.4th at 527 (quoting United States v. Hassebrock, 663 F.3d 906, 925 (7th Cir. 2011)). See also United States v. Minneman, 143 F.3d 274, 284 (7th Cir. 1998) ("Congress contemplated that a restitution order might require a district court to resolve complex questions regarding the amount of loss. Notably, Congress left the choice of procedures to the discretion of the court.").

In cases where the defendant has been convicted of sex trafficking, the court must impose restitution, even when the labor at issue is sex work. See United States v. Wyatt, 9 F.4th 440, 452 (7th Cir. 2021). Courts have

calculated restitution for sex trafficking victims based on the average amount they earned over the time they were trafficked. See United States v. Wilkins, 680 F. Supp. 3d 8, 14 (D.D.C. 2023); see also Williams, 5 F.4th at 1305. In United States v. Wyatt, the Seventh Circuit affirmed an order by Judge Stadtmueller that calculated restitution by multiplying the cost of each date reported by the victims by the estimated number of dates the victims performed while being trafficked. 9 F.4th at 444; USA v. Wyatt, Case No. 18-cr-85, Dkt. No. 92 (E.D. Wis.).

## III. Analysis

### A. Timeliness

Restitution is not time-barred, and the defendant's argument to that effect is disingenuous. Section 3664(d)(5) states that "[i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." 18 U.S.C. §3664(d)(5). But the Dolan Court held that "[t]he fact that a sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution." Dolan, 560 U.S. at 611. That holding alone puts paid to the defendant's assertion that this court does not have the authority to order restitution.

Addressing the defendant's more precise argument under Dolan: the Dolan Court held that the sentencing court retains the authority to enter

34

restitution when it "made clear prior to the deadline's expiration that it would order restitution, leaving open . . . only the amount." Id. at 608. Perhaps this court could have more clearly articulated it, but the court absolutely intended to impose restitution—it was, and is, *required by law* to do so. As the government correctly reasons, the court did not discuss with the parties *whether* it would impose restitution; it assumed that the defendant agreed that he owed some amount of restitution, but that the parties disputed the amount. At the sentencing hearing, the court did not set a restitution hearing/deadline within the next ninety days because defense counsel had advised the court—in writing before the hearing and orally at the hearing—that he would confer with the government to try to reach an agreement.

Why did the court assume that the defendant understood and agreed that he owed at least *some* restitution? Because on November 25, 2024, he wrote a letter to the presentence writer (a letter provided to the court ahead of sentencing, in the addendum to the presentence report). Dkt. No. 286 at 13. The letter outlined the defendant's many disagreements with the presentence report's recitation of the offense conduct and calculation of the sentencing guidelines range. But in a section titled "Restitution," defense counsel wrote:

> [The defendant] recognizes that restitution is mandatory. However, he disputes the government's preliminary restitution calculations. The defense will work with the government to determine if a stipulation to the restitution amount is possible. In the alternative, the defense would ask that the Court set the matter for a restitution hearing.

35

Id. at 17. The letter did *not* state that the defendant objected to the imposition of any restitution. It did *not* argue that the defendant was not liable for any restitution. It did *not* argue that the court ought not impose restitution. It stated only that the defendant disputed the government's preliminary calculations as to the amount of restitution. *That* was the dispute the court acknowledged at the sentencing hearing, and *that* is why the court agreed to the defense request to give the parties ninety days to try to come to an agreement.

In February 2025—well before the ninety days specified under the statute—the government filed a letter advising the court that the parties had not been able to reach agreement and asked the court to schedule a restitution hearing. It made that request well before the March 17, 2025 deadline. The court scheduled that hearing for April 7, 2025—three weeks outside the ninety-day timeframe, due to its calendar. The hearing did not take place on that date because the defendant had been transferred to his designated facility (the government and the court assumed that he would want to attend the hearing), and because the *defense* had not responded to the government's attempts to discuss a resolution. The three-week delay in setting a hearing is the court's responsibility, but the Dolan Court makes clear that that delay—even if caused by the court—does not deprive the court of the authority to impose mandatory restitution.

The defense has cited no authority supporting its assertion that because the court did not resolve the restitution issue by March 17, 2025, the court is

relieved of its mandatory obligation to order full restitution. The court rejects the defendant's argument that restitution is time-barred.

B.    Restitution Calculations

As a judge in another district has observed, "Calculating a restitution award is neither an exact science nor a 'precise mathematical inquiry.'" Whitley, 354 F. Supp. 3d at 933 (citing United States v. Hoskins, 876 F.3d 942, 947 (8th Cir. 2017), cert. denied, 584 U.S. 1008 (2018)). Calculation of restitution in a sex trafficking case such as this one necessarily requires estimation. The defendant and the victims were engaging in illegal activity. It appears that the victims did not keep written records of their sex work—dates, times, amounts charged and paid. They did not have bank records that could substantiate the amounts that they made, in part because they gave the money they made to the defendant. Most of the clients paid in cash. Trial evidence showed that several of the victims suffered physical injury at the defendant's hands—he stuffed a potted plant into one victim's mouth, slammed another's head into the floor of a motel bathroom. But despite the government's efforts, there are no medical records to substantiate any costs to the victims[5]—perhaps because they did not feel they could seek medical help, perhaps because they had long lost any records in changing addresses. There is no way for the government or the court to make a precise calculation of restitution, but that

_____

[5] Because the government was unable to ascertain the victims' losses beyond the defendant's ill-gotten gains, dkt. no. 323 at 5 n.2, this order calculates restitution only for the defendant's gross income from the victims' commercial sex dates. See 18 U.S.C. §1593(b)(3).

does not relieve the court of its obligation—its mandate—to order the full amount of restitution owed.

The defendant first challenges the methodology that the government has used in calculating restitution—multiplying the approximate number of days the victim was trafficked by the approximate average daily income the victim brought in for the defendant. Although the defendant concedes that other courts have used this methodology, he says that this court needn't do so. He emphasizes that the dates in the indictment are "necessarily broad and imprecise."

The court agrees that it is not the defendant's "function," or burden, to prove the amount of restitution. But "[a]lthough the burden is on the government to prove loss, a defendant's wholly unsubstantiated statements are not enough to counter or even question the court's acceptance of the government's proof of loss as outlined in the pre-sentence investigation report (PSI)." United States v. Swanson, 394 F.3d 520, 527 (7th Cir. 2005) (citing United States v. Sensmeier, 361 F.3d 982, 989 (7th Cir. 2004)). The defendant says that this court need not use the government's methodology but suggests no alternative. He argues that the date ranges alleged in the indictment are not precise—unsurprising, given that the offenses in the case date back years and sometimes decades—but suggests more precise dates in only some instances. These types of broad, general, "I just disagree" objections are not a basis for the court to reject the government's methodology or calculations.

38

Next, the defendant (again) attacks the victims' testimony and credibility, asserting that the victims each had long histories of substance use, claiming that those histories impeded their memories and arguing that the timeframes they gave at trial were estimates of events dating back years. This is the defendant's third attack on the victims' testimony. His first was the one to which he is constitutionally entitled—the trial, which lasted two weeks and during which his counsel grilled each victim and challenged each victim's credibility on multiple grounds (drug use, jealousy, faulty memory, self-interest, desire to avoid prosecution or incarceration, history of lying). Despite those thorough cross-examinations and defense counsel's full-throated arguments that the victims were not credible, the jury convicted the defendant. Although the court concedes that the verdicts shed no light on whether the jury found some testimony less credible than other testimony (common sense would suggest that the jurors likely did not believe every single word uttered by every single witness), at the very least they are proof that the jury did not disbelieve all the victims' testimony.

Yet the defendant attacked the victims' credibility and testimony a second time in his detailed and voluminous post-trial motions. The defendant filed a forty-five-page document containing multiple post-trial motion. Dkt. No. 232. Among other things, that motion again attacked the credibility of at least two victims. The court's order denying those motions was 161 pages long; it discussed in detail—and dismissed—those credibility challenges.

Now, for a third time, the defendant argues that the victims' testimony about how long they worked for the defendant, how frequently they worked for the defendant and how much money they made for the defendant is not credible. The court agrees that the jury was not asked to calculate how much money each victim made for the defendant, but that is not what the law requires. And the defendant's broad, general "you just can't believe them because they had histories of substance use" objections are not a basis for the court to reject the government's methodology or calculations.

The defendant argues that it is unreasonable to use a victim's busiest or most lucrative day to average what she made for the defendant over a particular period. It appears that the government agrees, because in making its calculations, the government did *not* use the highest number of dates a victim estimated, or the highest amount charged. The government attempted to reach more conservative estimates, and it has explained how it did so. In some cases, it may have been slightly less conservative than it could have been (as the court will explain below). But generally, the government did *not* use a victim's busiest day, or highest rate of pay, to make its calculations. This objection has no merit.

The defendant asserts that the government has not accounted for the fact that the defendant did not keep every dollar earned by the victims. This was a point of contention at trial. Some victims testified that the defendant *did* keep every dollar they earned; defense counsel challenged them about that testimony on cross. At least one victim testified that she tried to keep some of

40

the money she earned, but that the defendant would respond with violence. Another victim testified that toward the end of her time working for the defendant, she began to give him only half of what she earned. Some victims may have succeeded in keeping some money here and there. But there is no way to accurately account for that; again, the calculation requires estimation. As the court's discussion of the calculations for the individual victims will show, the government tried, and the court has tried, to factor this into the calculations.

The defendant's most perplexing—the court might go as far as to say bizarre—argument is that the court should offset the restitution to account for money the victims "paid" the defendant for drugs—money they "paid" out of the money they earned for him doing sex dates. The technical response to this argument is that §1593(b)(3) states that restitution shall include the gross income of the victims' services, meaning the amount the defendant received before expenses. 18 U.S.C. §1593(b)(3). As best the court can understand it, the defendant's argument in this regard is that the court should calculate restitution based on *net* income—the amount the victims earned minus the amount they "paid" the defendants for drugs. That is not what the statute requires.

But the more compelling response to this argument is that the evidence adduced at trial does not support it—not even remotely. The defense at trial was that the defendant might have been a drug dealer, he might have engaged in domestic violence with women with whom he had romantic relationships

41

(the victims), he might have been a pimp, but he was not a sex trafficker as defined by the federal statute. The verdict shows that the jury was not persuaded by that defense. Several of the victims testified that the defendant used multiple methods—including withholding or restricting drugs—to motivate them to make more income for him. See Dkt. No. 212 at 54. This was not a situation in which the victims earned income for themselves, then chose to use some of that income to purchase drugs from the defendant. The defendants earned money that they knew the defendant would take; if they made enough, they could use some of that money to obtain drugs. It borders on absurd to argue that by using the victims' need for drugs to encourage them to keep working for the defendant and to earn more for him, the victims received a benefit that should be deducted from the restitution.

The defendant argues that the government did not exclude from its calculations periods when *the defendant* was incarcerated. This argument assumes that the victims could not have been working for the defendant when he was in custody. There was no evidence produced at trial to support this assumption. In fact, as the court explained in its order denying the defendants' post-trial motions (Dkt. No. 284), some victims testified that they worked for the defendant even when they were not physically near him or with him, then gave him the money later. And the government has excluded periods during which victims testified that they were not working at the defendant's direction—either because they were in custody or were with other people or were physically unable or simply were not working for the defendant.

42

Finally, the defendant implies that he could not have been trafficking multiple victims at the same time. The evidence contradicts this implication. Victims testified that the defendant had multiple women working for him at the same time. Dkt. Nos. 213 at 215–217, 212 at 47. Some of the victims knew other victims. Ericka Buie, who was charged as a co-defendant, testified to multiple women working for the defendant simultaneously. This argument is without merit.

In sum, none of the defendant's general arguments demonstrate that the government has not proved by a preponderance of the evidence that the defendant owes the approximate amount of restitution calculated by the government. The court adopts the government's methodology and, as explained below, has applied it (as did the government) to each victim.

1. *AV-1*

The second superseding indictment alleged that the defendant trafficked AV-1 "[b]eginning in approximately 2005, and continuing through approximately July 2017." Dkt. No. 17 at 1. AV-1 testified that she did sex dates for the defendant from 2005 to 2017. Dkt. No. 213 at 215–17. The jury convicted the defendant of trafficking AV-1 "as charged in Count One." Dkt. No. 189 at 1.

In calculating the number of days that the defendant trafficked AV-1, the government appears to have counted the number of days from January 1, 2005—the first day of the first year listed in the indictment—through July 31, 2017—the last day of the last month listed in the indictment. If one counts

43

from January 1, 2005 to July 31, 2017, the result (counting the first and last days) is 4,594 days—the amount the government calculated. It is unlikely, however, that the defendant first trafficked AV-1 on January 1, 2005 and last trafficked her on July 31, 2017; life is not that precise. Yet any date the court or the government might use in 2005 would be a "guess-timate," as would any date in July 2017. In an attempt to be conservative, the court will assume that the defendant began trafficking AV-1 sometime in mid-2005—July 1, 2005— and that the trafficking ended mid-July, 2017 (July 15, 2017). That comes to 4,398 days.

AV-1 testified there were five periods in that time that she was not trafficked by the defendant because she had been arrested or was not with him. Dkt. No. 213 at 224–225, 236. She did not give exact dates, but using the same conservative method as the government, the court will discount the entirety of any month AV-1 testified she had been away from the defendant. She testified she was arrested for soliciting in Chicago in April 2009 (a deduction of thirty days) and sentenced in May 2009 (a deduction of thirty-one days). Id. at 224. She was arrested again in Chicago in June 2009 (a deduction of thirty days). Id. She testified that she was in Indiana without the defendant in July 2013 (a deduction of thirty-one days). Id. at 225. She testified she was arrested as part of a drug raid in April 2015 (a deduction of thirty days). Id. at 236. These deductions total 152 days. Deducting those days from the 4,398 days the court calculated above results in 4,246 days.

As for the amount AV-1 made for the defendant: AV-1 testified that she did dates every day that she worked for the defendant, and that she was required to give him between $200 and $300 every day. Dkt. No. 213 at 180–181. The court will use the low end of that spectrum and calculate that she made $200 for the defendant on each of the 4,246 days she worked for him.

The defendant's argument that there is no evidence connecting the defendant to AV-1 before 2011 or after 2013 has no merit. AV-1 testified that she was doing dates for the defendant from 2005 to 2017. Dkt. No. 213 at 216. The defendant's argument that "there is no evidence [that the] time periods [AV-1 was away from the defendant] were limited to *just* one month[,]" dkt. no. 324 at 8 (emphasis in original), is entirely speculative.

The court finds that AV-1 worked for the defendant for 4,246 days between mid-July 2005 and mid-July 2017, making at least $200 a day for him during that time. Multiplying $200 a day by 4,246 days results in a total restitution payment for AV-1 of **$849,200**.

### 2. *AV-2*

The second superseding indictment charged that the defendant trafficked AV-2 "[b]eginning in approximately September 2011, and continuing through approximately May 2020." Dkt. No. 17 at 2. In January 2024, the government filed a motion asking the court to narrow that date range to February 2013 through December 2019. Dkt. No. 153. The court granted that motion, ordering that Count Two of the second superseding indictment be modified to show that the alleged offense occurred "[b]eginning in approximately February 2013, and

45

continuing through approximately December 2019." Dkt. No. 156 at 3. AV-2 testified she was trafficked by the defendant from 2013 to 2019, stopping only when she was incarcerated. Dkt. No. 212 at 55. She testified that even when she was not around the defendant, she did dates for him and gave him the money later. Id. at 97. AV-2 testified that if she did not give the defendant the money, he would beat her. Id. AV-2 did not specify a date in 2013 when the trafficking started, nor a date in 2019 when it ended. The defendant was convicted of trafficking her from February 2013 to December 2019. Dkt. No. 285 at 28. The jury convicted the defendant of trafficking AV-2 "as charged in Count Two." Dkt. No. 189 at 1.

The government did not explain whether it began its calculations for AV-2 by calculating the number of days between dates in February 2013 and December 2019. If one counts from the first day of February 2013 to the last day of December 2019, one finds that 2,525 days elapsed. But the defendant asserts that AV-2 repeatedly testified that the defendant began trafficking her after February 14, 2013. Dkt. No. 324 at 9. If the court uses February 15, 2013 as the starting point, and mid-December 2019 (December 15, 2019) as the end point, the result is 2,495 days.

The government asserts that AV-2 was incarcerated for the following periods:

- February 25, 2013 to September 5, 2013 (193 days);
- April 27, 2014 to December 23, 2014 (241 days);
- March 9, 2015 to June 8, 2016 (458 days);
- August 1, 2016 to January 20, 2017 (173 days); and
- April 30, 2017 to January 7, 2019 (618 days).

Dkt. No. 323 at 8 (citing Ex. 577). This comes to a total of 1,683 days. Subtracting those days from the 2,495 the court calculated above results in 812 days that AV-2 was out of custody. The government calculated that AV-2 was out of custody for 795 days during that period (dkt. no. 323 at 8) and the defense calculated that she was out of custody 772 days (dkt. no. 324 at 9, calculating from February 14, 2013 to December 31, 2019). The defendant's calculation includes his assertion—without a citation to the record or the trial transcript—that AV-2 was incarcerated in the Waukesha County Jail from September 8, 2013 to November 5, 2013 (58 days). Dkt. No. 324 at 9. Rather than digging back through the transcript of the trial to find the source of the defendant's assertion, the court will give the defendant the benefit of the doubt and use his number—772 days—as the number of days that AV-2 was out of custody.

The defendant didn't stop there—he also argued that there is no evidence that he had any contact with AV-2 for most of the time she was out of custody. He cites a single piece of evidence to support this argument: AV-2's testimony that on June 24, 2016 (about two weeks after being released from custody), she texted the defendant that she had been released and wanted to meet with him. Dkt. No. 324 at 10 (citing Dkt. No. 212 at 152). The defendant argues that this message shows that he did not traffic AV-2 between her release on June 8, 2016 and the June 24, 2016 text date. Id. But AV-2 testified that even when she was not with the defendant she did dates and gave him the money later.

47

Dkt. No. 212 at 97. She testified that if she did not, the defendant would beat her. Id. The court will not reduce the number of days based on this argument.

The defendant also argued that "AV-2 was engaging in sex work with a different individual." Dkt. No. 324. Again, the defendant did not cite to the record. The court declines to dig back through the transcripts to find any source for this assertion. Even if AV-2 had been working for someone other than the defendant, that does not demonstrate that she was not working for, or giving money to, the defendant.

The PSR stated that AV-2 testified before the grand jury that the defendant required her to give him $1,500 a day when she started. Dkt. No. 285 at 28. The PSR also estimated that AV-2's daily quota decreased as she aged, estimating she was required to give the defendant $1,500 for the first half of the time she was trafficked and $750 for the second half. Id. The government halved the total number of days it estimated that AV-2 had worked for the defendant, multiplying the first half by the higher amount of $1,500 per day and the second half by the lower amount of $750 per day. Using the defendant's 772-day period, that means that AV-2 worked an estimated 386 days when she had to earn $1,500 per day and 386 days when she had to earn $750 a day.

The court finds that the defendant owes **$868,500** in restitution to AV-2. (386 days at $1,500 = $579,000 and 386 days at $750 = $289,500; $579,000 + $289,500 = $868,500).

48

### 3. *AV-3*

Count Three of the second superseding indictment charged that "[b]eginning in approximately 2014, and continuing through approximately 2020," the defendant trafficked AV-3. Dkt. No. 17 at 3. AV-3 testified she was trafficked by the defendant from mid-2014 to late 2020. Dkt. No. 214 at 128. The jury found the defendant guilty of trafficking AV-3 "as charged in Count Three." Dkt. No 189 at 1.

The PSR stated that the earliest the evidence showed AV-3 being connected to the defendant was April 27, 2014, and it stated that AV-3 estimated she stopped working for the defendant sometime in October, 2020. Dkt. No. 285 at 28. The government used, and the court will use, that range—April 27, 2014 to October 1, 2020, a period of 2,350 days.

The defendant, however, argues that the court should deduct the entire first year of the trafficking period because AV-3 described the first year of her relationship with the defendant as a "normal" relationship. This argument has no merit. The jury was not asked to determine whether the victims considered themselves to have been trafficked. It was asked to determine whether the government had proven beyond a reasonable doubt that (a) the defendant knowingly recruited, enticed, harbored, transported, provided or obtained AV-3 by any means; (b) the defendant knew that force, threats of force, fraud or coercion would be used to cause AV-3 to engage in a commercial sex act; and (c) the offense was in or affecting interstate commerce. Dkt. No. 187 at 24. The offense does not require proof that the victim believed or felt she was being

49

trafficked, and the jury was provided with no instruction about the definition of a "normal" relationship.

The defendant also argues that there was no evidence that the defendant trafficked AV-3 after her November 27, 2019 arrest in Glendale. But there *is* evidence that AV-3 worked for the defendant between November 27, 2019 and October 2020—AV-3's own testimony. This argument has no merit.

The government recounts that the testimony and exhibits show that AV-3 was not with the defendant for various reasons (she was in custody, or was in a relationship, or was working on her own, or was in medical treatment) for several periods:

- September 15, 2015 to October 10, 2015 (26 days);
- November 20, 2015 to December 16, 2015 (27 days);
- December 16, 2015 to May 2, 2016 (139 days);[6]
- June 10, 2016 to June 17, 2016 (8 days);
- August 1, 2016 to November 26, 2016 (118 days);[7]
- December 1, 2016 to June 12, 2017 (194 days);
- July 30, 2017; August 9, 14, 16, 17 and 24, 2017; September 3 and 26, 2017; October 1–8, 2017; November 1 and 29, 2017 (18 days); and
- April 3, 2019 to August 31, 2019 (151 days).

Dkt. No. 323 at 9-10. In total, AV-3 was away from the defendant for 681 days.

The defendant agrees that all the days the government says AV-3 was away from him are correct. But he also argues—without citation—that there were other periods when AV-3 was in custody, and he argues that the court should "extrapolate" periods when cell data shows AV-3 was with another man

_____

[6] The government calculated this period as 198 days; it is 139.

[7] The government calculated this period as 103 days; it is 118.

to periods without location data. The court will not dig through the transcript to find the source of the defendant's assertions about other periods of incarceration, and the government has excluded several periods during which AV-3 testified that she was with "T." The court will subtract the 681 days AV-3 was not with the defendant from the 2,350 days of possible trafficking, resulting in 1,669 days for which she is due restitution.

The PSR estimated AV-3 paid the defendant $625 every day. Dkt. No. 285 at 28–29. The defendant says that a "more reasonable average" would be $300 a day, without explaining how he reached that number or why. He also argues that AV-3 "used" some of what she earned to "pay [the defendant] back" for drugs she "bought from" him. Dkt. No. 324 at 12. The court has no basis for adopting the defendant's $300-per-day calculation, and it has rejected his "net income" argument. The court will multiply the 1,668 days by $625 per day.

The court finds that the defendant owes **$1,043,125** in restitution to AV-3 (1,669 days at $625 = $1,043,125).

4.    *AV-4*[8]

Count Four of the second superseding indictment charged that "[b]eginning in approximately December 2015, and continuing through approximately January 2019," the defendant trafficked AV-4. Dkt. No. 17 at 4. The jury convicted the defendant of trafficking AV-4 "as charged in Count Four." Dkt. No. 189 at 1. AV-4 testified that she was trafficked by the

_____

[8] The court agrees with the government that AV-4's death does not impact the court's analysis. She remains entitled to restitution, to be distributed to heirs or next-of-kin under any testamentary documents or the law.

51

defendant seven days a week from January 7, 2016 to January 8, 2019 (1,098 days). Dkt. No. 213 at 27, 30, 105.

AV-4 testified that she was in a rehabilitation program from October 2016 to April 2017 and did not resume doing dates for the defendant until May 8, 2017. Id. at 41, 63, 65–67, 83–85, 90. The government estimated the beginning of AV-4's stay in rehab as October 1, 2016; the period from October 1, 2016 to May 8, 2017 that AV-4 was in rehab is 220 days. Subtracting this period from the 1,098 days results in 878 days of trafficking.

The defendant argues that the court should reduce this period by the time he was incarcerated. The court already has rejected that argument, recounting that victims testified that they worked for the defendant even when they were not with him. He argues that it is "just not realistic" to think that AV-4 was working for the defendant every day, although he does not explain why. He argues that there were days that AV-4 "could not" have been with the defendant, because evidence shows he was with some of the other victims. This contradicts the trial testimony that the defendant had multiple women working for him and that women worked for him even when they were not with him. None of these arguments warrants a reduction.

AV-4 testified she gave between $150 and $500 to the defendant every day. Dkt. No. 323 at 11. The court will adopt the government's conservative estimate of a $300 daily quota. Dkt. No. 285 at 29. AV-4 also testified that starting in late 2017, she began to "pull away" from the defendant and to give him only half of her earnings. Dkt. No. 213 at 41, 154. The government

52

conservatively estimated that starting in January 2018 and continuing until the defendant stopped trafficking AV-4 (a period the court calculates as 372 days), she was earning only $150 per day, as opposed to the $300 per day she earned before beginning to pull away from the defendant.

The defendant owes **$207,600** in restitution for AV-4 (506 days at $300 = $151,800 and 372 days at $150 = $55,800; $151,800 + $55,800 = $207,600).

C.  <u>The Need for a Hearing and the Defendant's Presence</u>

The trial record and the PSR are sufficient to support the court's restitution order; there is no need for the court to exercise its discretion to hear additional testimony or to hold a hearing. <u>See</u> 18 U.S.C. §3664(d)(4) ("[a]fter reviewing the report of the probation officer, the court *may* require additional documentation or hear testimony") (emphasis added); <u>See also</u> <u>Robl</u>, 8 F.4th at 527. If the court were to hold a hearing, the victims would be required to go through the experience of testifying a second time, and they are unlikely to remember more precise information than they did two years ago, during trial. AV-4 no longer is living. And, as the defendant has acknowledged, dkt. no. 324 at 14, the court already has explained in detail that it will not hold a "mini-trial" on restitution, and has explained why. Dkt. No. 319 at 11–12 (analyzing and rejecting the defendant's argument under Justice Gorsuch's dissent from denial in <u>Rimlawi</u>, 145 S. Ct. 518, that restitution is a penalty and thus a jury trial is required). Because there is no need for a hearing, there is no need for the court to order the defendant to be produced.

53

## IV. Conclusion

The court **ORDERS** that the defendant must make restitution to the victims in the amounts listed below:

| PAYEE | AMOUNT |
|---|---|
| AV-1 | $849,200 |
| AV-2 | $868,500 |
| AV-3 | $1,043,125 |
| AV-4 | $207,600 |
| TOTAL | $2,972,175 |

In all other respects, the judgment entered on December 19, 2024 remains the same.

Dated in Milwaukee, Wisconsin this 31st day of December, 2025

BY THE COURT:

**HON. PAMELA PEPPER**
**Chief United States District Judge**

54